E. MARTIN ESTRADA
United States Attorney
DAVID M. HARRIS
Assistant United States Attorney
Chief, Civil Division
JOANNE S. OSINOFF
Assistant United States Attorney
Chief, Complex and Defensive Litigation Section
JASMIN YANG (Cal. Bar No. 255254)
Assistant United States Attorney
     Federal Building, Suite 7516
     300 North Los Angeles Street
     Los Angeles, California 90012
     Telephone: (213) 894-8827
     Facsimile: (213) 894-7819
     E-mail: jasmin.yang@usdoj.gov

Attorneys for Defendants Katherine K. Vidal
and the United States Patent and Trademark Office

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| SNAP INC.,<br><br>       Plaintiff,<br><br>       v.<br><br>KATHERINE K. VIDAL et al.,<br><br>       Defendants. | No. CV 22-00085-SK<br><br>**DEFENDANTS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT**<br><br>[Separate Statement, Declarations, and (Proposed) Judgment filed concurrently herewith]<br><br>Hearing Date:   December 20, 2023<br>Hearing Time:   10:00 a.m.<br>Ctrm:          540, 5th Floor<br><br>Honorable Steve Kim<br>United States Magistrate Judge |

**TABLE OF CONTENTS**

I.     INTRODUCTION ................................................................................. 1

II.    STATEMENT OF THE CASE AND FACTS ....................................... 2

     A.    Snap's trademark applications: "Spectacles" for use with smart glasses ......................................................................................... 2

     B.    The USPTO's decision: "Spectacles" is unregistrable because the relevant public understands the word to be generic in the context of smart glasses. ........................................................................... 3

     C.    These proceedings pursuant to § 1071(b): agency record and new evidence ............................................................................. 4

     D.    The USPTO draws on evidence of the relevant public's understanding to find "spectacles" generic. .................................. 5

          1.    Dictionary definitions of "spectacles" encompass smart glasses. .................................................................................. 5

          2.    Snap's public communications describe Spectacles as sunglasses that can be purchased with prescription lenses. ............... 5

          3.    The media uses the word "spectacles" to refer generally to smart glasses, including products marketed by companies other than Snap ........................................................................ 9

          4.    Other companies market smart glasses as spectacles. ..................... 11

          5.    Dr. Anderson's survey found that 72.9% of respondents understood "spectacles" to be a generic word in the context of smart glasses. ..................................................................... 12

     E.    Snap's expert evidence addresses the relevant public's use, not understanding, of "spectacles." ............................................ 14

III.   STANDARD ..................................................................................... 17

IV.   ARGUMENT ................................................................................... 18

     A.    Legal principles: If the relevant public understands a term to be generic, it is not registrable. ...................................................... 18

     B.    There is no genuine issue of material fact that the relevant public understands "spectacles" to be generic in the context of goods that resemble glasses, including smart glasses ............................... 19

     C.    Even viewed in the light most favorable to Snap, Snap's evidence is probative only of the relevant public's use, not the relevant public's understanding. .................................................................. 22

V.    CONCLUSION ................................................................................ 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re 1800Mattress.com IP, LLC,*
   586 F.3d 1359 (Fed. Cir. 2009) ................................................ .... 19, 23, 24

*In re Am. Soc'y of Clinical Pathologists, Inc.,*
   442 F.2d 1404 (CCPA 1971) ........................................................... .... 19

*Anderson v. Liberty Lobby, Inc.,*
   477 U.S. 242 (1986) ....................................................................... .... 17

*Comm. for Idaho's High Desert, Inc. v. Yost,*
   92 F.3d 814 (9th Cir. 1996) ........................................................... 19, 24

*In re Cordua Restaurants, Inc.,*
   823 F.3d 594 (Fed. Cir. 2016) ....................................................... 19

*Donchez v. Coors Brewing Co.,*
   392 F.3d 1211 (10th Cir. 2004) ..................................................... 21

*E. I. DuPont de Nemours & Co. v. Yoshida Intern., Inc.,*
   393 F. Supp. 502 (E.D.N.Y. 1975) ................................................ 12, 13

*Filipino Yellow Pages, Inc. v. Asian J. Publications, Inc.,*
   198 F.3d 1143 (9th Cir. 1999) ....................................................... 18

*H. Marvin Ginn Corp. v. Int'l Ass'n of Fire Chiefs, Inc.,*
   782 F.2d 987 (Fed. Cir. 1986) ...................................................... 18, 19, 23

*Intel Corp. v. Advanced Micro Devices, Inc.,*
   756 F. Supp. 1292 (N.D. Cal. 1991) .............................................. 21

*Kendall–Jackson Winery, Ltd. v. E. & J. Gallo Winery,*
   150 F.3d 1042 (9th Cir. 1998) ....................................................... 18

*KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.,*
   408 F.3d (9th Cir. 2005) ............................................................... 18

*In re La. Fish Fry Prods., Ltd.,*
   797 F.3d 1332 (Fed. Cir. 2015) ..................................................... 4

*Magic Wand, Inc. v. RDB, Inc.*,
   940 F.2d 638 (Fed. Cir. 1991) ........................................................... 19, 20, 24

*In re Merrill Lynch, Pierce, Fenner, & Smith, Inc.*,
   828 F.2d 1567 (Fed. Cir. 1987) .................................................................. 18, 21

*Nestle Co. v. Chester's Mkt., Inc.*,
   571 F. Supp. 763 (D. Conn. 1983) .................................................................. 21

*In re Nordic Naturals, Inc.*,
   755 F.3d 1340 (Fed. Cir. 2014) ...................................................................... 4

*Park 'n Fly, Inc. v. Dollar Park & Fly, Inc.*,
   469 U.S. 189 (1985).......................................................................................... 18

