DAVID H. BERNSTEIN (CA Bar No. 336551)
**DEBEVOISE & PLIMPTON LLP**
650 California Street
San Francisco, CA 94108
Tel:    (212) 909-6696
Fax:    (212) 521-7696
Email:  dhbernstein@debevoise.com

JARED I. KAGAN (admitted *pro hac vice*)
QUENIQUE M. NEWBILL (admitted *pro hac vice*)
**DEBEVOISE & PLIMPTON LLP**
66 Hudson Boulevard
New York, NY 10001
Tel:    (212) 909-6000
Fax:    (212) 909-6836
Email:  jikagan@debevoise.com
Email:  qnewbill@debevoise.com

Attorneys for Plaintiff
SNAP INC.

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

| | |
|---|---|
| SNAP INC., <br><br> Plaintiff, <br><br> v. <br><br> KATHERINE K. VIDAL, Under Secretary of Commerce for Intellectual Property and Director of the United States Patent and Trademark Office, and the UNITED STATES PATENT AND TRADEMARK OFFICE, <br><br> Defendants. | No. CV 22-00085-SK <br><br> **PLAINTIFF SNAP INC.'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** <br><br> Filed concurrently with: Statement of Genuine Disputes; Declarations <br><br> Hearing Date: December 20, 2023 <br> Hearing Time: 10:00am <br> Ctrm: 540, 5th Floor <br><br> Honorable Steve Kim <br> United States Magistrate Judge |

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................... 1

STATEMENT OF THE CASE AND FACTS .......................................................... 2

I.      Snap and its SPECTACLES Branded Smart Glasses ............................. 2

II.     Snap's Trademark Applications ................................................................ 5

III.    The TTAB Decision .................................................................................. 6

RECORD BEFORE THE COURT .......................................................................... 7

I.      The Expert Linguistics Report of Dr. Robert A. Leonard ....................... 8

II.     The Expert Marketing Report of Dr. Peter N. Golder ........................... 10

III.    The Expert Survey Report of Brian Sowers ........................................... 11

IV.     Testimony of Persons In The Trade ....................................................... 13

LEGAL STANDARDS .......................................................................................... 15

I.      Standard Under 15 U.S.C. § 1071(b) ..................................................... 15

II.     Standard for Summary Judgment ........................................................... 16

ARGUMENT ......................................................................................................... 17

I.      Defendants Have Failed To Provide Clear And Convincing Evidence That Consumers Primarily Understand "Spectacles" To Be Generic. ......................... 17

        A.      Defendants Offer No Testimony from Anyone in the Trade ...................... 20

        B.      Defendants Offer No Evidence of Generic Use of "Spectacles" by Competitors ........................................................................................... 21

        C.      Defendants Offer No Evidence of Generic Use of "Spectacles" by Snap ...................................................................................................... 24

        D.      No Dictionary Defines "Spectacles" as Smart Glasses, or Anything Remotely Close to a Product That Incorporates Technology ............... 25

        E.      Defendants' Cherry-Picked Media Articles Falls Far Short of Clear and Convincing Evidence of Primary Significance ............................. 26

        F.      The Parties' Competing Survey Evidence Creates Disputed Issues of Fact ....................................................................................................... 28

II.     Defendants' Failure To Comply With Local Civil Rule 7-3 Provides An Independent Ground To Deny The Motion ........................................... 29

CONCLUSION ...................................................................................................... 33

1

# TABLE OF AUTHORITIES

2

## **CASES**

3

*Anderson v. Liberty Lobby, Inc.*,

4

 477 U.S. 242 (1986).................................................................16, 21, 27

5

*B&B Hardware, Inc. v. Hargis Indus., Inc.*,

6

 135 S. Ct. 1293 (2015)....................................................................7, 15

7

*Bayer Co. v. United Drug Co.*,

 272 F. 505 (S.D.N.Y. 1921) ..................................................................17

8

9

*Bohn v. Pharmavite, LLC*,

 No. CV 11-10430-GHK (AGRx),

10

 2013 WL 4517173 (C.D. Cal. 2013) ..................................................2, 32

11

*Booking.com B.V. v. United States Pat. & Trademark Off.*,

12

 915 F.3d 171 (4th Cir. 2019) .................................................................15

13

*Cascade Mfg. Sales, Inc. v. Providnet Co. Tr.*,

14

 No. C08-5433RBL, 2008 WL 4889716 (W.D. Wash. Nov. 12, 2008)................20

15

*Clicks Billiards, Inc. v. Sixshooters Inc.*,

16

 251 F.3d 1252 (9th Cir. 2001) ...............................................................29

17

*DiDio v. Jones*,

 Case No. CV 13-4949 PSG (AGRx),

18

 2013 WL 12133906 (C.D. Cal. 2013) .......................................................30

19

*E.T. Browne Drug Co. v. Cococare Prod.*, Inc.,

20

 538 F.3d 185 (3d Cir. 2008) .............................................................21, 28

21

*Filipino Yellow Pages v. Asian J. Publ'g*,

22

 198 F.3d 1143 (9th Cir. 1999) ...............................................................17

23

*Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*,

24

 618 F.3d 1025 (9th Cir. 2010) ...............................................................26

25

*Garan, Inc. v. Manimal, LLC*,

 2022 WL 225060 (D. Or. 2022) .............................................................15

26

27

*GeoData Sys. Mgmt., Inc. v. Am. Pac. Plastic Fabricators, Inc.*,

 No. CV154125, 2016 WL 11756835 (C.D. Cal. Oct. 19, 2016)........................8

28

*H. Marvin Ginn Corp. v. Int'l Assn. of Fire Chiefs, Inc.*,
    782 F.2d 987 (Fed. Cir.1986) ................................................................. 19

*Horizon Mills Corp. v. QVC, Inc.*,
    161 F. Supp. 2d 208 (S.D.N.Y. 2001) ................................................... 26

*In re 1800 Mattress.com*,
    586 F.3d 1359 (Fed. Cir. 2009) ............................................................ 19

*In re Am. Online, Inc.*,
    77 U.S.P.Q.2d 1618,
    2006 WL 236389 (T.T.A.B. Jan. 18, 2006) .......................................... 27

*In re Cordua Rests., Inc.*,
    823 F.3d 594 (Fed. Cir. 2016) .............................................................. 15

*In re Hotels.com, L.P.*,
    573 F.3d 1300 (Fed. Cir. 2009) ............................................................ 16

*In re Merrill Lynch, Pierce, Fenner, and Smith, Inc.*,
    828 F.2d 1567 (Fed. Cir. 1987) ................................................ 16, 20, 28

*In re Trek 2000 Int'l Ltd.*,
    97 U.S.P.Q.2d (BNA) 1106,
    2010 WL 5099653 (T.T.A.B. Nov. 30, 2010) ................................. 21, 24

*Interprofession Du Gruyere v. U.S. Dairy Export Council*,
    575 F. Supp. 3d 627 (E.D. Va. 2021) ............................................. 15, 17

*Interstellar Starship Servs., Ltd. v. Epix Inc.*,
    184 F.3d 1107 (9th Cir. 1999) .............................................................. 17

*Kappos v. Hyatt*,
    132 S. Ct. 1690 (2012) .......................................................................... 15

*Kudos Inc. v. Kudoboard LLC*,
    No. 20-CV-01876-SI,
    2021 WL 5415258 (N.D. Cal. Nov. 20, 2021) ............................... 17, 18

*LaLonde v. County of Riverside*,
    204 F.3d 947 (9th Cir. 2000) ................................................................ 16

*Mead Johnson & Co. v. Abbott Labs.*,
    201 F.3d 883 (7th Cir. 2000 .................................................................. 8

*Monster Energy Co. v. USA Nutraceuticals Grp., Inc.*,
    No. ED-CV-17896,
    2018 WL 1942767 (C.D. Cal. Mar. 14, 2018) ................................................. 6, 15

*Morales v. K. Chocolatier Inc.*,
    No. 2:21-cv-08522-ODW (SKHx),
    2022 WL 19829446 (C.D. Cal. Oct. 31, 2022) ...................................... 31

*Moroccanoil, Inc. v. Marc Anthony Cosms., Inc.*,
    57 F. Supp. 3d 1203 (C.D. Cal. 2014) ....................................... 21

*Nartron Corp. v. STMicroelectronics, Inc.*,
    305 F.3d 397 (6th Cir. 2002) ....................................... 17

*Nightlight Sys., Inc. v. Nitelites Franchise Sys., Inc.*,
    Civil Action No. 1:04–CV–2112-CAP,
    2007 WL 4563873 (N.D. Ga. July 17, 2007) ....................................... 28

*Ossur hf v. Manamed Inc.*,
    331 F. Supp. 3d 1005 (C.D. Cal. 2017) ....................................... 19, 20, 21

*Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*,
    718 F.2d 327 (9th Cir. 1983) ....................................... 16

*POM Wonderful LLC v. Hubbard*,
    No. CV 13-06917,
    2016 WL 3621281 (C.D. Cal. June 29, 2016) ....................................... 7

*Reinalt-Thomas Corp. v. Mavis Tire Supply, LLC*,
    391 F. Supp. 3d 1261 (N.D. Ga. 2019) ....................................... 9

*San Diego Comic Convention v. Dan Farr Prods.*,
    336 F. Supp. 3d 1172 (S.D. Cal. 2018) ....................................... 26, 27

*Singer v. Live Nation Worldwide, Inc.*,
    No. SACV 11–0427 DOC (MLGx),
    2012 WL 123146 (C.D. Cal. Jan. 13, 2012) ....................................... 32

*Solid 21, Inc. v. Hublot of America*,
    109 F. Supp. 3d 1313 (C.D. Cal. 2015) ....................................... 8

*Solid 21, Inc. v. Hublot of America*,
    685 Fed. Appx. 530 (9th Cir. 2017) ....................................... 8

iv

*Solid 21, Inc. v. Richemont N. Am., Inc.*,
 No. 19 Civ. 1262 (LGS),
 2023 WL 3996530 (S.D.N.Y. June 14, 2023) ........................................................29

*Swatch AG v. Beehive Wholesale, LLC*,
 739 F.3d 150 (4th Cir. 2014) ...................................................................6, 15