*Premier Nutrition, Inc. v. Organic Food Bar, Inc.*,
   No. SACV06-0827, 2008 WL 1913163 (C.D. Cal. Mar. 27, 2008), *aff'd*,
   327 F. App'x 723 (9th Cir. 2009) ................................................................... 24

*Surgicenters of Am., Inc. v. Medical Dental Surgeries Co.*,
   601 F.2d 1011 (9th Cir. 1979) ................................................................. 19, 20

*Triton Energy Corp. v. Square D Co.*,
   68 F.3d 1216 (9th Cir. 1995) ........................................................................ 17

*Two Pesos, Inc. v. Taco Cabana, Inc.*,
   505 U.S. 763 (1992) .......................................................................................... 4

*USPTO v. Booking.com B.V.*,
   140 S. Ct. 2298 (2020).................................................................................. 2, 20

**Statutes**

Lanham Act § 1(a)(1), 15 U.S.C. §1051(a)(1)....................................................... 3

Lanham Act § 2, 15 U.S.C. § 1052 ....................................................................... 17

Lanham Act § 14(3), 15 U.S.C. § 1064(3) ............................................................. 2

Lanham Act § 21(a), 15 U.S.C. § 1071(a) ............................................................. 4

Lanham Act § 21(b), 15 U.S.C. § 1071(b) ......................................................... 1, 4

Lanham Act § 21(b)(3), 15 U.S.C. § 1071(b)(3) ................................................... 4

Lanham Act § 45, 15 U.S.C. § 1127....................................................................... 2

**Other Authorities**

37 C.F.R. § 2.34(a)(1)(iv) ................................................................................. 3

37 C.F.R. § 2.56(a)–(b) .................................................................................... 3

Fed. R. Civ. P. 56 ............................................................................................ 17

2 *McCarthy on Trademarks and Unfair Competition* § 12:16 (5th ed.)............ 12

## **NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT**

Please take notice that, on December 20, 2023, at 10:00 a.m., or as soon thereafter as the matter may be heard, before the Honorable Steve Kim, United States Magistrate Judge, in Courtroom 540, 5th Floor, Roybal Federal Building and United States Courthouse, 255 E. Temple St., Los Angeles, California 90012, Defendants will, and hereby do, move for summary judgment under Fed. R. Civ. P. 56.

This motion is based on this Notice of Motion and Motion for Summary Judgment, the attached Memorandum of Points and Authorities, the concurrently-filed Separate Statement of Undisputed Facts, the Declarations of Mai-Trang Dang and Dr. Justin R. Anderson, the exhibits thereto, the administrative record, all pleadings, records, and other documents on file with the Court in this action, and on any arguments made at the hearing of this motion.

This motion is made following the conference of counsel pursuant to Local Rule 7-3, including e-mail correspondence on September 15, 2023, and a video conference on September 19, 2023.

Respectfully submitted,

Dated: September 22, 2023

E, MARTIN ESTRADA
United States Attorney
DAVID M. HARRIS
Assistant United States Attorney
Chief, Civil Division
JOANNE S. OSINOFF
Assistant United States Attorney
Chief, Complex and Defensive Litigation
Section

  /s/ *Jasmin Yang*
JASMIN YANG
Assistant United States Attorney

Attorney for Defendants

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.   INTRODUCTION

The U.S. Patent and Trademark Office (the "USPTO") cannot register a proposed trademark if the relevant public understands it to be a generic word. Here, Snap Inc. has applied to register the word "spectacles" for use with computer hardware and peripherals, but the computer hardware and peripherals are smart glasses, such as these:



A11. (For the Court's ease of reference, pages from the Certified Administrative Record that are referenced in this Motion are attached hereto as Exhibit 1 and notated as A___.) Smart glasses, generally speaking, are glasses that can perform functions such as taking photographs and videos, and connecting to other wireless devices such as smart phones.

The USPTO refused to register "spectacles," finding that the relevant public—consumers who may or do purchase the goods—understands the word to be generic in the context of smart glasses. Snap has filed a civil action under Lanham Act § 21(b), 15 U.S.C. § 1071(b), challenging the USPTO's decision.

Summary judgment is appropriate because Snap has failed to develop evidence on the dispositive element of the legal test for genericness. A mark proposed for registration

1

is generic if the primary significance to the relevant public is to denote goods or services rather than to indicate the source of goods or services. *USPTO v. Booking.com B.V.*, 140 S. Ct. 2298, 2304 (2020) (quoting Lanham Act § 14(3), 15 U.S.C. § 1064(3)); *see also* Lanham Act § 45, 15 U.S.C. § 1127 (defining a "trademark"). But Snap has limited its proof to how the relevant public *uses* the word "spectacles," rather than how the relevant public *understands* the word in the context of smart glasses.

The undisputed evidence, including dictionary definitions, Snap's own marketing, and a consumer survey, demonstrates that the relevant public understands the word "spectacles" to be generic because "spectacles" is synonymous with glasses, and smart glasses like Snap's look and wear just like glasses.

Snap has developed no evidence to dispute that consumer understanding of genericness; rather, Snap's position is that consumers seldom use "spectacles" to refer to smart glasses. Even if that were true, Snap has failed to address how the relevant public understands "spectacles" in the context of smart glasses. Because Snap has no evidence to offer about that dispositive element of the genericness analysis, this Court should grant summary judgment to the USPTO.

## II. STATEMENT OF THE CASE AND FACTS

### A. Snap's trademark applications: "Spectacles" for use with smart glasses

Snap applied to register SPECTACLES in standard characters and the stylized form *Spectacles*. A1–7, A2198–2206. There is no dispute that the registrability of the standard-character and stylized forms stand or fall on the same grounds.