*Unicorn Glob., Inc. v. Hillo Am., Inc.*,
 Case No. LA CV19-03028 JAK (AFMx),
 2021 WL 1034838 (C.D. Cal. 2021) ..............................................................30

*United States Pat. & Trademark Off. v. Booking.com B. V.*,
 140 S. Ct. 2298 (2020).....................................................................7, 17, 20

*Walker v. Klein*,
 No. 97–1322-IEG (CGA),
 1998 WL 35304733 (S.D. Cal. Apr. 3, 1998) ......................................................20

*Warmack-Stillwell v. Christian Dior, Inc.*,
 No. 22 C 4633, 2023 WL 1928109 (N.D. Ill. Feb. 10, 2023) ......................................24

*Yellow Cab Co. of Sacramento v. Yellow Cab of Elk Grove, Inc.*,
 419 F.3d 925 (9th Cir. 2005) ..................................................................18

**STATUTES**

15 U.S.C. § 1064(3) ...........................................................................17

15 U.S.C. § 1071(b) ........................................................................6, 15

15 U.S.C. § 1071(b)(3).........................................................................7

21 C.F.R. § 886.5850 ..........................................................................24

**TREATISES**

2 McCarthy on Trademarks and Unfair Competition § 12:13
 (5th ed. 2017 & 2023 Supp.) ("McCarthy") ......................................................7

McCarthy § 11:64 .............................................................................17

McCarthy § 12:15 ..........................................................................12, 28

McCarthy § 12:51 .............................................................................18

# INTRODUCTION

In 2016, Snap introduced its SPECTACLES brand of wearable digital video cameras, known commonly as camera glasses or smart glasses, to be used with its famous Snapchat app.  Unlike the wire-rimmed bifocals that Benjamin Franklin wore in the 18th century to correct his eyesight, Snap's SPECTACLES are high-tech, stylish sunglasses with sophisticated electronics and software that capture images and video.  The most recent version enables users to experience augmented reality (AR).  The SPECTACLES name for these modern devices evokes the incongruity between an antiquated term for corrective eyewear and Snap's 21st century smart glasses.  The SPECTACLES name also is suggestive of the camera's purpose:  to capture and share unusual, notable, or entertaining scenes (*i.e.*, "spectacles") while also encouraging users to make "spectacles" of themselves.  SPECTACLES is a distinctive brand name for Snap's product, not the common category name for smart glasses, and is entitled to be registered as a trademark.

Defendants fail to carry their heavy burden of showing by *clear and convincing* evidence that the primary significance of the term SPECTACLES in the minds of consumers is as a generic term for smart glasses.  Defendants' motion relies primarily on flawed logic, arguing that, because dictionaries define "spectacles" as glasses and because Snap's SPECTACLES look like glasses, that must mean that the term SPECTACLES is generic for camera glasses.  But the law is not that facile.  Defendants' "if it looks like a duck" argument is no substitute for evidence of consumer perception that Defendants are required to put forward to satisfy their burden.

In contrast, Snap has produced evidence that overwhelmingly shows that consumers understand SPECTACLES to be the name of Snap's branded product rather than a generic or descriptive term for smart glasses.  Snap's evidence includes expert linguistic, marketing, and survey evidence; media articles; social media posts; and testimony from prominent real-world users of Snap's SPECTACLES smart glasses.  Defendants' suggestion that the Court should disregard this evidence contravenes

precedent of the United States Supreme Court and courts in the Ninth Circuit, which unequivocally recognize that this is precisely the type of evidence that is relevant for assessing the fact-intensive question of genericness. Although Snap's evidence overpowers Defendants' competing survey and handful of cherry-picked media articles, the Court need not (and should not) weigh the evidence at this stage of the proceedings. The record leaves no doubt that there are many disputed issues of material fact, and Defendants' motion for summary judgment should therefore be denied.[1]

## STATEMENT OF THE CASE AND FACTS

### I. Snap and its SPECTACLES Branded Smart Glasses

Snap is a technology company that believes that the camera presents the greatest opportunity to improve the way people live and communicate. Declaration of Ryan Chan (Oct.19, 2023) ("Chan Decl.") ¶ 5. Snap contributes to human progress by empowering people to express themselves, live in the moment, learn about the world, and have fun together. *Id.* Snap's flagship product is Snapchat, a mobile messaging and media application and platform that helps people communicate visually with friends and family through short videos and images called Snaps, which they can create with a camera. *Id.* ¶ 6.

In 2016, Snap introduced SPECTACLES, an innovative line of smart glasses aimed at its Snapchat users (largely "Gen Z" and "Millennials") and other everyday enthusiasts who wish to capture and share their experiences in a hands-free manner. The

---

[1] Defendants' motion also should be denied because Defendants failed to comply with Local Civil Rule 7-3, which requires counsel "to discuss thoroughly, preferably in person, the substance of the contemplated motion and any potential resolution . . . at least 7 days prior to the filing of the motion." *See Bohn v. Pharmavite, LLC*, 2013 WL 4517173 (C.D. Cal. 2013) (denying motion where counsel refused to engage in "substantive discussion regarding the specific issues" of the motion). Defendants waited until 7 days before the deadline for filing summary judgment to even broach the subject of a Rule 7-3 conference, at which time they asked Snap to agree to waive the requirements of Local Rule 7-3. Snap declined, and during the parties' 12-minute Zoom conference 3 days before Defendants filed their motion, Defendants refused to answer basic questions about their anticipated motion and to identify the undisputed facts that Defendants believed entitle them to summary judgment.

SPECTACLES camera can be used to post videos and images directly to Snapchat.  *Id.* ¶¶ 9, 10.



A1027.

Smart glasses—which the United States Patent and Trademark Office's ("USPTO") Trademark ID Manual[2] recognizes as a generic term for these types of devices, ["smart glasses" (009-5639)]—are a form of wearable technology that allow users to capture images, record videos, place calls, and, in some cases, deploy interactive augmented reality (AR) applications, among other things.  Declaration of Quenique M. Newbill (Oct. 20, 2023) ("Newbill Decl."), Ex. 8.  Smart glasses are often integrated with connectivity features such as Bluetooth and Wi-Fi, which allow users to sync data with smartphones and other devices.  Chan Decl. ¶ 14.  Some smart glasses even incorporate advanced sensors like accelerometers and gyroscopes to track movements and orientation.  *Id.* ¶ 15.  With these features, smart glasses operate as multi-functional technology devices, comparable to smartphones in many respects, because they enable users to engage in activities, such as watching movies, playing interactive games, following recipes, or receiving turn-by-turn GPS navigation.  *Id.* ¶ 16.

---

[2] Available at https://idm-tmng.uspto.gov/id-master-list-public.html

Snap's SPECTACLES branded smart glasses are a leading product in this category. SPECTACLES function as a digital video camera worn as glasses that record photos and videos from a first-person viewpoint with the press of a button. *Id.* ¶ 9. The design of SPECTACLES smart glasses facilitates not only hands-free recording but also easy integration for sharing with friends on the Snapchat platform. *Id.* ¶ 10.

There have been four generations of SPECTACLES smart glasses, each of which has surpassed its predecessor in technical sophistication and has been at the forefront of the wearable tech market. *Id.* ¶¶ 21–24. SPECTACLES 1 (2016) was a video camera device with a simple capture button located near the temple, allowing for hands-free operation. *Id.* ¶ 21. The second generation, SPECTACLES 2 (2018), built upon this innovative technology by offering various sizes and styles, as well as water resistance, making the device suitable for use in diverse environments and situations. *Id.* ¶ 22. SPECTACLES 3 (2019) incorporated a second camera for stereoscopic capture, which enabled the device to render images with an illusion of depth and allowed for a seamless integration of augmented reality elements into the user's environment. *Id.* ¶ 23. SPECTACLES 4 (2021) integrated an augmented reality display directly into the device, using a nano-imprinted waveguide to project unique images to each eye that delivered a 3D visual experience to the wearer. *Id.* ¶ 24. Coupled with an independent operating system, input mechanisms, and enhanced features within the Snapchat application, SPECTACLES 4 not only empowered its users to document and share their experiences, but also provided a platform for engaging with augmented reality content directly. *Id.*

Other brands of smart glasses currently on the market along with SPECTACLES include Ray-Ban Stories, Bose Frames, Vuzix Blade, Amazon Echo Frames, ThinkReality A3, Rokid Air Pro, and XREAL Air Glasses. *Id.* ¶ 12.[3] Snap is not aware of any other company that refers to its own smart glasses product as "spectacles," either as a brand or the product category generally. *Id.* ¶ 13.

---

[3] One of the earliest smart glasses on the market was Google Glass which launched in 2012; Google Glass is no longer sold. Chan Decl. ¶ 11.

4

## II. <u>Snap's Trademark Applications</u>

On September 20, 2016, Snap filed an application with the USPTO to register SPECTACLES as a trademark (Serial No. 87/177,292) (the "Word Mark Application") for use in connection with:

> Computer hardware; computer peripherals; wearable computer hardware; wearable computer peripherals; computer hardware and peripherals for remotely accessing, capturing, transmitting and displaying pictures, video, audio and data; downloadable computer software, namely, software for setting up, configuring, and controlling wearable computer hardware and peripherals; downloadable computer software and software applications for use in uploading, downloading, capturing, editing, storing, distributing and sharing photographic and video content and other digital data via global and local computer networks and via mobile devices; downloadable multimedia files containing digital audio and video files featuring user generated images, videos, multimedia files, and other digital data, all in the fields of entertainment, photography and online social networking; computer software for accessing and transmitting data and content among consumer electronics devices and displays.

A1–7, A2198–2206. [4]

On October 21, 2016, Snap filed an application with the USPTO to register a stylized version of the word SPECTACLES (*Spectacles*) (Serial No. 87/211,997) (the "Stylized Mark Application" and together with the Word Mark Application, the "Applications") for use in connection with:

> Computer hardware; computer peripherals; wearable computer hardware; wearable computer peripherals; computer hardware and peripherals for remotely accessing, capturing, transmitting and displaying pictures, video, audio and data; downloadable computer software, namely, software for setting up, configuring, and controlling wearable computer hardware and peripherals; downloadable computer software and software applications for use in uploading, downloading, capturing, editing, storing, distributing and sharing photographic and video content and other digital data via global and local computer networks and via mobile devices; downloadable multimedia files containing digital audio and video files featuring user generated

---

[4] Pages from the Certified Administrative Record are noted as A__.

images, videos, multimedia files, and other digital data, all in the fields of entertainment, photography.