Snap applied to register SPECTACLES for use with the following goods:

> Computer hardware; computer peripherals; wearable computer hardware; wearable computer peripherals; computer hardware and peripherals for remotely accessing, capturing, transmitting and displaying pictures, video, audio and data; downloadable computer software, namely, software for setting up, configuring, and controlling wearable computer hardware and peripherals; downloadable computer software and software applications for use in uploading, downloading, capturing,

2

> editing, storing, distributing and sharing photographic and
> video content and other digital data via global and local
> computer networks and via mobile devices; downloadable
> multimedia files containing digital audio and video files
> featuring user generated images, videos, multimedia files, and
> other digital data, all in the fields of entertainment, photography
> and online social networking; computer software for accessing
> and transmitting data and content among consumer electronics
> devices and displays in International Class 9.

A2099–2100, A4296–4297.

Although that identification of goods is heavy on computer hardware and peripherals, the specimen of use that Snap submitted to the USPTO was a photograph of Snap's Spectacles sunglasses, as shown above on page 1. A11. Because a specimen must depict the mark as actually used in commerce on or in connection with the goods identified, Snap has admitted that its identification of goods includes glasses like that depicted in the specimen. Lanham Act § 1(a)(1), 15 U.S.C. §1051(a)(1); 37 C.F.R. §§ 2.34(a)(1)(iv), 2.56(a)–(b). Snap has identified no other products that fall within the scope of the goods for which it seeks registration or with which it uses the proposed "spectacles" mark.

**B.    The USPTO's decision: "Spectacles" is unregistrable because the relevant public understands the word to be generic in the context of smart glasses.**

The agency's consideration of Snap's applications began with an examining attorney at the USPTO, who refused registration, finding that "spectacles" is generic in the context of smart glasses. A2100, A4297. The examining attorney cited dictionary definitions, media articles, and examples of smart glasses called spectacles that were not made by Snap as evidence to support her genericness finding. A2101–2106, A4298–A4303.

Snap appealed to the Trademark Trial and Appeal Board, which affirmed the examining attorney's refusals. A2099–2130, A4296–4327. The Board relied on the same

1    evidence cited by the examining attorney. A2101–2118, A4298–4317. The Board found

2    that the evidence "clearly establishes that the term 'spectacles' is currently used and

3    understood by the relevant public as a reference to hardware and peripherals wearable as

4    glasses generally, i.e. 'smart spectacles' or 'AR [augmented reality] spectacles.' It is not

5    a trademark that specifically identifies [Snap] or any other particular source of smart

6    glasses." A2118, A4315.

7         As an alternative ground, the Board found Snap's proposed marks unregistrable as

8    merely descriptive. A2121–2129, A4318–4326. Unlike a generic term, a merely

9    descriptive term could attain trademark status if an applicant can show that the term has

10   acquired distinctiveness in the minds of the relevant public. *See Two Pesos, Inc. v. Taco*

11   *Cabana, Inc.*, 505 U.S. 763, 769 (1992).

12        **C.    These proceedings pursuant to § 1071(b): agency record**

13               **and new evidence**

14        To challenge the Board's decision, Snap had the choice to appeal directly to the

15   U.S. Court of Appeals for the Federal Circuit on the agency record, or to file an action in

16   district court, allowing Snap to obtain de novo review and to augment the agency record.

17   Lanham Act § 21(a), (b); 15 U.S.C. § 1071(a), (b). Snap chose the latter route.

18   The USPTO has filed the administrative record in this Court. *See* ECF No. 42; *see also*

19   Lanham Act § 21(b)(3), 15 U.S.C. § 1071(b)(3). The parties have developed additional

20   evidence during discovery.

21        The USPTO moves for summary judgment on genericness. Because a generic

22   term can never attain trademark status, if this Court finds no genuine issue of material

23   fact that Snap's proposed marks are generic, this Court need not reach the issue of

24   acquired distinctiveness. *See In re La. Fish Fry Prods., Ltd.*, 797 F.3d 1332, 1335–36

25   (Fed. Cir. 2015); *In re Nordic Naturals, Inc.*, 755 F.3d 1340, 1345 (Fed. Cir. 2014).

26

27

28

**D.    The USPTO draws on evidence of the relevant public's understanding to find "spectacles" generic.**

The following evidence is drawn from the agency record and the evidence developed by the parties in this action, viewed in the light most favorable to Snap:

1.    Dictionary definitions of "spectacles" encompass smart glasses.

The Online Merriam–Webster Dictionary defines "spectacle" as "glasses," which means "plural: a device used to correct defects of vision or to protect the eyes that consists typically of a pair of glass or plastic lenses and the frame by which they are held in place," "also called eyeglasses, spectacles." UF1.

The Online American Heritage Dictionary defines "spectacles" as "a pair of eyeglasses; something resembling eyeglasses in shape or suggesting them in function." UF2.

The Unabridged Merriam–Webster Dictionary, in its definition of "spectacles," includes the sense, "any of various things felt to resemble a pair of glasses." UF3.

The Online Oxford English Dictionary defines "spectacle" as "[a] device for assisting defective eyesight, or for protecting the eyes from dust, light, etc., consisting of two glass lenses set in a frame which is supported on the nose, and kept in place by side-pieces passing over the ears. Usually in plural." UF4.

The Online Cambridge Dictionary defines "smart glasses" as "a pair of glasses that contain computer technology so that, for example, they can be used in a similar way to a smartphone, or you can get information added to what you are seeing as you look through them …." UF5. The Cambridge dictionary further provides the example, "A pair of smart glasses will mean that you can take photos with your spectacles." *Id.*

2.    Snap's public communications describe Spectacles as sunglasses that can be purchased with prescription lenses.

According to Snap, its Spectacles product is "a wearable digital video camera housed in a pair of fashionable sunglasses" that can be used with "its famous Snapchat app." Complaint ¶¶ 1, 11.