A1–7, A2198–2206.

Following a series of office actions, the USPTO ultimately refused registration on the ground that SPECTACLES is a generic term for the goods identified in the Applications, and, alternatively, that SPECTACLES is descriptive and lacks secondary meaning.  A2100, A4297.

### III.        The TTAB Decision

Snap appealed the Trademark Examiner's decision to the Trademark Trial and Appeal Board ("TTAB").  The TTAB affirmed the refusal to register the SPECTACLES trademark, holding that "spectacles" is a generic term that the consuming public primarily understands to designate an entire class of goods (*i.e.*, wearable cameras), rather than the source of those goods (*i.e.*, Snap's branded smart glasses).  A2099–2130, A4296–4327.

On January 5, 2022, Snap filed the instant action pursuant to 15 U.S.C. § 1071(b) to appeal the TTAB's decision, which expressly provides Snap the right to submit new evidence and testimony in addition to the TTAB record.  *See* Dkt. No. 1; *Swatch AG v. Beehive Wholesale, LLC*, 739 F.3d 150, 155 (4th Cir. 2014) ("In a § 1071(b) action . . . [w]hether or not the record is admitted, the parties have an unrestricted right to submit further evidence as long as it is admissible under the Federal Rules of Evidence and Civil Procedure.").  This Court's task is not to consider whether the Trademark Examiner's or TTAB's decision was supported based on the evidence they considered, but rather, to consider all the evidence now submitted by the parties, and to determine *de novo* whether the USPTO has carried its burden of establishing, by clear and convincing evidence, that the primary significance of the term SPECTACLES in the minds of consumers is as a generic term for smart glasses.  *Monster Energy Co. v. USA Nutraceuticals Grp., Inc.*, No. ED-CV-17896, 2018 WL 1942767, at *2 (C.D. Cal. Mar.

14, 2018) (citing *B&B Hardware, Inc. v. Hargis Indus., Inc.*, 135 S. Ct. 1293, 1301 (2015)).

## RECORD BEFORE THE COURT

The TTAB record (which includes evidence that Snap submitted showing that SPECTACLES is understood by consumers to be a brand name) has been moved into the record before this Court pursuant to 15 U.S.C. § 1071(b)(3). *See* Dkt. 42. Snap has further developed the record with new and robust evidence, pursuant to 15 U.S.C. § 1071(b)(3), including the Expert Reports of Dr. Robert A. Leonard, a professor of linguistics; Dr. Peter N. Golder, a professor of marketing; Brian M. Sowers, an expert in designing and conducting consumer perception surveys; the declaration of Lauren Cason, a user of Snap SPECTACLES; the declaration of Kyle Neely, a user of Snap SPECTACLES; and the exhibits of additional materials attached thereto. Along with this motion, Snap is submitting the declaration of Ryan Chan, a Senior Manager of Product Management at Snap, who was previously identified in Snap's disclosures.

This evidence is the kind of evidence that the Supreme Court and courts in the Ninth Circuit have recognized is relevant to assessing whether a term is generic. *United States Pat. & Trademark Off. v. Booking.com B. V.*, 140 S. Ct. 2298, 2307 (2020) ("Evidence informing that inquiry can include not only consumer surveys, but also dictionaries, usage by consumers and competitors, and any other source of evidence bearing on how consumers perceive a term's meaning."); *POM Wonderful LLC v. Hubbard*, No. CV 13-06917, 2016 WL 3621281, at *7 (C.D. Cal. June 29, 2016) ("Courts have found the following forms of evidence relevant in determining whether a mark has become generic: competitors' use, plaintiff's use, dictionary definition, media usage, testimony of persons in the trade, and consumer surveys." (citations omitted)); 2 McCarthy on Trademarks and Unfair Competition § 12:13 (5th ed. 2017 & 2023 Supp.) ("The understanding of those who are familiar with the marketplace usage of the designation in question can be helpful evidence on the genericness issue.").

In light of the evidence Snap has produced, Defendants' repeated assertions that Snap "has no evidence to offer about that dispositive element of the genericness analysis" borders on frivolous.  Defs Mot. at 2.

## I.   **The Expert Linguistics Report of Dr. Robert A. Leonard**

Dr. Robert A. Leonard ("Dr. Leonard"), a tenured professor of linguistics at Hofstra University, provided both a diachronic and synchronic analysis of the meaning and usage in American English of the term "spectacles."[5]  Declaration of Robert A. Leonard (Oct. 19, 2023) ("Leonard Decl."), Ex. 2, p. 49 (Second Leonard Report, p. 5).

Courts recognize the testimony of linguists generally is probative of how consumers perceive words.  For example, in *Solid 21, Inc. v. Hublot of America*, another court in this District held that a linguist's opinion on the use of a term in "ordinary English" that drew "upon use, or lack of use, of the term in dictionaries" was "relevant under well-settled Ninth Circuit law."  109 F. Supp. 3d 1313, 1319 (C.D. Cal. 2015). Although the court limited the linguist's testimony to anything other than dictionary definitions, the Ninth Circuit on appeal held that was error because it was too limiting. 685 Fed. Appx. 530, 531–32 (9th Cir. 2017).  The Ninth Circuit explained that the district court's exclusion of "testimony regarding the associations that ordinary English speakers have with the term" in dispute "prejudiced [the plaintiff] by depriving it of evidence related to the primary significance that consumers assign to the [the plaintiff's] mark."  *Id.*; *see also Mead Johnson & Co. v. Abbott Labs.*, 201 F.3d 883, 885-86 (7th Cir.), *opinion amended on denial of reh'g*, 209 F.3d 1032 (7th Cir. 2000) (noting that "lexicographers determine how words have been used in both scholarly and popular texts").

Courts also have specifically credited Dr. Leonard's expert linguistic opinions in assessing genericness.  *See, e.g.*, *GeoData Sys. Mgmt., Inc. v. Am. Pac. Plastic*

---

[5] Diachronic refers to studies of language change over time and synchronic (referring to studies of language at a specific period in time. Leonard Decl., Ex. 2, p.49 (Second Leonard Report, p. 5).

1  *Fabricators, Inc.*, No. CV154125, 2016 WL 11756835, at *8 (C.D. Cal. Oct. 19, 2016)

2  (finding Dr. Leonard's report "contain[ed] considerable information supporting

3  Plaintiff's claim that the term 'Killer Tomato' is not generic"); *Reinalt-Thomas Corp. v.*

4  *Mavis Tire Supply, LLC*, 391 F. Supp. 3d 1261, 1269 (N.D. Ga. 2019) ("conclud[ing]

5  that the linguistics evidence [of Dr. Leonard] weighs against finding the phrase

6  generic").

7       Defendants' linguistics expert, Dr. Edward Finegan ("Dr. Finegan"), expressly

8  agrees with Dr. Leonard's view on this issue. In another matter, Dr. Finegan testified that

9  "[l]inguistics, and corpus linguistics more specifically, has long been used to answer

10  research questions relating to trademarks." Newbill Decl., Ex. 4, pp. 48–49 (Finegan

11  Dep. 44:15–45:7).  Dr. Finegan has also acknowledged in his own academic writing that

12  "[e]xpert testimony by linguists has relied on corpora in . . . trademark disputes

13  (especially concerning genericity) . . . ." Newbill Decl., Ex. 4, p. 30.

14       Here, Dr. Leonard analyzed the lexical item "spectacles" by reviewing (i) the

15  etymology of "spectacles," (ii) widely-used and well-respected dictionaries (Merriam-

16  Webster, The American Heritage Dictionary of the English Language (the "American

17  Heritage Dictionary"), and Cambridge Dictionary (of US English)), and (iii) established

18  online corpora including the Corpus of Historical American English ("COHA"), the

19  Corpus of Contemporary American English ("COCA"), and Google Ngram Viewer.

20  Leonard Decl., p. 1.  Based on the analysis detailed in his expert report, Dr. Leonard

21  concluded that the term "spectacles" is not commonly used by users of American

22  English to refer to smart glasses or wearable technology that can take photographs and

23  videos.  *Id.*, p. 19 (First Leonard Report, p. 16).

24       Dr. Finegan has relied in other cases upon the same sources that Dr. Leonard

25  relied upon here to assess whether a word is generic.  *See* Report of Edward Finegan,

26  ECF No. 143-9, *Solid 21, Inc. v. Richement North America, Inc. et al.*, Case No. 1:19-cv-

27

28

01262-LGS (S.D.N.Y.) (consulting COHA and COCA and finding non-genericness).[6]  In *Solid 21*, for example, Dr. Finegan's expert report emphasized that "corpus evidence is crucial in assessing genericity."  Newbill Decl., Ex. 5, p. 73. Dr. Finegan explained that corpora can provide "real-life, genuine examples of how ordinary speakers and writers use an expression and understand it."  *Id.*  He added that, "consequently, in the hands of a competent interpreter a corpus can be shown to indicate whether that usage characterizes an expression as an ordinary, or 'common,' noun – a generic – or as a brand name – a proper noun identifying the source of a product or service or as something else."  *Id.*  Dr. Finegan concluded in *Solid 21*, in part, based on his review of corpora, that the disputed term (in that case, "red gold"), was not generic.  *See generally* Newbill Decl., Ex. 5.  He added that "the absence of [the term] from authoritative American dictionaries" was "sound evidence in support of [finding non-genericness] as well."  Newbill Decl., Ex. 5, p. 97.

## II.        The Expert Marketing Report of Dr. Peter N. Golder

Dr. Peter N. Golder ("Dr. Golder"), a distinguished marketing professor at Dartmouth's Tuck School of Business, conducted research to assess whether consumers use and understand "spectacles" in the relevant product category as a generic term or, alternatively, as a brand identifier for Snap's product.  Declaration of Peter N. Golder Ph.D (Oct. 19, 2023) ("Golder Decl."), p. 1.  Dr. Golder followed the historical research method,[7] a peer-reviewed methodology, and conducted an empirical analysis of traditional media articles, social media posts, consumer search patterns, online consumer reviews, and retailer product classification menus.  Based on his research, Dr. Golder concluded that "spectacles" is not a generic term for smart glasses.  *Id.* pp. 1–2.  Specifically, Dr. Golder found:

---

[6] Attached as Exhibit 5 to the Newbill Declaration.