1       According to Snap's official partner, Lensabl, "Spectacles are sunglasses that

2 capture your world, the way you see it":



17 UF6.

Lensabl offers Snap's Spectacles sunglasses with prescription lenses, single-vision and progressive:



UF7.

Snap promotional materials tout Spectacles as "Sunglasses that Snap!":



UF8.

In reports to shareholders, Snap has stated that the "FDA and other state and foreign regulatory agencies regulate Spectacles. … Government authorities, primarily the FDA …, regulate the medical device industry." UF9.

Ryan Chan, a Snap senior manager of product development, explained that Snap conveys to consumers that its Spectacles are supposed to look and feel like ordinary sunglasses:

> Q. And what's your understanding as to why Spectacles are being referred to as a "pair of glasses"?
>
> A. As a new product, customers look to some analog as to how they should use the product or what the product—what are the circumstances that somebody might want to use the product under. The form factor of the hardware component of Spectacles resembles glasses and is meant to be used in circumstances that somebody might be wearing sunglasses for.

UF10.

> 3.     The media uses the word "spectacles" to refer generally to smart glasses, including products marketed by companies other than Snap.

A pcmag.com article describes Snap's Spectacles as "shades" and "connected glasses that do one thing—take snaps" using "outward facing cameras, one in the corner of each lens." UF11.

A TechRadar article about Apple's augmented reality ("AR") "smart glasses" refers to them as "the Apple AR spectacles." UF12.

A cnet.com article about new Huawei products refers to the company's glasses that "let you listen to music in stereo and take calls" as "smart spectacles." UF13.

A Business Insider article reports that "Amazon is the latest firm to try to build its own smart spectacles," and that the glasses "apparently look like normal spectacles." UF14.

An article in The Bridge about new smart glasses reports that "North is counting on a few things to make smart spectacles actually stick. Focals are custom-built glasses with a transparent, holographic display that only the wearer can see. From this display you can scroll through texts, travel directions and weather notifications. The glasses even

1   allow you to hail an Uber and speak with Alexa." UF15.

2   An NBC News article about smart glasses includes this lead: "The jury is still out

3   on whether smart glasses are a fashion do or don't, but tech companies are already

4   running wild with ideas for how smart spectacles can be used in the future." UF16.

5   An MIT Technology Review article titled "Coming Soon: Smart Glasses That

6   Look Like Regular Spectacles" includes the subtitle "Sunglasses made with nanoscale

7   optical technology hint at a near future of inconspicuous head-mounted displays." UF17.

8   A VR Scout article about Intel's prototype AR glasses called "Vaunt" reports that

9   the product "comes equipped with customized lenses and two different hardware suites

10  built into each stem of the spectacles." UF18. The product's "sole purpose is to sync

11  with your smartphone to pull and project notifications via laser directly into the retina of

12  your right eye." *Id.*

13  A VRFOCUS article about a Microsoft prototype is titled "Microsoft Reveals AR

14  Glasses That Look Like Regular Spectacles." UF19.

15  A USA TODAY article about Google's new AR effort states, "On Monday,

16  Google announced a new version of the AR spectacles called 'Google Glass Enterprise

17  Edition 2." UF20.

18

19

20

21

22

23

24

25

26

27

28

1

### 4. Other companies market smart glasses as spectacles.

2

Walmart sells "Bluetooth Smart Glasses Spectacles," not made by Snap:

3

4

5



6

7

8

9

10

11

12

13

14

15

16

17     UF21.

18

19

20

21

22

23

24

25

26

27

28

1    Amazon offers the "eFashion Spectacles Eyewear Glasses DVR Camcorder

2  Camera," not made by Snap:



13  UF22.

14    5.    <u>Dr. Anderson's survey found that 72.9% of respondents understood</u>

15    <u>"spectacles" to be a generic word in the context of smart glasses.</u>

16    The USPTO engaged Dr. Justin R. Anderson to conduct surveys to determine how

17  the relevant public understands the word "spectacles" in the context of smart glasses.

18  *See* First Decl. of Justin Anderson, Second Decl. of Justin Anderson. Dr. Anderson

19  conducted two surveys; the second survey incorporates critiques by Snap's expert.

20  Because the second survey is more favorable to Snap, the USPTO relies on and refers to

21  the second survey as the singular survey for purposes of this motion.

22    Dr. Anderson's survey followed the "Teflon" format, which is derived from a case

23  involving a genericness challenge to the mark TEFLON for use with nonstick coating.

24  *See E. I. DuPont de Nemours & Co. v. Yoshida Intern., Inc.*, 393 F. Supp. 502 (E.D.N.Y.

25  1975). The Teflon format is "the most widely used" and "the most judicially accepted"

26  survey format as evidence of genericness. 2 *McCarthy on Trademarks and Unfair*

27  *Competition* § 12:16 (5th ed.).

28

A Teflon survey begins with a mini-course in genericness, explaining the difference between a brand name and a generic name. The survey then administers a mini-test to respondents to determine whether they understand the difference. Respondents who pass the mini-test proceed to the main test, where their understanding of the term of interest is assessed. *See generally id.*

In his Teflon survey, Dr. Anderson included in his survey panel respondents who stated that they had purchased smart glasses within the past two years or planned to purchase smart glasses within the next two years. Second Anderson Decl., p. 37.

Dr. Anderson began the survey with his mini-course on the distinction between a brand name and a generic name:

> A <u>brand name</u> refers to a product that is made by only one company. For example, IPHONE is a brand name that refers to a product that is made by only one company, Apple.
>
> A <u>generic name</u> refers to a type of product that may be made by more than one company. For example, SMARTPHONE is a generic name that refers to a type of product that may be made by more than one company.
>
> …
>
> Here is another example. HERO is a <u>brand name</u> that refers to a product that is made by only one company, GoPro. CAMERA is a <u>generic name</u> that refers to a type of product that may be made by more than one company.
>
> Similarly, THINKREALITY is a <u>brand name</u> that refers to a product that is made by only one company, Lenovo. SMART GLASSES is a <u>generic name</u> that refers to a type of product that may be made by more than one company.