[7] Defendants' marketing expert, Professor Ashish Sood, agreed that the historical research method may be used to assess consumer perception of the primary significance of a term.  Newbill Decl., Ex. 6, pp. 103-14 (Sood Dep. 57:20-58:4).

- With respect to <u>media articles</u>, 86 to 100 percent of articles using "spectacles" in the context of the relevant product category do so to refer to Snap's branded offering. *Id.*, p. 2.

- With respect to <u>social media postings</u>, 92 to 99 percent of postings using "spectacles" in the context of the relevant product category do so to refer to Snap's branded offering. *Id.*

- In <u>retailer product classification</u> menus, the top ten US online consumer electronics retailers referred to the relevant product category using terms such as "Smart Glasses," "Wearable Technology," "Wearables," and "Eyewear" to describe the relevant products. *Id.*, Ex. 1, p. 44 (First Golder Report at fn. 64).

- Analysis of product reviews by Amazon customers in the relevant product category showed that usage of "smart glasses" to refer to the relevant product category greatly exceeds use of "spectacles" as the common category name, and that references to "spectacles" as a category name is *de minimis*. *Id.*, Ex. 1, pp. 44–48 (First Golder Report, pp. 40–44 ¶¶ 49–52)

- Google Trends substantiated these findings, indicating that "smart glasses" was the prevalent term used by consumers to describe the category. In contrast, searches for "spectacles" experienced spikes only upon the launch of Snap's product. *Id.*, Ex. 1, p. 41 (First Golder Report, p. 37 ¶ 48).

- Overall, the generic use of "spectacles" as the common category name was *de minimis* and was far exceeded by generic use of "smart glasses" as the common category name for these types of goods. *Id.*, p. 3.

### III.     The Expert Survey Report of Brian Sowers

Brian Sowers, a consumer survey expert, designed and conducted a *Thermos*-format survey (named after the case in which it first was used) to determine what generic terms consumers use to describe the relevant category of goods (*i.e.*, smart glasses). *See*

11

1    *generally* Declaration of Brian Sowers (Oct. 20, 2023) ("Sowers Decl.") (First Sowers

2    Report, p. 8 ¶ 22).  In a typical *Thermos* survey, potential consumers of the category of

3    goods at issue are asked a series of open-ended questions to discern how they would ask

4    for or describe a product.  *Id*.  These questions are designed to effectively "empty the

5    minds" of the consumers, eliciting all generic terms they might use to request or describe

6    a product within the category in question.  Sowers Decl., p. 2.  The responses to these

7    open-ended questions are used to determine the extent to which the consuming public

8    uses the mark at issue as a generic term.  *Id.* ¶ 8. (First Sowers Report, p. 8 ¶ 22).

9        Courts and leading commentators recognize that the results of a *Thermos* survey

10   are relevant to the issue of genericness.[8]  Additionally, MMR Strategy Group, a

11   marketing research and consulting firm where Defendants' survey expert, Justin

12   Anderson, is the Senior Vice President, states on its website that "MMR Strategy Group

13   surveys measure genericness in matters before federal courts, the TTAB, and other

14   venues, using the Teflon ***or Thermos*** survey formats."  Sowers Decl., p. 1018 (Second

15   Sowers Report, p. 8 ¶ 16).  And Dr. Anderson, himself, has written that, "[t]here are two

16   main types of genericness surveys: a Teflon survey and ***a Thermos survey***."  *Id*.

17        Mr. Sowers' *Thermos* survey asked respondents a series of open-ended questions

18   regarding "eyeglasses that can connect to smartphones via Bluetooth or Wi-Fi to provide

19   features like photo and audio/video capture," including to identify (Q1) the words they

20   would use to identify or describe the product; (Q2) the terms they would use to ask a

21   sales person, or type into an online search bar, if they wanted to purchase the product;

22   (Q3) the words they would use to describe the product to a friend; (Q4) any other words

---

24        [8] *See* McCarthy on Trademarks and Unfair Competition § 12:15 (5th ed.); Jacoby, J. (2013).

25   Trademark Surveys Volume 1, Designing, Implementing, and Evaluating Surveys. US: American Bar
Association, p.12 ("The Thermos model and the Teflon model are the two preferred models for

26   genericness surveys."); Diamond, S.S. & Swann, J.B. (2022); Trademark and Deceptive Advertising
Surveys: Law, Science, and Design. 2nd ed. American Bar Association, Section of Intellectual Property

27   Law, p.119 ("The Thermos Survey is a method that has achieved general acceptance for use in
determining the genericness of a disputed term."); Sowers Decl., p. 1018.

28

they would use to describe the product; (Q5) and any "common name(s)" they could think of for the product.  Sowers Decl., pp. 3–4 (First Sowers Report, pp. 12–14 ¶¶ 31–41).

Mr. Sowers' *Thermos* survey found, based on the open-ended responses across all of these questions, that the generic terms most commonly used by consumers to describe the relevant category of goods in this case were "smart glasses" and/or "camera glasses" in some form (75.1%) and Bluetooth/Wi-Fi/wireless glasses (47.6%).  Sowers Decl., pp. 33–34 (First Sowers Report, pp. 23–24 ¶ 63).  Out of 273 total respondents, only 4 (1.5%) used "spectacles" as a generic term to describe the relevant category of goods. Even conservatively counting abbreviated forms of "spectacles" (e.g., "Smart specs" or "MediaSpecs") as generic usage of the term "spectacles," a total of only 12 (or 4.4% of total respondents) used the term "spectacles," or some variation, as a generic term. Sowers Decl., p. 33 (First Sowers Report, p. 24 ¶ 64).  As Dr. Anderson acknowledges, the results of the Sowers survey demonstrate "that SPECTACLES is not a word that many consumers would use to refer to smart glasses."  Newbill Decl., Ex. 10, p. 133 (First Anderson Report p. 17 ¶ 53).

## IV.  **Testimony of Persons In The Trade**

Kyle Neely ("Mr. Neely") is a social media content creator and an auto collision technician based in in St. Louis, Missouri.  Declaration of Kyle Neely (Mar. 9, 2023) ("Neely Decl.") ¶ 2.  He began using SPECTACLES smart glasses in late 2016, shortly after their launch.  *Id*. ¶ 3.  Since May 2017, he has been using SPECTACLES smart glasses almost daily to record and share informative auto repair videos.  *Id*.

For Mr. Neely, the term "Spectacles" is firmly associated exclusively with Snap's branded camera glasses, and in his experience, SPECTACLES is exclusively used to refer to Snap's branded product.  *Id*. ¶ 6.  He shares his videos taken by Spectacles across various social media platforms, including Snapchat, Facebook, Instagram, TikTok, and YouTube, under the handle "BlueCollarKyle."  *Id*. ¶ 4.  With over 860,000 followers on Snapchat and approximately 1.5 million followers across all social media

13

1     platforms, he may be one of the most prolific creators of content filmed with

2     SPECTACLES smart glasses in the U.S. *Id*.

3         Mr. Neely has owned twelve pairs of SPECTACLES smart glasses over the years.

4     *Id*. ¶ 5.  He has purchased most of them, although he has received one or two of the

5     newer models from Snap at no cost.  *Id*.  During his six plus years of use of Snap's

6     SPECTACLES, Mr. Neely has never heard anyone use the term "spectacles" to describe

7     or refer to camera glasses generally, or to any other brand of camera glasses.  *Id*. ¶ 7.

8     Mr. Neely, himself, uses the phrase "glasses with a built-in camera" to refer to the

9     product category into which Snap SPECTACLES fits.  *Id.* ¶ 6.  He also owns a pair of

10     Ray-Ban Stories, another brand of smart glasses.  *Id*. ¶ 5.  Even in the case of Ray-Ban

11     Stories, Mr. Neely has never heard anyone refer to them as "spectacles."  *Id*. ¶ 7.

12         Lauren Cason ("Ms. Cason") resides in Santa Fe, New Mexico and runs a

13     technology design studio called Refract that specializes in augmented reality (AR)

14     software.  Declaration of Lauren (Mar. 9, 2023) ("Cason Decl.") ¶ 2.  Refract extends

15     consulting services to technology companies, advising on the application of wearable

16     AR devices.  *Id*.  Ms. Cason began her journey with software and immersive technology

17     in 2015 as part of a team that developed a virtual reality (VR) video game.  *Id*. ¶ 3.

18         Ms. Cason has experience using a variety of eyeglasses that capture video and

19     photographs, including SPECTACLES, Google Glass, and Microsoft HoloLens, and she

20     has handled and tried on Ray-Ban Stories.  *Id*. ¶ 4.  Ms. Cason also has experience with

21     other AR or VR-enabled glasses, such as Oculus Quest by Meta, products by Qualcomm,

22     Take Five, and Vive, many of which allow users to capture video and photographs.  *Id*.

23     In June 2021, Ms. Cason independently wrote and published an article reviewing Snap's

24     SPECTACLES (2021) model.  *Id*. ¶ 5.

25         Ms. Cason refers to the category of AR-enabled eyeglasses that capture video and

26     photographs as "waveguide headsets" or "passthrough headsets".  *Id*. ¶ 6.  She is aware

27     that many consumers use the terms "smart glasses" and "camera glasses" to refer to this

28     category of eyewear.  *Id*. ¶ 7.  Based on her experience, Ms. Cason believes that the term

1  "Spectacles" is used exclusively to refer to Snap's branded smart glasses.  *Id*. ¶ 8.  She is

2  not aware of any instances where the term "Spectacles" is used to describe or refer to the

3  broader category of AR-enabled eyeglasses or any other brand of eyeglasses that capture

4  video and photographs.  *Id*.  Furthermore, Ms. Cason is not aware of any of Refract's

5  clients using the term "spectacles" to describe or refer to AR-enabled eyeglasses or

6  eyeglasses that capture video and photographs.  *Id*. ¶ 9.