*Id.* at 39.

Dr. Anderson then administered his mini-test, asking several questions to determine if respondents understood the difference between a brand name and a generic name, including the following question:

13

> Thinking about names relating to smart glasses, do you think that STORIES is a brand name that refers to a product that is made by only one company, a generic name that refers to a type of product that may be made by more than one company, or you don't know?

*Id.* at 41.

Respondents who demonstrated that they understood the difference proceeded to the main test, which asked the following:

> Do you think that [NAME] is a brand name that refers to a product that is made by only one company, a generic name that refers to a type of product that may be made by more than one company, or you don't know?

*Id.* at 44. In the "[NAME]" field, Dr. Anderson inserted various names, including "spectacles." *Id.* The result: 72.9% of respondents said that they believed "spectacles" to be generic. *Id.*; UF23.

### E.    Snap's expert evidence addresses the relevant public's use, not understanding, of "spectacles."

Snap engaged Brian M. Sowers to conduct a consumer survey. Dang Decl. Ex. 8. Mr. Sowers applied the "Thermos" format, a format used to assess how frequently consumers use a word in a particular context:

> Q. Can you describe why you [chose] a Thermos format survey for this case?
>
> A. Sure. My assignment, as I say in my report, [was] to determine what generic terms consumers use to describe the relevant category of goods in the application, and initially to determine whether and to what extent "spectacles" is used as a generic term in the context.

Dang Decl. Ex. 13 (Sowers Dep. 18:22–19:7).

Rather than ask respondents what they understood about the word "spectacles," as Dr. Anderson did in his Teflon survey, Mr. Sowers asked respondents ten open-ended questions, including the following:

Q1. What word or words would you use to identify or describe eyeglasses that can connect to your smartphone via Bluetooth or Wi-Fi to provide features such as photo and audio/video capture? *(Please answer as completely as possible. You are not limited by the size of the answer box.)*

…

Q2. If you wanted to purchase eyeglasses that can connect to your smartphone via Bluetooth or Wi-Fi to provide features such as photo and audio/video capture in a store, what would you tell the salesperson you wanted, or what would you type into a search bar online? *(Please answer as completely as possible. You are not limited by the size of the answer box.)*

Dang Decl., Ex. 8, pp. 12–13.

Mr. Sowers concluded that "[t]he generic terms most commonly used by consumers to describe the relevant category of goods … are 'smart glasses' and/or 'camera glasses' in some form (75.1%) and Bluetooth/wi-fi/wireless glasses (47.6%)." *Id.* at 26–27. Mr. Sowers also concluded that only 1.5% of respondents "used 'spectacles' as a generic term to describe the relevant category of goods." *Id.*

Mr. Sowers acknowledged that, unlike Dr. Anderson, he "was not asked to determine the primary significance for the term SPECTACLES or to provide an opinion on whether or not it is a generic term." Dang Decl. Ex. 9, p. 78. As Mr. Sowers also acknowledged, a Teflon survey, the format that Dr. Anderson used, is the appropriate format to determine the relevant public's understanding:

Q. So if respondents to a Thermos Survey do not provide a particular word in response to any of those survey questions, is there any way to gauge their understanding of that word?

A. Yes. I mean, I think that's a different test. I mean, I think, again, Thermos is testing all the words that people use. I think their understanding would be a different type of survey, potentially.

Q. What type of survey would that be?

15

> A. I think in testing genericness, if it's understanding, it would be Teflon ….

Dang Decl. Ex. 13 (Sowers Dep. 52:4–52:18).

Snap also engaged Professor Peter N. Golder, who conducted empirical analyses of media articles, social media postings, Google search data, and Amazon product reviews. Dang Decl. Ex. 10, p. 140. Like Mr. Sowers, Professor Golder examined evidence of the use of the word "spectacles":

- "With respect to media articles, … 86 percent to 100 percent of articles using 'spectacles' in the context of the product category do so to refer to Snap's branded offering."

- "With respect to social media postings, I found that 92 percent to 99 percent of postings using 'spectacles' in the context of the relevant product category do so to refer to Snap's branded offering."

- In analyzing media articles and social media postings, "I found that generic use of 'spectacles' as the common category name is *de minimis* and is far exceeded by generic use of 'smart glasses' as the common category name."

- "My analysis of consumer online search behavior indicated that consumers tend to use 'smart glasses' as the common name for this product category but tend to use 'spectacles' in connection with Snap's branded offering."

- "My analysis of consumer-generated Amazon reviews of products in the relevant product category showed that usage of 'smart glasses' to refer to the relevant product category greatly exceeds use of 'spectacles' as the common category name, which is *de minimis*."

*Id.* at 145–48.

Snap also engaged Professor Robert A. Leonard, a linguist. Dang Decl. Ex. 1. Like Mr. Sowers and Professor Golder, Professor Leonard focused on the use of the word "spectacles": "I was asked to determine whether users of American English use the lexical term 'spectacles' to commonly refer to smart glasses or wearable technology that

16

can take photographs and video." *Id.* at 5.

Dr. Leonard proposed two competing hypotheses:

- **Hypothesis 1:** Users of American English use the lexical item "spectacles" to commonly refer to smart glasses or wearable technology that can take photographs and videos

- **Hypothesis 2:** Users of American English do not use the lexical item "spectacles" to commonly refer to smart glasses or wearable technology that can take photographs and videos

*Id.* at 5–6.