7  **LEGAL STANDARDS**

8  **I.    Standard Under 15 U.S.C. § 1071(b)**

9  When a party is dissatisfied with a decision of the TTAB, that party may file a

10  civil action under 15 U.S.C. § 1071(b).  In such a proceeding, when an applicant

11  "presents new evidence, the district court resolves the issue of registration *de novo*

12  without deference to the TTAB decision."  *Monster Energy Co.*, 2018 WL 1942767, at

13  *2 (citing *B&B Hardware, Inc.*, 135 S. Ct. at 1301 (2015)); *Garan, Inc. v. Manimal,*

14  *LLC*, 20-cv-0623-IM, 2022 WL 225060, *6 (D. Or. 2022) ("Plaintiffs have submitted a

15  plethora of new evidence that goes directly to the heart of the TTAB's decision. . . .  This

16  new evidence demands this Court's *de novo* review of both the new evidence and the

17  administrative record.").

18  *De novo* review is critical because deference to the TTAB's findings is impractical

19  if those findings were based on only a subset of facts before the court.  *See Swatch*, 739

20  F.3d at 156 (quoting *Kappos v. Hyatt*, 132 S. Ct. 1690, 1700 (2012)); *Interprofession Du*

21  *Gruyere v. U.S. Dairy Export Council*, 575 F. Supp. 3d 627, 632 (E.D. Va. 2021) *aff'd,*

22  61 F.4th 407 (4th Cir. 2023) ("[T]he determination of genericness in this case is made *de*

23  *novo*, and the TTAB's opinion is not given deference." (citations omitted)).

24  Both on appeal to the TTAB and in a Section 1071 federal court proceeding, "the

25  USPTO always bears the burden of establishing that a proposed mark is generic" by

26  clear and convincing evidence.  *Booking.com B.V. v. United States Pat. & Trademark*

27  *Off.*, 915 F.3d 171, 179 (4th Cir. 2019), *as amended* (Feb. 27, 2019), *aff'd*, 140 S. Ct.

28  2298 (2020), *and cert. granted, judgment vacated*, 141 S. Ct. 187 (2020); *In re Cordua*

15

*Rests., Inc.*, 823 F.3d 594, 600 (Fed. Cir. 2016) ("When a proposed mark is refused registration as generic, the Office has the burden of proving genericness by 'clear evidence' thereof." (citations omitted)); *In re Hotels.com, L.P.*, 573 F.3d 1300, 1302 (Fed. Cir. 2009) ("The Patent and Trademark Office (PTO) bears the burden of establishing that a proposed mark is generic); *see also In re Merrill Lynch, Pierce, Fenner, and Smith, Inc.*, 828 F.2d 1567, 1571 (Fed. Cir. 1987) (the burden of proving genericness "remains with" the USPTO) (emphasis added)).

Defendants' motion conspicuously fails to mention the USPTO's heavy burden. This burden, however, is critical and must be taken into account when evaluating the evidence on Defendants' motion for summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1986). That is because, "[w]ithout evidence that to the consuming public the primary significance of [a] term is to denote the [product] offer[ed] and not its source, [a court is] without a sufficient evidentiary basis to find the mark generic." *Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 718 F.2d 327, 330 (9th Cir. 1983), *rev'd on other grounds*, 469 U.S. 189 (1985).

## II.    **Standard for Summary Judgment**

Summary judgment is appropriate only when the pleadings, affidavits, depositions, and other submissions show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A material fact is one that could affect the outcome of the case, and a genuine dispute is present when a fact finder could find in favor of the non-moving party based on the evidence. *Liberty Lobby*, 477 U.S. at 248.

Importantly, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from facts are . . . not those of a judge . . . ruling on a motion for summary judgment. The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.*; *LaLonde v. County of Riverside*, 204 F.3d 947, 959 (9th Cir. 2000) (same).

Due to the "intensely factual nature of trademark disputes," summary judgment is disfavored.  *Interstellar Starship Servs., Ltd. v. Epix Inc.*, 184 F.3d 1107, 1109 (9th Cir. 1999).  Courts have generally limited summary judgement to the rare instances where "the evidence of genericness was so one-sided that no genuine issue of fact existed." *Interprofession Du Gruyere*, 575 F. Supp. 3d at 636 (citations omitted); *see Nartron Corp. v. STMicroelectronics, Inc.*, 305 F.3d 397, 405 (6th Cir. 2002), *cert. denied*, 538 U.S. 907 (2003) (affirming summary judgment on the basis of "overwhelming evidence" of genericness).

## ARGUMENT

I. **Defendants Have Failed To Provide Clear And Convincing Evidence That Consumers Primarily Understand "Spectacles" To Be Generic.**

Whether a term is generic is an issue of fact that depends on how consumers perceive the mark.  The ultimate test is the "primary significance" of the mark to members of the relevant public.  15 U.S.C. § 1064(3); *see also Booking.com*, 140 S. Ct. at 2304 ("[T]he relevant meaning of a term is its meaning to consumers." (citing *Bayer Co. v. United Drug Co.*, 272 F. 505, 509 (S.D.N.Y. 1921))).

This determination depends on how consumers actually use or refer to the mark.  *See Filipino Yellow Pages v. Asian J. Publ'g*, 198 F.3d 1143, 1148-52 (9th Cir. 1999) (explaining courts must consider evidence of whether consumers use the mark as a genus name); *see also Kudos Inc. v. Kudoboard LLC*, No. 20-CV-01876-SI, 2021 WL 5415258, at *6 (N.D. Cal. Nov. 20, 2021) ("[T]he proper inquiry [is] namely, consumer's use of the word . . . as a generic referent to . . . the class of goods . . . .").  How a mark is characterized on the spectrum of distinctiveness (*i.e.*, generic, descriptive, suggestive, arbitrary or fanciful) depends on the context in which it is used.  For example, "the mark BRILLIANT may be 'descriptive' of diamonds, 'suggestive' on furniture polish, and 'arbitrary' on canned applesauce."  *McCarthy, supra*, § 11:64.

Courts assessing genericness also must carefully consider whether the term at issue has multiple meanings or may have evolved over time.  *See Booking.com* 140 S.

17

1  Ct. at 2307 n.6 ("[D]ifficult questions may be presented when a term has multiple

2  concurrent meanings to consumers or a meaning that has changed over time."); *see, e.g.*,

3  McCarthy, *supra*, § 12:51 (terms may be "a generic name to some portion of the market

4  and a trademark to another class of customers").  As a simple but illustrative example,

5  although a "telegram" is the generic word for an antiquated way of sending messages via

6  telegraph, TELEGRAM also is a federally registered trademark for the name of a

7  popular messaging smartphone application.  *See* Newbill Decl., Ex. 7, p. 108.

8      Importantly, "[m]erely establishing that [a term] is generic for something . . . does

9  not establish that [it] is generic for the relevant class of goods." *Kudos Inc.*, 2021 WL

10  5415258, at *8 (emphasis omitted).  For a mark to be refused registration on the ground

11  that it is generic, the USPTO "needs to produce evidence affirmatively demonstrating

12  that relevant consumers primarily perceive the . . . mark to refer to . . . the relevant

13  class." *Id.* at *8.

14      In this Circuit, courts follow the "who-are-you/what-are-you" test to determine

15  whether a mark is generic. *Yellow Cab Co. of Sacramento v. Yellow Cab of Elk Grove,*

16  *Inc.*, 419 F.3d 925, 929-30 (9th Cir. 2005) (reversing summary judgment on grounds that

17  "yellow cab" was not generic as a matter of law).  In short, when a consumer asks for a

18  product using the term at issue, the question the court seeks to answer is whether the

19  consumer is seeking the product of a particular producer (species) or referring to the type

20  of product itself (genus).  *See id.*

21      Defendants have failed to demonstrate with undisputed, let alone *clear and*

22  *convincing*, evidence that consumers primarily understand "spectacles" to be a generic

23  term for smart glasses.  On the contrary, the evidence presented by Snap shows that

24  SPECTACLES is primarily understood by consumers as a source identifier for Snap's

25  smart glasses, thus answering the question of "who-are-you" under the Ninth Circuit's

26  test.

27      Defendants entreat the Court to ignore all of Snap's evidence by drawing an

28  artificial distinction between "consumer usage" and "consumer understanding," arguing

18

that "Snap has limited its proof to how the relevant public uses the word 'spectacles,' rather than how the relevant public understands the word in the context of smart glasses." Defs. Mot. at 2. But Defendants' position would require the Court ignore clear legal precedent that expressly recognizes that Snap's evidence is highly relevant to the issue at hand. As this court has explained:

> Evidence of genericness includes the following: (1) generic *use* by competitors of the mark that has not been contested by the owner of the mark; (2) generic *use* of the trademark by the proponent of the trademark; (3) dictionary definitions to determine public *usage*; (4) generic *usage* in the media of the trademark, such as in trade journals and newspapers; (5) testimony of persons in the trade; and (6) consumer surveys.

*Ossur hf v. Manamed Inc.*, 331 F. Supp. 3d 1005, 1012 (C.D. Cal. 2017) (emphasis added) (citation omitted). Defendants' position also would require the Court to ignore portions of the very cases on which Defendants rely. *See In re 1800 Mattress.com*, 586 F.3d 1359, 1362 (Fed. Cir. 2009) ("We have held that '[t]he critical issue in genericness cases is whether members of the relevant public primarily *use or understand* the term sought to be protected to refer to the genus of goods or services in question." (emphasis added) (quoting *H. Marvin Ginn Corp. v. Int'l Assn. of Fire Chiefs, Inc.*, 782 F.2d 987, 989–90 (Fed. Cir.1986))).[9]

---

[9] Defendants' reliance on *In re 1800Mattress.com* to argue that consumer usage is irrelevant (Defs. Mot. at 19)—notwithstanding the court's statement to the contrary in that case—is misplaced. The court's holding that MATTRESS.COM was generic for online retailers of mattresses turned on the specific facts of that case. The court essentially found that MATTRESS.COM was one-dimensional and singular in its meaning and thus was generic in the minds of the consumers. The court specifically highlighted the absence of evidence that the mark evoked a quality of comfort in mattresses, or that the relevant public perceived any double entendre or special meaning in the mark. 586 F.3d at 1364 (finding "no evidence that the relevant public finds such a double entendre in the term" and "no evidence that the mark MATTRESS.COM acts a mnemonic"). The court also highlighted the generic use by the applicant itself, and generic use by competitors. *Id.* at 1362 ("the Board's conclusion of genericness was supported by clear and substantial evidence, including dictionary definitions, use by Dial–A–Mattress, and use of the identical term 'mattress.com' to denote the websites of competitors offering the same services as Dial–A–Mattress."). In the face of this overwhelming evidence of genericness, the court found that it was "irrelevant whether the relevant public refers to online mattress retailers as 'mattress.com.'" *Id.* at 1364. Even on the specific facts of that case, the court's reasoning is

*(footnote cont'd on next page)*

Indeed, courts expressly recognize that "[e]vidence of the public's ***understanding*** of the term [at issue] may be obtained from ***any competent source***, such as purchaser testimony, consumer surveys, listings in dictionaries, trade journals, newspapers, and other publications." *In re Merrill Lynch*, 828 F.2d at 1570 (emphasis added). That is exactly the type of evidence that Snap has put forward.