After examining dictionaries and language corpora, Dr. Leonard affirmed hypothesis 2: "Users of American English do not use the lexical item 'spectacles' to commonly refer to smart glasses or wearable technology that can take photographs and videos." *Id.* at 4.

## III.   STANDARD

To grant summary judgment, this Court must determine that there is no genuine issue of material fact, viewing the evidence in the light most favorable to Snap, the nonmoving party. Fed. R. Civ. P. 56; *Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1220 (9th Cir. 1995). A material fact is one that affects the outcome of the litigation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The substantive law determines which facts are material. *Id.*

As the USPTO will show, under the substantive law, a court cannot find non-genericness merely because the relevant public seldom uses a word in a generic sense; a court must also consider the relevant public's understanding. The material, undisputed facts show that the relevant public understands "spectacles" to refer to smart glasses.

17

IV.   **ARGUMENT**

      A.   **Legal principles: If the relevant public understands a term to be generic, it is not registrable.**

An applicant may obtain federal registration of a trademark if it distinguishes the applicant's goods from those of others. *See* Lanham Act § 2, 15 U.S.C. § 1052; *Booking.com*, 140 S. Ct. at 2302. "Generic terms are not registrable …." *Park 'n Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 194 (1985). "Generic marks give the general name of the product; they embrace an entire class of products." *Kendall–Jackson Winery, Ltd. v. E. & J. Gallo Winery*, 150 F.3d 1042, 1047 n.8 (9th Cir. 1998). "Generic marks are not capable of receiving protection because they identify the product, rather than the product's source." *KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.,* 408 F.3d, 596, 602 (9th Cir. 2005); *see also In re Merrill Lynch, Pierce, Fenner, & Smith, Inc.*, 828 F.2d 1567, 1569 (Fed. Cir. 1987) ("Generic terms, by definition incapable of indicating source, are the antithesis of trademarks, and can never attain trademark status.").

The policy reasons behind prohibiting the registration of generic terms are straightforward. The terms must be left free for public use: To hold otherwise would grant the owner of the mark a monopoly, since a competitor could not describe his goods as what they are. *Filipino Yellow Pages, Inc. v. Asian J. Publications, Inc.*, 198 F.3d 1143, 1151 (9th Cir. 1999).

The Ninth Circuit and the Federal Circuit, which hears appeals of the majority of the USPTO's registrability decisions, have articulated similar tests for determining whether a proposed mark is generic. The Ninth Circuit has called it the "'who-are-you/what-are-you' test: A mark answers the buyer's questions "Who are you?' 'Where do you come from?' 'Who vouches for you?' But the generic name of the product answers the question 'What are you?'" *Filipino Yellow Pages*, 198 F.3d at 1147 (citations, quotation marks, and brackets omitted). The Federal Circuit has adapted that question in a two-step test: first, it defines the genus of the goods or services with which

18

the proposed mark is used; second, it determines whether the relevant public uses *or understands* the mark primarily to refer to that genus of goods. *H. Marvin Ginn Corp. v. Int'l Ass'n of Fire Chiefs, Inc.*, 782 F.2d 987, 990 (Fed. Cir. 1986).

The phrase "*or understands*" demands emphasis here. "[H]ow a term is understood by the consuming public [is] the ultimate test of whether a trademark is generic." *Surgicenters of Am., Inc. v. Medical Dental Surgeries Co.*, 601 F.2d 1011 (9th Cir. 1979). "[T]he time-honored test for genericness" is "what do the buyers understand by the word for whose use the parties are contending?" *Comm. for Idaho's High Desert, Inc. v. Yost*, 92 F.3d 814, 821 (9th Cir. 1996) (quoting *Magic Wand, Inc. v. RDB, Inc.*, 940 F.2d 638, 640 (Fed. Cir. 1991)) (internal quotation marks omitted).

Thus, regardless of whether the relevant public *uses* a word in a generic sense, if the relevant public *understands* the word primarily to refer to the genus of goods, the word is unregistrable as generic. *H. Marvin Ginn*, 782 F.2d at 990. As the Federal Circuit has held, "it is irrelevant whether the relevant public refers" to a genus of goods; "the correct inquiry is whether the relevant public would understand, when hearing the term, that it refers to [the genus of goods]." *In re 1800Mattress.com IP, LLC*, 586 F.3d 1359, 1362 (Fed. Cir. 2009).

**B.    There is no genuine issue of material fact that the relevant public understands "spectacles" to be generic in the context of goods that resemble glasses, including smart glasses.**

For the first part of the inquiry, the genus of the goods may be defined by an applicant's identification of goods. *Magic Wand*, 940 F.2d at 640. For purposes of this motion, the USPTO adopts the genus that Snap proposed during administrative examination: "cameras and related software/hardware components that are commonly and generically referred to as 'smart glasses' or 'camera glasses,' but never 'spectacles.'" A4307. For convenience, this Court may use "smart glasses" as the working definition of the genus because "spectacles" must be found generic if it is generic for any portion of the genus. *In re Cordua Restaurants, Inc.*, 823 F.3d 594, 605–

19

06 (Fed. Cir. 2016) ("A term is generic if the relevant public understands the term to refer to part of the claimed genus of goods or services"); *see also In re Am. Soc'y of Clinical Pathologists, Inc.*, 442 F.2d 1404, 1406–07 (CCPA 1971).

For the second part of the inquiry, the relevant public is the purchasing or consuming public of the genus of goods, smart glasses. *See Magic Wand*, 940 F.2d at 641. Evidence of the relevant public's understanding of a term can be obtained from any competent source, including "not only consumer surveys, but also dictionaries, usage by consumers and competitors, and any other source of evidence bearing on how consumers perceive a term's meaning." *Booking.com*, 140 S. Ct. at 2307 n.6.