In contrast, Defendants have failed to submit many of these types of evidence, and inexplicably ask the Court to credit their media articles and survey, while disregarding the media articles and survey that Snap submitted.

## A. Defendants Offer No Testimony from Anyone in the Trade

Courts recognize that testimony of persons in the trade is relevant to the question of genericness because these users possess knowledge, experience, and industry-specific terminology. *See Ossur hf*, 331 F. Supp. 3d at 1012; *Cascade Mfg. Sales, Inc. v. Providnet Co. Tr.*, No. C08-5433RBL, 2008 WL 4889716, at *3 (W.D. Wash. Nov. 12, 2008) ("[A] term's status as generic is also informed by reference to purchaser and consumer testimony.").

Defendants have submitted no testimony from anyone in the trade stating that they understand, or that they are aware of others in the industry who understand, "spectacles" to be a generic term for smart glasses. In contrast, Snap has submitted the declarations of Mr. Neely and Ms. Cason, both of whom are familiar with the smart glasses product category, and both of whom recognize SPECTACLES to be a brand name for Snap's product rather than a common category name for smart glasses. These declarations are highly relevant, and are sufficient, standing alone, to raise a disputed issue of material fact. *See Walker v. Klein*, No. 97–1322-IEG (CGA), 1998 WL 35304733 at *6 (S.D.

---

dubious, at best, in light of the Supreme Court's more recent ruling in *Booking.com*, its treatment of so-called generic.com trademarks, and holding that Booking.com was not generic for the name of a travel website. There, the Supreme Court explained: "[I]f 'Booking.com' were generic, we might expect consumers to understand Travelocity—another such service—to be a 'Booking.com.' We might similarly expect that a consumer, searching for a trusted source of online hotel-reservation services, could ask a frequent traveler to name her favorite 'Booking.com' provider." *Booking.com*, 140 S. Ct. at 2304–05.

1   Cal. Apr. 3, 1998) (multiple declarations from the relevant public stating that whenever

2   the declarants heard the term at issue they thought only of plaintiff's services and

3   materials "[we]re enough to raise a triable issue of material fact with respect to the

4   genericness of the [term]").[10]

5       **B.   Defendants Offer No Evidence of Generic Use of "Spectacles" by**

6           **Competitors**

7       Snap is not aware of any past or present use by competitors of "spectacles"

8   generically to refer to their products, and Defendants have not submitted any such

9   evidence.  This weighs against a finding of genericness.  *See Moroccanoil, Inc. v. Marc*

10   *Anthony Cosms., Inc.*, 57 F. Supp. 3d 1203, 1214 (C.D. Cal. 2014) (evidence that

11   "competitors do not use the term 'Moroccan Oil' or 'Moroccanoil' to describe their

12   argan oil hair products" weighed against finding the mark generic); *Ossur hf*, 331 F.

13   *Supp. 3d at 1013* (absence of evidence of competitors using the mark "Unloader One" in

14   a generic sense weighed against find the mark generic); *In re Trek 2000 Int'l Ltd.*, 97

15   *U.S.P.Q.2d (BNA) 1106, 1113, 2010 WL 5099653 at *9 (T.T.A.B. Nov. 30, 2010)*

16   (precedential) (the availability of other terms for flash drives and the "complete absence

17   of competitor use after ten years," indicated the mark THUMBDRIVE was not generic);

18   *see also E.T. Browne Drug Co. v. Cococare Prod.*, Inc., 538 F.3d 185, 198 (3d Cir.

19   2008) ("Courts have long focused on the availability of commonly used alternatives in

20   deciding whether a term is generic." (citations omitted)).

21       Instead of submitting evidence of how competitors refer to smart glasses,

22

23       [10] Snap acknowledges that Mr. Neely and Ms. Cason have previously received compensation or free products from Snap, – though not connected in any way to their participation in this matter – which Snap expects Defendants to raise in their reply.  Both Mr. Neely's and Ms. Cason's declarations, however, establish that they are familiar with the product category and the industry.  Their own understanding of "spectacles" and how "spectacles" is used in the industry is therefore relevant and probative to the issue of genericness.  Defendants are free to argue at trial what weight they believe should be given to Mr. Neely's and Ms. Cason's testimony, but the testimony must be credited on summary judgment.  *See Liberty Lobby, Inc.*, 477 U.S. at 248 ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from facts are . . . not those of a judge . . . ruling on a motion for summary judgment.").

24

25

26

27

28

Defendants argue that online retailers market smart glasses as "spectacles," based on two cherry-picked product listings from Walmart and Amazon.com.  Defs. Mot. at 11–12. But that simply is not true.  The listings that Defendants cite appear to be examples of search engine optimization (SEO) practices known as "keyword stuffing" or "title stuffing." These practices are considered unethical by many, and are prohibited by Amazon.com, Google, and other e-commerce sites.  This practice is aimed at improving a product's online visibility through the intentional and excessive inclusion of various keywords (including brand names) within a product's listing to maximize its appearance in search results across a broad array of customer searches.  Chan Decl. ¶¶ 29–31.  Some news reporting has tied the "flood" of these types of products to foreign countries subsidizing the cost of seeking U.S. intellectual property registrations for their citizens.[11]

On their face, the two product listings Defendants cite are nonsensical, do not appear to be the actual name of any product, and are highly misleading.  The Walmart product listing is called "Relax love Bluetooth Smart Glasses Spectacles Open-ear Glasses Speaker with MIC Waterproof."  Defs. Mot. at 11. It appears to be sold not by Walmart, but by a third-party seller in Hong Kong called Joybuy Marketplace, which has many one-star customer reviews complaining how the product descriptions misrepresent the nature of the product actually sold.[12]  Notably, the product description does not

---

[11] *See, e.g.*, Josh Gershman, *Flood of Trademark Applications From China Alarms U.S. Officials*, WALL ST. J. (May 5, 2018), https://www.wsj.com/articles/flood-of-trademark-applications-fromchinaalarms-u-s-officials-1525521600; *see also* John Herrman, *The Junkification of Amazon Why does it feel like the company is making itself worse?*, N.Y. MAG.: INTELLIGENCER (Jan. 30, 2023), https://nymag.com/intelligencer/2023/01/why-does-it-feel-like-amazon-is-making-itself-worse.html ("Many products will be described in SEO-ese: 'Silicone Spatula Turner, VOVOLY 3-Pack Spatula Set for Nonstick Cookware, BPA Free Rubber Spatulas, Heat Resistant Kitchen Utensil, No Scratch or Melting, Ideal for Egg, Cookie, Crepe, Burger, Pancake.'").

[12] *See* Joybuy Marketplace Reviews, Walmart. https://www.walmart.com/seller/18988?itemId=748626613&pageName=item&returnUrl=%2Fip%2FRelax-love-Bluetooth-Smart-Glasses-Spectacles-Open-ear-Glasses-Speaker-with-MIC-Waterproof%2F748626613%3Fwmlspartner%3Dwlpa%26selectedSellerId%3D18988 (last visited Oct. 18, 2023).

1   include the term "spectacles."[13]  Rather, when describing the product, the seller uses

2   terms such as "advanced Bluetooth glasses" and "wireless Bluetooth 5.0 sunglasses,"

3   which indicates that the term "spectacles" is not being used generically here, but rather a

4   reference to Snap's brand for SEO purposes.

5          The Amazon.com product listing is called "eFashion Spectacles Eyewear Glasses

6   DVR Camcorder Camera 720P."  Defs. Mot. at 12; A0055–57.  Again, the product

7   "name" is simply a series of keywords and a likely reference to Snap's branded product.

8   This product no longer appears to be available for sale on Amazon.com, perhaps because

9   the listing violated Amazon's terms of use prohibiting keyword stuffing.  Chan Decl. ¶

10  34.

11         Even if these uses of "spectacles" could be considered generic, two product

12  listings certainly are not clear and convincing evidence that the primary significance of

13  "spectacles" to relevant consumers is a generic term.  More telling is the product

14  category under which these products are listed.  The Walmart product is listed under the

15  category of "sunglasses" (not "spectacles") and the Amazon product is listed under the

16  category "Hidden Cameras" (not "spectacles").[14]  *See* A0055–57.  Indeed, Snap is not

17  aware of any retailer that sells smart glasses under a generic product category known as

18  "spectacles," which one would expect to see if "spectacles" is, in fact, a generic term for

19  smart glasses.

20         Dr. Golder specifically researched this very issue.  He reviewed how the top ten

21  online consumer electronics retailers in the United States—which include Amazon.com,

22  Best Buy, Target, and Walmart—refer to the relevant product category, and Dr. Golder

23  found that none use "spectacles."  Instead, they use terms such as "Smart Glasses,"

---

24
25       [13] *See* Relax Love Product Listing, Walmart, https://www.walmart.com/ip/Relax-love-
26  Bluetooth-Smart-Glasses-Spectacles-Open-ear-Glasses-Speaker-with-MIC-
    Waterproof/748626613?wmlspartner=wlpa&selectedSellerId=18988 (last visited Oct. 18, 2023) (under
    "product details").

27       [14] The full product classification menu is shown as "Electronics > Camera & Photo > Video
28  Surveillance > Surveillance Cameras > Hidden Cameras" *See* A0055.