The record is replete with evidence demonstrating that the relevant public would primarily understand "spectacles" to be generic in the context of smart glasses:

**Dictionaries:** Dictionaries provide that "spectacles" include "something resembling eyeglasses in shape or suggesting them in function," and "any of various things felt to resemble a pair of glasses," which is what Snap's Spectacles are. UF2, UF3. One dictionary provides examples of "smart glasses" as "a pair of glasses that contain computer technology so that, for example, they can be used in a similar way to a smartphone, or you can get information added to what you are seeing as you look through them"; that dictionary also provides the example, "A pair of smart glasses will mean that you can take photos with your spectacles." UF5. As the Ninth Circuit has observed, "dictionary definitions are relevant and often persuasive in determining how a term is understood by the consuming public, the ultimate test of whether a trademark is generic ...." *Surgicenters*, 601 F.2d at 1015 n.11.

**Snap's public communications** present Spectacles smart glasses as desirable because they look like ordinary eyeglasses: "sunglasses that capture your world"; "[m]ulti-focal lenses with no visible line that give a seamless progression for distance, intermediate, and near vision connection"; and "sunglasses that Snap!" UF6–UF8. Snap has acknowledged in investor reports that Spectacles are medical devices. UF9.

As that evidence shows, Snap conveys to the relevant public that Spectacles are

fashionable, useful eyewear, just like a pair of eyeglasses. Snap's product-development manager Ryan Chan confirmed that fact, explaining that "[t]he form factor of the hardware component of Spectacles resembles glasses and is meant to be used in circumstances that somebody might be wearing sunglasses for." UF10.

This Court can infer from Snap's own use of "spectacles" that a consumer understands that "spectacles" is generic in the context of smart glasses.

**Media articles** confirm that the public understands Snap's Spectacles to be like ordinary eyeglasses; one article, for example, calls Snap's Spectacles "shades." UF11. Media articles also use "spectacles" to refer to other companies' smart glasses: "the Apple AR spectacles"; Huawei's "smart spectacles"; Amazon's building "its own smart spectacles"; North's "counting on a few things to make smart spectacles actually stick"; Vaunt's smart glasses with "two different hardware suites built into each stem of the spectacles"; and an emerging market for "smart glasses that look like regular spectacles." UF12–UF19. That the word "spectacles" is used to refer to goods produced by multiple companies demonstrates that Snap's proposed mark is "by definition incapable of indicating source." *Merrill Lynch*, 828 F.2d at 1569.

**Other companies** have referred to non-Snap smart glasses as "spectacles" for sale at Walmart and on Amazon. UF21, UF22.

Finally, Dr. Anderson's **consumer survey** put the question to the relevant public and found that 72.9% of respondents believed that "spectacles" was a generic word in the context of smart glasses. UF23. Although there is no percentage that courts have determined is categorically probative of genericness, they have found genericness rates close to the 70th percentile to be potent. *See, e.g.*, *Intel Corp. v. Advanced Micro Devices, Inc.*, 756 F. Supp. 1292, 1297 (N.D. Cal. 1991) ("386" found generic for microprocessors on a 72% genericness rate in a Teflon survey); *Donchez v. Coors Brewing Co.*, 392 F.3d 1211, 1218 (10th Cir. 2004) ("The term 'beerman' was recognized as a common or generic name by 75.9% of the respondents."). That makes sense: If about three-quarters of the relevant public believes that a word is generic,

1  a single company should not be permitted to monopolize it. As Dr. Anderson's findings
2  show, survey evidence is "of undeniable importance in a case of this kind as it is the
3  most practical and useful way of assessing public opinion." *Nestle Co. v. Chester's Mkt.,*
4  *Inc.*, 571 F. Supp. 763, 773 (D. Conn. 1983).

5        In sum, Snap's own public communications, as well as media articles,
6  dictionaries, competing products, and landslide survey results, leave no genuine issue of
7  material fact that the relevant public understands the word "spectacles" to be generic in
8  the context of smart glasses.

9        **C.**    **Even viewed in the light most favorable to Snap, Snap's evidence is**
10          **probative only of the relevant public's use, not the relevant public's**
11          **understanding.**

12       Snap has failed to develop any evidence about the relevant public's
13 *understanding*, instead touting evidence of the relevant public's seldom *use* to prove
14 non-genericness. Snap's experts have acknowledged that they limited their inquiries to
15 the relevant public's use of the word.

16       Mr. Sowers stated that he was asked "to design and conduct a consumer survey to
17 determine what generic terms the relevant public *use* to describe [the relevant goods] …
18 and *to what extent* relevant consumers *use* 'spectacles' in this context …." Dang Decl.
19 Ex. 9, p. 108 (emphases added). Mr. Sowers also acknowledged that his survey, which
20 used the Thermos format, is limited to the evaluation of consumer use and that a Teflon
21 survey, the format that Dr. Anderson used, is the appropriate format to determine the
22 relevant public's understanding:

23         Q. So if respondents to a Thermos Survey do not provide a
        particular word in response to any of those survey questions, is
24         there any way to gauge their understanding of that word?
25
26         A. Yes. I mean, I think that's a different test. I mean, I think,
        again, Thermos is testing all the words that people use. I think
27         their understanding would be a different type of survey,
28         potentially.

Q. What type of survey would that be?

A. I think in testing genericness, if it's understanding, it would be Teflon ….

Dang Decl. Ex. 13 (Sowers Dep. 52:4–52:18).

Professor Golder's research focused on media articles, social media postings, online search terms, and Amazon product reviews often describing Snap's Spectacles product or an event about the product. Dang Decl. Ex. 10, pp. 145–48. He found most uses of "spectacles" to refer to Snap's product and few uses of "spectacles" to refer to smart glasses generically. *Id.*

And Professor Leonard concluded that "[u]sers of American English do not use the lexical item 'spectacles' to commonly refer to smart glasses or wearable technology that can take photographs and videos." Dang Decl. Ex. 1, pp. 5–6.