1   "Wearable Technology," "Wearables," and "Eyewear."  Golder Decl., Ex. 1, p. 44 (First

2   Golder Report at fn. 64).  Dr. Golder also systematically analyzed product reviews of

3   smart glasses by Amazon consumers and found that use of "spectacles" referred

4   predominantly to Snap's branded smart glasses rather than as a common category name.

5   *Id.* at 44–46 (First Golder Report, pp. 40–42 ¶ 49–51).

6       **C.    Defendants Offer No Evidence of Generic Use of "Spectacles" by Snap**

7       Snap itself does not use "spectacles" generically, and Defendants have submitted

8   no evidence that Snap does.  Rather, Snap uses terms such as "sunglasses," and "glasses"

9   as the common category name for its branded SPECTACLES.  This further weighs

10  against a finding of genericness.  *See, e.g., In re Trek 2000 Int'l Ltd.*, 2010 WL 5099653

11  at *8 (evidence that "applicant used other terminology as the name of the goods from the

12  outset" weighed against finding of genericness).

13      Defendants' assertion that "Snap's public communications describe Spectacles as

14  sunglasses that can be purchased with prescription lenses," Defs. Mot. at 5, is

15  misleading.  Snap does not market SPECTACLES as corrective eyewear or "ordinary

16  eyeglasses."[15]  Defs. Mot. at 26.  A third-party, Lensabl, not Snap, offers prescription

17  inserts that can be purchased by consumers to use with their SPECTACLES smart

18  glasses.  Chan Decl. ¶ 25.  SPECTACLES are smart glasses, and Snap neither sells

19  SPECTACLES with prescription inserts, nor markets the availability of prescription

20  inserts by Lensabl for SPECTACLES.  *Id.*

21      Defendants' suggestion that Snap's SPECTACLES are prescription glasses seems

22  to be an attempt to fit them within a dictionary definition of "spectacles" as corrective

23  _____

24      [15] Snap's compliance with Food and Drug Administration ("FDA") regulations, Defs. Mot. at 8,
    does not demonstrate that "spectacles" is a generic term for smart glasses.  The FDA exercises

25  regulatory oversight over all forms of sunglasses, both prescription and non-prescription, due to their
    role in protecting eyes from solar radiation.  *See* 21 C.F.R. § 886.5850; *see also Warmack-Stillwell v.*

26  *Christian Dior, Inc.*, No. 22 C 4633, 2023 WL 1928109, at *3 (N.D. Ill. Feb. 10, 2023) ("[S]unglasses,
    even if nonprescription, protect one's eyes from the sun and are Class I medical devices under the Food

27  & Drug Administration's regulations." (citing 21 C.F.R. § 886.5850)).

28

24

1   eyewear.  But this approach by Defendants is an acknowledgment that they have no

2   evidence that consumers understand "spectacles" to be a generic term for smart glasses.

3   If they did, there would be no need for Defendants to try and portray Snap's

4   SPECTACLES as prescription glasses because they would be "spectacles" (*i.e.*, a

5   generic term for smart glasses) regardless of whether they have prescription inserts.

6     **D.**  **No Dictionary Defines "Spectacles" as Smart Glasses, or Anything**

7       **Remotely Close to a Product That Incorporates Technology**

8     Defendants have admitted that they are not aware of *any* English language

9   dictionary that defines "spectacle" or "spectacles" as smart glasses, camera glasses,

10   picture glasses, photo glasses, or video glasses.  Newbill Decl., Ex. 2, pp. 19–23.  As Dr.

11   Leonard found, after consulting three widely used dictionaries (Merriam-Webster, the

12   American Heritage Dictionary, and Cambridge Dictionary), the "meaning of 'spectacles'

13   generally refers to (1) an event or behavior or (2) corrective eyewear, and not wearable

14   technology that can take photographs and videos."  Leonard Decl., p. 18 (First Leonard

15   Report, p. 15)

16     Defendants do not identify dictionary definitions that provide materially different

17   definitions.  Instead, they present a convoluted tautology that essentially boils down to:

18   dictionaries define "spectacles" as "glasses" or "something resembling eyeglasses";

19   Snap's SPECTACLES resemble glasses; therefore, "spectacles" must be generic for

20   smart glasses.  Defs. Mot. at 5.  But Defendants' argument is not based on any evidence

21   of consumer understanding or usage.  Notably, no dictionary defines "spectacles" as

22   anything close to resembling the genus of goods that Defendants have expressly adopted

23   for purposes of their motion: "cameras and related software/hardware components that

24   are commonly and generically referred to as 'smart glasses' or 'camera glasses,' but

25   never 'spectacles.'"  Defs. Mot. at 19.

26     Even if the Court were to agree with Defendants' tortured logic, Defendants'

27   argument must be weighed against Snap's evidence surrounding the dictionary

28   definitions, with every reasonable inference drawn in favor of Snap.  Accordingly, even

1  if the Court views the parties' different interpretations as competing definitions (which it

2  should not given that no dictionary defines "spectacles" as smart glasses or anything

3  incorporating modern technology), the Ninth Circuit has found that a genuine issue of

4  material fact exists where a disputed term carries different dictionary meanings, because

5  a fact-finder could reasonably rely on any one definition.  *See Fortune Dynamic, Inc. v.*

6  *Victoria's Secret Stores Brand Mgmt., Inc.*, 618 F.3d 1025, 1034 (9th Cir. 2010).

7      **E.    Defendants' Cherry-Picked Media Articles Falls Far Short of Clear**

8          **and Convincing Evidence of Primary Significance**

9      Media articles are relevant to assessing genericness because "[t]he media is often

10  considered to have its finger on the pulse of the general public, and its use of a particular

11  term will likely conform to the public's understanding of that term. The press also has

12  the ability to shape public interpretation." *San Diego Comic Convention v. Dan Farr*

13  *Prods.*, 336 F. Supp. 3d 1172, 1180 (S.D. Cal. 2018) (citation omitted).

14      Defendants rely on less than a dozen media articles that the TTAB cited to argue

15  that "spectacles" is a generic term for smart glasses.  Defs. Mot. at 9-10.  As Defendants'

16  own marketing expert, Professor Ashish Sood, acknowledged, nine articles, without

17  more information about how those articles were searched for and identified, provide an

18  insufficient basis to draw any reliable conclusion about whether "spectacles" is a generic

19  term for the relevant product category.  Newbill Decl., Ex. 6, pp. 106–07 (Sood Dep. at

20  134:19–135:9).  They certainly cannot sustain Defendants' burden to show by clear and

21  convincing evidence that the ***primary*** significance of "spectacles" is a generic term.  *See,*

22  *e.g.*, *Horizon Mills Corp. v. QVC, Inc.*, 161 F. Supp. 2d 208, 217 (S.D.N.Y. 2001)

23  (finding 60 examples of usage over a 10-year period in magazine and newspaper articles,

24  trade publications, and Internet advertisements insufficient to demonstrate the primary

25  significance of "slinky" to be generic for clothing fabric).

26      In contrast to Defendants' unprincipled approach to identifying media articles, Dr.

27  Golder applied a rigorous empirical process, rooted in peer-reviewed literature that relies

28  upon random sampling techniques to yield representative insights into collections of

1    archival materials from specifying particular search terms.  Golder Decl., Ex. 1, p. 18.

2    (First Golder Report at 14 ¶ 20).  By varying the time period and source of evidence

3    across multiple analyses, Dr. Golder was able to conduct "sensitivity analyses" to

4    investigate how robust his findings were to these variations.  *Id.*

5         With respect to media articles, Dr. Golder's analyses showed that 86 to 100

6    percent of articles used "spectacles" in the context of the relevant product category to

7    refer to Snap's branded offering.  With respect to social media postings, Dr. Golder's

8    analyses showed that 92 to 99 percent of postings used "spectacles" in the context of the

9    relevant product category to refer to Snap's branded offering.  To accommodate Dr.

10   Sood's flawed critiques (with which Dr. Golder fundamentally disagreed), Dr. Golder

11   expanded his analytical samples and found results that corroborated his original

12   conclusions.  In total, Dr. Golder sampled and reviewed 1,837 media articles from a

13   population of 11,771.  He also analyzed a sample of 2,289 social media postings across

14   thirteen samples selected from a total population of 126,027.  As Dr. Golder explains,

15   these random sample sizes are at or above thresholds necessary to provide statistically

16   representative insights.  Golder Decl., Ex. 1, p. 18 (First Golder Report at fn. 28).  This

17   evidence demonstrates that SPECTACLES is primarily understood as a brand name, not

18   a generic term.  *See, e.g.*, *San Diego Comic Convention*, 336 F. Supp. 3d at 1180 (media

19   usage of "Comic Con" to refer to the plaintiff's comic conventions supported jury's

20   finding that "Comic Con" was not generic); *In re Am. Online, Inc.*, 77 U.S.P.Q.2d 1618,

21   1623, 2006 WL 236389 at *7–8 (T.T.A.B. Jan. 18, 2006) (precedential) (concluding

22   INSTANT MESSENGER was not generic where 43 out of 70 media articles used the

23   term INSTANT MESSENGER as a trademark and specifically identified the applicant as

24   the source of the services offered).

25        Any criticisms that Defendants may have of Dr. Golder's analysis or the weight to

26   be afforded to the articles reviewed are not properly resolved on summary judgment.

27   *See Liberty Lobby, Inc.*, 477 U.S. at 249  ("[A]t the summary judgment stage the judge's

28   function is not himself to weigh the evidence and determine the truth of the matter but to

1 determine whether there is a genuine issue for trial."). Even when looked at in a light

2 most favorable to Defendants (which is not the standard on summary judgment),

3 Defendants' handful of articles and Snap's thousands of articles present a picture of

4 mixed use, which falls short of the clear and convincing evidence that is required for

5 Defendants to carry their burden. *See, e.g.*, *In re Merrill Lynch*, 828 F.2d at 1571 ("The

6 mixture of usages unearthed by the NEXIS computerized retrieval service does not

7 show, by clear evidence, that the financial community views and uses the term CASH

8 MANAGEMENT ACCOUNT as a generic, common descriptive term for the brokerage

9 services to which Merrill Lynch first applied the term." (footnote omitted)).