The problem with these experts' opinions is that, even if the relevant public seldom uses the word "spectacles" to describe smart glasses, it's irrelevant as a matter of law. Professor Golder's findings are an apt example: Even if most tweets about smart glasses or Amazon searches for smart glasses do not *use* "spectacles" as a generic word, consumers still can primarily *understand* "spectacles" to be generic for things that look and wear like ordinary glasses.

The Federal Circuit has squarely addressed this issue. *See 1800Mattress.com*, 586 F.3d at 1364. In *1800Mattress.com*, the USPTO refused to register as generic "mattress.com" for use with online retail mattress stores. *Id.* at 1361. The applicant argued that the proposed mark was not generic because "the relevant public would not use the term 'mattress.com' to refer to online mattress retailers." *Id.* at 1364. Rejecting that argument, the Federal Circuit held that the focus is on consumer understanding, not just consumer use:

The test is not only whether the relevant public would itself *use* the term to describe the genus, but also whether the relevant public would *understand* the term to be generic. *See H. Marvin*

23

> *Ginn,* 782 F.2d at 990 (describing the test as whether the term is "*understood* by the relevant public primarily to refer to [the appropriate] genus of goods or services"). Thus, it is irrelevant whether the relevant public refers to online mattress retailers as "mattress.com." Instead, as the Board properly determined, the correct inquiry is whether the relevant public would understand, when hearing the term "mattress.com," that it refers to online mattress stores.

*Id.* (emphases in original). Although the Ninth Circuit has not had occasion to squarely address this issue, it agrees with the Federal Circuit's articulation of the relevant public's understanding as "the time-honored test for genericness." *Comm. for Idaho's High Desert*, 92 F.3d at 821 (quoting *Magic Wand*, 940 F.2d at 640). In view of that focus on consumer understanding, Snap's proposed marks cannot be found non-generic merely because the relevant public seldom uses "spectacles" to refer to smart glasses; the evidence must demonstrate the relevant public's understanding of that word in relation to the goods.

On the same logic, Snap would fail to raise a material fact issue by arguing that there are other generic words for "spectacles," such as "smart glasses" and "camera glasses." Rejecting the same argument, the Federal Circuit has held, "We … disagree with [the] assertion that there can only be one generic term …. Instead, any term that the relevant public understands to refer to the genus of [goods] is generic." *Magic Wand,* 940 F.2d at 640. Another judge of this Court has concluded the same: "[J]ust because a term is not the most generic term for a product does not mean it is not generic." *Premier Nutrition, Inc. v. Organic Food Bar, Inc.*, No. SACV06-0827, 2008 WL 1913163, at *11 (C.D. Cal. Mar. 27, 2008), *aff'd,* 327 F. App'x 723 (9th Cir. 2009).

Mirroring the foregoing precedent, Mr. Sowers highlighted the tension between what Snap asked him to do—to limit his study to consumer use—and what the law requires—to consider consumer understanding. As Mr. Sowers explained, Snap asked him "to determine what generic terms consumers use to describe" the goods rather than "to determine the primary significance for the term SPECTACLES or to provide an

24

1    opinion on whether or not it is a generic term." Dang Decl. Ex. 9, p. 78.

2    **V.    CONCLUSION**

3            A court must consider the relevant public's understanding of a term in a

4    genericness analysis. During almost two years of litigation, Snap has avoided developing

5    any evidence to answer the dispositive question of what the relevant public understands

6    "spectacles" to mean in the context of smart glasses. Even if this Court were to accept

7    Snap's evidence that the relevant public seldom uses "spectacles" to describe smart

8    glasses, Snap cannot address the relevant public's understanding at trial. This Court,

9    therefore, should grant summary judgment to the USPTO.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

Dated: September 22, 2023

2

Respectfully submitted,

3

E. MARTIN ESTRADA
United States Attorney

4

DAVID M. HARRIS

5

Special Counsel:
THOMAS W. KRAUSE

Assistant United States Attorney
Chief, Civil Division

6

Solicitor
CHRISTINA J. HIEBER

JOANNE S. OSINOFF
Assistant United States Attorney

7

Senior Counsel for Trademark
Litigation

Chief, Complex and Defensive Section

8

MAI-TRANG DANG

  /s/ *Jasmin Yang*
JASMIN YANG

9

BENJAMIN T. HICKMAN
MARY BETH WALKER

Assistant United States Attorney

10

Associate Solicitors

BRIAN M. BOYNTON

11

United States Patent and
Trademark Office

Principal Deputy Assistant Attorney General
SCOTT D. BOLDEN

12

Office of the Solicitor

Acting Director
LUCY GRACE D. NOYOLA

13

Mail Stop 8, P.O. Box 1450

CARRIE E. ROSATO

14

Alexandria, Virginia 22313-
1450

Trial Attorneys
Commercial Litigation Branch

15

(571) 272-9035

Civil Division
Department of Justice

16

Washington, DC 20530
Telephone: (202) 514-6090

17

Facsimile: (202) 307-0345

18

Email: lucy.grace.d.noyola@usdoj.gov
carrie.e.rosato@usdoj.gov

19

20

*Attorneys for Defendants*

21

22

23

24

25

26

27

28

26

1

## CERTIFICATE OF COMPLIANCE WITH L.R. 11-6.2

2

The undersigned, counsel of record for Defendants certifies that the memorandum

3

of points and authorities is fewer than 50 pages, the limit prescribed in the Court's order

4

of November 19, 2022.

5

6

Dated: September 22, 2023          /s/ *Jasmin Yang*
                                   _____
7                                  JASMIN YANG
                                   Assistant United States Attorney

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28