10 **F.     The Parties' Competing Survey Evidence Creates Disputed Issues of**

11 **Fact**

12      Mr. Sowers' *Thermos* survey shows that consumers overwhelming use many

13 different terms, such as smart glasses, camera glasses, and Wi-Fi glasses, among others,

14 as the common category name for the products at issue. Sowers Decl., p. 35 (First

15 Sowers Report at 26 ¶ 68(a)). In contrast, only 4.4% of respondents use "spectacles," or

16 some variation, as a generic term. Sowers Decl., p. 35–36 (First Sowers Report at pp.

17 26–27 ¶ 68(b)). That so few consumers use "spectacles," or some variation, as a generic

18 reference for these goods is evidence that supports consumers not understanding

19 "spectacles" to be a generic term. Defendants' argument that the results of Mr. Sowers'

20 survey are not relevant is both legally and factually wrong.

21      On the law, courts and commentators recognize *Thermos* surveys are probative on

22 the issue of genericness. *See Nightlight Sys., Inc. v. Nitelites Franchise Sys., Inc.*, Civil

23 Action No. 1:04–CV–2112-CAP, 2007 WL 4563873, at *6 (N.D. Ga. July 17, 2007)

24 ("[T]he 'Thermos Survey' is a method that has achieved general acceptance for use in

25 determining the genericness of a disputed term."); *see also* McCarthy, *supra*, § 12:15

26 ("The *Thermos*-type of genericness survey is a recognized methodology that has been

27 allowed into evidence."). Courts have specifically recognized that *Thermos* surveys

28 raised fact issues on a motion for summary judgment. *See E.T. Browne Drug Co.*, 538

F.3d at 197 (Thermos-type survey created a question of fact as to the genericness of the designation "cocoa butter formula" for personal care and beauty products).

On the facts, Mr. Sowers explains:

> If respondents understood "spectacles" to be a generic term for the relevant product category, I would have expected to see it provided as an answer with greater frequency to the multiple open-ended questions in my survey. The fact that only 1.5% of respondents provided "spectacles" as a response to the survey questions indicates that it is rarely used as a generic term. Conversely, that means that 98.5% of respondents did not provide "spectacles" as a term that they use to identify or describe the products at issue in this case, which I believe provides evidence that "spectacles" is not a generic term.

Sowers Decl. ¶ 14.

Although Defendants have submitted their own survey from Dr. Anderson that purports to show that "spectacles" is generic, Dr. Anderson's survey must be weighed against Mr. Sowers' significant criticisms of it, as well as Mr. Sowers' *Thermos* survey. The weighing of this evidence must await trial and cannot be resolved on summary judgment. *See, e.g.*, *Clicks Billiards, Inc. v. Sixshooters Inc.*, 251 F.3d 1252, 1263–64 (9th Cir. 2001) (reversing summary judgment in light of conflicting consumer surveys); *Solid 21, Inc. v. Richemont N. Am., Inc.*, No. 19 Civ. 1262 (LGS), 2023 WL 3996530, at *4 (S.D.N.Y. June 14, 2023) ("[T]he issue of genericness cannot be resolved at summary judgment [where] [t]he record contains conflicting expert opinions as well as conflicting evidence from media publications, dictionaries, other texts and [relevant] consumers . . . regarding the perception of the term . . . .").

## II. <u>Defendants' Failure To Comply With Local Civil Rule 7-3 Provides An Independent Ground To Deny The Motion</u>

Defendants' motion should be denied because Snap's evidence gives rise to many genuine disputes of material fact. But the motion also can independently be denied because Defendants failed to comply with Local Civil Rule 7-3, which requires counsel "to discuss thoroughly, preferably in person, the substance of the contemplated motion

and any potential resolution . . . at least 7 days prior to the filing of the motion."  Civ. L.R. 7-3.

The purpose of the meet and confer requirement is for the parties to have the "opportunity to identify and concentrate their arguments on the material issues in dispute" and limit the chance they will spend "significant time and energy briefing peripheral or undisputed issues."  *DiDio v. Jones*, Case No. CV 13-4949 PSG (AGRx), 2013 WL 12133906, at *3 (C.D. Cal. 2013).  The Rule "is not a mere technicality."  *Id.*  Courts in this District recognize that a violation of Local Rule 7-3 "creates an avoidable waste of judicial and party resources," that warrant denial of a motion.  *Unicorn Glob., Inc. v. Hillo Am., Inc.*, Case No. LA CV19-03028 JAK (AFMx), 2021 WL 1034838, at *2 (C.D. Cal. 2021).

Defendant's failure to comply with Local Rule 7-3 is unambiguous, and their certification that they complied with the Rule is disingenuous, at best.  Under the schedule set by the Court, motions for summary judgment were due by September 22, 2023.  Dkt. 67.  On September 15, 2023, seven days before Defendants' motion was due, Defendants emailed Snap and acknowledged their obligations under Local Rule 7-3.  *See* Newbill Decl., Ex. 1, p. 8.  In it, Defendants expressed skepticism about the parties' ability to obviate the need for the motion and, on that basis, asked for Snap's consent that the email correspondence satisfy the "meet and confer" obligations set forth in the Rule.  *Id.* ("Please let us know if Snap agrees that this communication can serve as a Local Rule 7-3 conference.").  Snap declined and instead expressly informed Defendants that the email did not satisfy either the letter or the spirit of the requirement under Rule 7-3 that the parties "discuss thoroughly, preferably in person, the substance of the contemplated motion and any potential resolution."  *Id.* at 7–8.  Defendants responded by email outlining in bullet form the purported "grounds" for their motion.  *Id.*

The parties participated in a meet and confer by Zoom on September 19, 2023, three days before Defendants' motion was due.  That conference lasted approximately 12 minutes.  *Id.* at 4–5.  Defendants' counsel began by explaining that Defendants believed

the conference was unnecessary, in part, because of the Court's previous routine orders setting a deadline for the filing of summary judgment motions, as well as the September 15 email correspondence between the parties. *Id.* Under Defendants' view, a conference under Local Rule 7-3 is only necessary for situations where the parties could "obviate the need for motion practice." *Id.* Defendants added that there was "[n]o secret" as to the grounds of Defendants' motion because the issue in dispute was genericness. *Id.*

In an effort to meet and confer in good faith, Snap asked Defendants to identify the undisputed facts that they believed supported summary judgment in their favor. *Id.* Defendants responded that "Snap's evidence failed to address the dispositive element of the relevant public's understanding," and that Defendants' "evidence does address that dispositive element and Snap's evidence fails to address it at all." *Id.* Snap requested clarification of Defendants' position, given that the parties had relied on similar types of evidence (*e.g.*, media articles, surveys, and dictionary definitions, among other evidence). *Id.* Rather than respond to Snap's question, counsel for Defendants asked his colleague: "At this point have I said enough?" *Id.* His colleague responded in the affirmative and again stated that Snap "won't be surprised" when it sees the motion, and that because Snap was not going to voluntarily dismiss the case, the motion was likely unavoidable. *Id.* Snap reminded Defendants that the purpose of Local Rule 7-3 is to facilitate a discussion so that the movant also may consider its position. Counsel for Defendants responded "I can tell you that our position is not going to change." *Id.*

Snap again reminded Defendants that Rule 7-3, at a minimum, requires the parties to "thoroughly discuss the substance" of the motion. *Id.* Defendants responded that they had "given a very high level" of the anticipated motion and that, because counsel for Snap was present for the depositions in the case and "know[s] what the evidence is," Defendants had "said all [they] needed to say." *Id.*

Defendants' position has been rejected by courts in this District. *See, e.g.*, *Morales v. K. Chocolatier Inc.*, No. 2:21-cv-08522-ODW (SKHx), 2022 WL 19829446, at *3 (C.D. Cal. Oct. 31, 2022) ("To interpret Local Rule 7-3 as being satisfied merely

because counsel at some point in the past spoke about some of the issues raised by a motion would be to defeat the spirit and purpose of the rule.").  A party cannot discharge its obligations under Rule 7-3 by unilaterally deciding that its motion cannot be obviated. Even if the parties disagree on the merits, "[a] good faith effort to comply with Local Rule 7-3 would have required the Parties to discuss the substance of the various 'fronts' [of disagreement] to see whether the number of 'fronts' may be narrowed." *Bohn v. Pharmavite, LLC*, No. CV 11-10430-GHK (AGRx), 2013 WL 4517173, at *1 (C.D. Cal. Feb. 5, 2013).  Had Defendants engaged in a good faith discussion, at a minimum, they could have considered the relevant legal standards that their motion flatly ignores, which would have helped to focus the briefing and save party and court resources.  Defendants' failure warrants denial of their motion. *See, e.g.*, *Singer v. Live Nation Worldwide, Inc.*, No. SACV 11–0427 DOC (MLGx), 2012 WL 123146, at *2 (C.D. Cal. Jan. 13, 2012) (denying motion for summary judgment for failure to comply with L.R. 7-3).

[remainder of page intentionally left blank]

## **CONCLUSION**

For all of the foregoing reasons, Snap respectfully requests that the Court deny Defendants' motion for summary judgment.


Dated: October 20, 2023          */s/ David H. Bernstein*
                                  DAVID H. BERNSTEIN
                                  Debevoise & Plimpton LLP
                                  650 California Street
                                  San Francisco, CA 94108
                                  Tel.: (212) 909-6696
                                  Fax: (212) 521-7696
                                  dhbernstein@debevoise.com

                                  JARED I. KAGAN (admitted *pro hac vice*)
                                  QUENIQUE M. NEWBILL (admitted *pro hac vice*)
                                  Debevoise & Plimpton LLP
                                  Hudson Boulevard
                                  New York, NY 10001
                                  Tel.: (212) 909-6000
                                  Fax: (212) 909-6836
                                  jikagan@debevoise.com
                                  qnewbill@debevoise.com

                                  *Attorneys for Plaintiff*

1

## <u>CERTIFICATE OF COMPLIANCE WITH L.R. 11-6.2</u>

2   The undersigned, counsel of record for Plaintiff, certifies that Plaintiff Snap Inc.'s

3 Memorandum of Points and Authorities in Opposition to Defendants' Motion For

4 Summary Judgment is fewer than 50 pages, the limited prescribed in the Court's order of

5 November 29, 2022.  *See* Dkt. No. 45.

6

7 Dated: October 20, 2023

8              */s/ David H. Bernstein*

9              David H. Bernstein

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28