DAVID H. BERNSTEIN (CA Bar No. 336551)
**DEBEVOISE & PLIMPTON LLP**
650 California Street
San Francisco, CA 94108
Tel:   (212) 909-6696
Fax:   (212) 521-7696
Email:  dhbernstein@debevoise.com

JARED I. KAGAN (admitted *pro hac vice*)
**DEBEVOISE & PLIMPTON LLP**
66 Hudson Boulevard
New York, NY 10001
Tel:   (212) 909-6000
Fax:   (212) 909-6836
Email:  jikagan@debevoise.com

Attorneys for Plaintiff
SNAP INC.

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

| | |
|---|---|
| SNAP INC., <br><br> Plaintiff, <br><br> v. <br><br> KATHERINE K. VIDAL, Under Secretary of Commerce for Intellectual Property and Director of the United States Patent and Trademark Office <br><br> Defendant. | No. CV 22-00085-SK <br><br> **PLAINTIFF SNAP INC.'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW** <br><br> Honorable Steve Kim <br> United States Magistrate Judge |

# TABLE OF CONTENTS

BACKGROUND .................................................................................................... 1

FINDINGS OF FACT ........................................................................................... 2

I.    THE PARTIES ........................................................................................... 2

II.   SNAP'S "SPECTACLES" SMART GLASSES ..................................... 2

    A.    Snap Inc. ........................................................................................ 2

    B.    Snap's Development and Launch of SPECTACLES ................... 4

    C.    The SPECTACLES Product Line ................................................ 5

    D.    Snap's Promotion of Its SPECTACLES Product Line ............... 6

III.  PROCEDURAL HISTORY ...................................................................... 8

IV.  TESTIMONIAL RECORD ..................................................................... 12

    A.    Snap's Witnesses ........................................................................ 12

        1.    Ryan Chan ........................................................................ 12

        2.    Professor Robert A. Leonard ......................................... 13

        3.    Professor Peter N. Golder .............................................. 15

        4.    Brian M. Sowers ............................................................. 17

    B.    Defendant's Witnesses ............................................................... 17

        1.    Professor Edward Finegan ............................................. 17

        2.    Professor Ashish Sood .................................................... 18

        3.    Dr. Justin R. Anderson ................................................... 18

        4.    Orchideh Rushenas ......................................................... 19

    C.    Administrative Record Before the TTAB .................................. 19

CONCLUSIONS OF LAW ................................................................................ 19

V.    JURISDICTION AND VENUE ............................................................. 19

VI.  ISSUES BEFORE THE COURT ............................................................ 19

VII. DEFENDANT HAS NOT DEMONSTRATED THAT SPECTACLES IS A GENERIC MARK .................................................. 20

    A.    Test for Genericness ................................................................... 20

i

B.      Burden of Proof..................................................................................23

C.      Standard of Proof................................................................................23

D.      Defendant Has Failed to Prove SPECTACLES Is a Generic Name for Smart Glasses.........................................................................................25

        1.      The Relevant Genus is "Smart Glasses"..................................25

        2.      Defendant Failed to Meet Its Burden to Show That the Primary Significance of SPECTACLES to the Relevant Consuming Public Is a Generic Term for "Smart Glasses" .................................28

        3.      SPECTACLES Has Not Been Proven to Be Generic for Smart Glasses by Clear and Convincing Evidence ..............................44

VIII.   SNAP HAS DEMONSTRATED THAT SPECTACLES IS A SUGGESTIVE TRADEMARK FOR THE RELEVANT CLASS OF GOODS..................................................................................................44

        A.      The Spectrum of Distinctiveness........................................................44

        B.      Snap's Evidence Satisfies the Tests for Suggestiveness.....................45

        1.      Snap's Evidence Satisfies the Imagination Test. ....................47

        2.      Snap's Evidence Also Satisfies the Competitors' Needs Test. ......51

        3.      SPECTACLES is a Suggestive Mark for Smart Glasses.................52

IX.     IN THE ALTERNATIVE, SNAP'S EVIDENCE DEMONSTRATES THAT SPECTACLES IS A DESCRIPTIVE MARK THAT HAS ACQUIRED SECONDARY MEANING. ................................................53

        1.      Snap's Evidence Supports a Finding That SPECTACLES Has Acquired Distinctiveness. ......................................................53

        2.      The SPECTACLES Mark Has Acquired Secondary Meaning. .......67

CONCLUSION ......................................................................................................69

# TABLE OF AUTHORITIES

**Cases**

*Adidas Am., Inc. v. Skechers USA, Inc.*,
   No. 3:15-cv-01741, 2017 WL 3319190 (D. Or. Aug. 3, 2017).........................60

*Adidas Am., Inc. v. Skechers USA, Inc.*,
   890 F.3d 747 (9th Cir. 2018) ..................................................................58, 63

*AMF, Inc. v. Sleekcraft Boats*,
   599 F.2d 341 (9th Cir. 1979) ..............................................................46, 47, 51

*Audio Fid., Inc. v. High Fid. Recordings, Inc.*,
   283 F.2d 551 (9th Cir. 1960) ......................................................................65

*Aurora World, Inc. v. Ty Inc.*,
   No. CV 09-08463, 2011 WL 13176413 (C.D. Cal. Mar. 14, 2011)..................68

*Baroness Small Estates, Inc.*,
   104 U.S.P.Q.2d 1224, 2012 WL 4763149 (T.T.A.B. Sept. 17, 2012) ..............22

*Blue Bottle Coffee, LLC v. Liao*,
   No. 21-cv-06083, 2024 WL 2061259 (N.D. Cal. May 7, 2024) ...........54, 57, 59

*Booking.com B.V. v. United States Pat. & Trademark Off.*,
   915 F.3d 171 (4th Cir. 2019),
   *rev'd on different issues*, 141 S. Ct. 187 (2020) ..............................23, 24, 26

*Brookfield Communs., Inc. v. W. Coast Entm't Corp.*,
   174 F.3d 1036 (9th Cir. 1999) ....................................................................49

*California Scents v. Surco Prods., Inc.*,
   28 F. App'x 659 (9th Cir. 2002) ..................................................................56

*Carter-Wallace, Inc. v. Procter & Gamble Co.*,
   434 F.2d 794 (9th Cir. 1970) ......................................................................68

*Cartier v. TechnaOro, Inc.*,
   No. 05-cv-6614, 2008 WL 11518433 (S.D.N.Y. Mar. 28, 2008) ....................67

*Clamp Mfg. Co. v. Enco Mfg. Co.*,
   870 F.2d 512 (9th Cir. 1989) ......................................................................58

*Clicks Billiards, Inc. v. Sixshooters Inc.*,
  251 F.3d 1252 (9th Cir. 2001) ...................................................................65

*Closed Loop Marketing, Inc. v. Closed Loop Marketing, LLC*,
  589 F.Supp.2d 1211 (E.D. Cal. 2008) ........................................................28

*Converse, Inc. v. Int'l Trade Comm'n*,
  909 F.3d 1110 (Fed. Cir. 2018) ..................................................................54

*Conversive, Inc. v. Conversagent, Inc.*,
  433 F. Supp. 2d 1079 (C.D. Cal. 2006) ...............................................49, 50

*Creative Gifts, Inc. v. UFO*,
  235 F.3d 540 (10th Cir. 2000) ...................................................................32

*Creative Tech., Ltd. v. SRT, Inc.*,
  No. 93-3511, 1993 WL 603292 (N.D. Cal., Nov. 8, 1993)...........................63

*Cross Commerce Media, Inc. v. Collective, Inc.*,
  841 F.3d 155 (2d Cir. 2016) .......................................................................47

*Dogloo, Inc. v. Doskocil Mfg. Co., Inc.*,
  893 F.Supp. 911 (C.D. Cal. 1995) ..............................................................58

*E.T. Browne Drug Co. v. Cococare Prods., Inc.*,
  538 F.3d 185 (3d Cir. 2008) .......................................................................30

*Eko Brands, LLC v. Adrian Rivera Maynez Enters.*,
  No. 20-35369, 2021 WL 3630225 (9th Cir. Aug. 17, 2021)..........................60

*Entrepreneur Media, Inc. v. Smith*,
  279 F.3d 1135 (9th Cir. 2002) ...................................................................20

*Filipino Yellow Pages Inc. v. Asian J. Publ'ns, Inc.*,
  198 F.3d 1143 (9th Cir. 1999) ..............................................21, 32, 53, 54

*Gianni Versace, S.p.A. v. Versace 19.69 Abbigliamento Sportivo SRL*,
  328 F.Supp.3d 1007 (N.D. Cal. 2018) ........................................................54

*Grupo Salinas Inc. v. JR Salinas Wheels & Tires Inc.*,
  No. SA-CV-161923, 2016 WL 9277320 (C.D. Cal. Dec. 22, 2016) ...........58, 59

*GTFM, Inc. v. Solid Clothing, Inc.*,
  215 F. Supp. 2d 273 (S.D.N.Y. 2002) .........................................................58

*Gucci Timepieces America Inc. v. Yidah Watch Co.*,
   No. CV-97-6985, 1998 WL 650078 (C.D. Cal. Aug. 4, 1998) ..............54, 58, 63

*H. Marvin Ginn Corp. v. Int'l Ass'n of Fire Chiefs, Inc.*,
   782 F.2d 987 (Fed. Cir. 1986) ...............................................................22, 25

*H.I.S.C., Inc. v. Rajanayagam*,
   810 F. App'x 560 (9th Cir. 2020) .................................................................66

*Horizon Mills Corp. v. QVC, Inc.*,
   161 F. Supp. 2d 208 (S.D.N.Y. 2001) ..........................................................22

*iCall, Inc. v. Tribair, Inc.*,
   No. C-12-2406, 2012 WL 5878389 (N.D. Cal. Nov. 21, 2012) (N.D. Cal.
   Nov. 21, 2012) ...............................................................................................49

*In re Am. Fertility Soc.*,
   188 F.3d 1341 (Fed. Cir. 1999) ....................................................................22

*In re Am. Online, Inc.*,
   77 U.S.P.Q.2d 1618, 2006 WL 236389 (T.T.A.B. Jan. 18, 2006) ....................37

*In re Bed-Check Corp.*,
   226 U.S.P.Q. 946, 1985 WL 72091 (T.T.A.B. Aug. 23, 1985)..........................46

*In re Boston Beer Co. L.P.*,
   198 F.3d 1370 (Fed. Cir. 1999) ....................................................................68

*In re Cordua Rests., Inc.*,
   823 F.3d 594 (Fed. Cir. 2016) .......................................................23, 25, 26

*In re Hotels.com, L.P.*,
   573 F.3d 1300 (Fed. Cir. 2009) .............................................................23, 24

*In re Merrill Lynch, Pierce, Fenner, and Smith, Inc.*,
   828 F.2d 1567 (Fed. Cir. 1987) .............................................................22, 23

*In re Reed Elsevier Props. Inc.*,
   482 F.3d 1376 (Fed. Cir. 2007) ....................................................................25

*In Re SC Licensing, LLC*,
   No. 88737743, 2022 WL 633387 (T.T.A.B. Feb. 14, 2022)...........................46

*In Re Snap Inc.*,
  Nos. 87177292 and 87211997, 2021 WL 5232470
  (T.T.A.B. Nov. 3, 2021) ........................................................................69

*In re Steelbuilding.com*,
  415 F.3d 1293 (Fed. Cir. 2005) ..............................................................54

*In re Trek 2000 Int'l Ltd.*,
  97 U.S.P.Q.2d 1106, 2010 WL 5099653 (T.T.A.B. Nov. 30, 2010)............24, 31

*In re YZ Enters., Inc.*,
  No. 75/262,976, 2000 WL 1125563 (T.T.A.B. July 28, 2000) .............46, 48, 49

*Intenze Products, Inc. v. TCM Supply Corporation*,
  No. 23-55710, 2024 WL 511878 (9th Cir. Feb 9, 2024)...................................57

*Ironhawk Techs., Inc. v. Dropbox, Inc.*,
  2 F.4th 1150 (9th Cir. 2021) .............................................................53, 55

*Jason Scott Collection, Inc. v. Trendily Furniture, LLC*,
  68 F.4th 1203 (9th Cir. 2023) ................................................................64

*Jean Royere SAS, et al. v. Edition Modern, et al.*,
  Case No. 2:22-cv-01507 (C.D. Cal. Dec. 7, 2023).....................................64, 65

*Kudos Inc. v. Kudoboard LLC*,
  No. 20-CV-01876, 2021 WL 5415258 (N.D. Cal. Nov. 20, 2021)...................21

*Lahoti v. VeriCheck, Inc.*,
  586 F.3d 1190 (9th Cir. 2009) ........................................................19, 45

*Lahoti v. Vericheck, Inc.*,
  636 F.3d 501 (9th Cir. 2011) .................................................................49

*Levi Strauss & Co. v. Blue Bell, Inc.*,
  778 F.2d 1352 (9th Cir. 1985) ...............................................................67

*Maduka v. Tropical Naturals, Ltd.*,
  409 F. Supp. 3d 337 (E.D. Pa. 2019).......................................................48

*McNeil-PPC, Inc. v. Walgreen Co.*,
  No. 91184978, 2013 WL 223400 (T.T.A.B. Jan. 22, 2013)..............................62

*Mend Health, Inc. v. Carbon Health Techs., Inc.*,
  No. 2:21-CV-06142, 2023 WL 3431902 (C.D. Cal. Mar. 16, 2023)..........49, 50

*Mercado Latino, Inc. v. Indio Prod., Inc.*,
No. CV 13-01027, 2018 WL 3490752 (C.D. Cal. July 17, 2018).....................68

*Metro Publ'g, Ltd. v. San Jose Mercury News*,
987 F.2d 637 (9th Cir.1993) .............................................................10

*Moroccanoil, Inc. v. Marc Anthony Cosms., Inc.*,
57 F. Supp. 3d 1203 (C.D. Cal. 2014) ...............................................31

*National Pork Board and National Pork Producers Council v. Supreme*
*Lobster and Seafood Company*,
96 U.S.P.Q.2d 1479, 2010 WL 2513872 (T.T.A.B. June 11, 2010) ..................62

*Opulent Treasures, Inc. v. Ya Ya Creations, Inc.*,
682 F. Supp. 3d 815 (C.D. Cal. July 13, 2023) ....................................54

*Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*,
469 U.S. 189 (1985)........................................................................21

*Phat Fashions, L.L.C. v. Phat Game Athletic Apparel, Inc.*,
Case No. 01C1771, 2002 WL 570681 (E.D. Cal., Mar. 20, 2002) ..............53, 60

*Pom Wonderful Ltd. Lab. Co. v. Hubbard*,
775 F.3d 1118 (9th Cir. 2014) ........................................................49

*Princeton Vanguard, LLC v. Frito-Lay N. Am., Inc.*,
786 F.3d 960 (Fed. Cir. 2015) ........................................................38

*Quinn v. Dowbak*,
No. 2:17-cv-992, 2018 WL 3428560 (E.D. Cal. July 16, 2018) ..................35

*Reserve Media, Inc. v. Efficient Frontiers, Inc.*,
No. CV 15-05072, 2017 WL 1377591 (C.D. Cal. Apr. 14, 2017) ..................49

*Rodeo Collection, Ltd. v. West Seventh*,
812 F.2d 1215 (9th Cir. 1987) ........................................................51

*Royal Crown Co. v. Coca-Cola Co.*,
892 F.3d 1358 (Fed. Cir. 2018) ...................................................25, 26

*Schieffelin & Co. v. Jack Co. of Boca, Inc.*,
850 F.Supp. 232 (S.D.N.Y. 1994) ....................................................62

*Self-Realization Fellowship Church v. Ananda Church of Self-Realization*,
59 F.3d 902 (9th Cir. 1995) ...........................................................49

*Snap Inc. v. Vidal*,
　Case No. 2:22-cv-00085, 2024 WL 1136407 (C.D. Cal. Mar. 4, 2024) ...........12

*Threshold Enterprises Ltd. v. Pressed Juicery, Inc.*,
　445 F. Supp. 3d 139 (N.D. Cal. 2020).....................................................28, 36

*Tranik Enterprises, Inc. v. Fulda*,
　No. 2:16-cv-02931, 2017 WL 11150925 (C.D. Cal. Mar. 7, 2017)..................58

*Transgo, Inc. v. Ajac Transmission Parts Corp.*,
　768 F.2d 1001 (9th Cir. 1985) ..........................................................57, 63

*Transparent Energy, LLC v. Premiere Mktg., LLC*,
　No. 3:19-CV-3022, 2021 WL 6135475 (N.D. Tex. Dec. 29, 2021) .................51

*Two Pesos, Inc. v. Taco Cabana, Inc.*,
　505 U.S. 763 (1992).............................................................19, 20, 45, 53

*Ty Inc. v. Softbelly's Inc.*,
　353 F.3d 528 (7th Cir. 2003) .................................................................24

*United States Pat. & Trademark Off. v. Booking.com B.V.*,
　591 U.S. 549 (2020)...............................................................15, 21, 24, 39, 44

*United States v. Wealth and Tax Advisory Servs., Inc.*,
　526 F.3d 528 (9th Cir. 2008) .................................................................35

*Vans, Inc. v. Walmart, Inc.*,
　Case No. 8:21-cv-01876, 2022 WL 1601530 (C.D. Cal., Mar. 31, 2022) ...58, 63

*Venetian Casino Resort, LLC v. Venetiangold.Com*,
　380 F. Supp. 2d 737 (E.D. Va. 2005) .......................................................66

*Viña Undurraga S.A. v. Serine-Cannonau Vineyard, Inc.*,
　No. CV 15-9658, 2017 WL 11636421 (C.D. Cal. May 17, 2017) .....................11

*Vision Sports, Inc. v. Melville Corp.*,
　888 F.2d 609 (9th Cir. 1989) .................................................................66

*WheelImage Corp. v. Axial Manufacturing*,
　No. 8:23-cv-02206, 2024 WL 1012847 (C.D. Cal. Mar. 5, 2024) ....................10

*Yellow Cab Co. of Sacramento v. Yellow Cab of Elk Grove, Inc.*,
　419 F.3d 925 (9th Cir. 2005) .................................................................21

*Zobmondo Entertainment, LLC v. Falls Media, LLC,*
  602 F.3d 1108 (9th Cir. 2010) ............................................45, 47, 51

**Statutes**

15 U.S.C. § 1052(f) ...........................................20, 53, 56, 57, 69

15 U.S.C. § 1064(3) ....................................................................21

15 U.S.C. § 1071(b) .........................................................1, 11, 19

15 U.S.C. § 1071(b)(3) ..............................................................19

15 U.S.C. § 1127 ........................................................................20

28 U.S.C. § 1331 ........................................................................19

28 U.S.C. § 1338(a) ...................................................................19

**Other Authorities**

4 Callmann on Unfair Competition, Trademarks & Monopolies § 20:16
  (4th ed.) ...................................................................................57

Fed. R. Evid. 201(b) ..................................................................35

2 McCarthy on Trademarks § 11:24 (5th ed.) ("McCarthy") ..............................46

McCarthy § 11:71 .......................................................................45

McCarthy § 12:6 .........................................................................22

McCarthy § 12:12 ..................................................................22, 23

McCarthy § 12:13 ..............................................................31, 33, 38

McCarthy § 12:14 .......................................................................39

McCarthy § 12:16 .......................................................................39

McCarthy § 15:28 .......................................................................55

McCarthy § 15:30 ..................................................................54, 60

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Plaintiff Snap Inc. ("Snap") submits these Proposed Findings of Fact and Conclusions of Law following the bench trial held from March 12, 2024 through March 14, 2024 and closing arguments held on May 29, 2024.

## **BACKGROUND**

1.     Snap filed the present action on January 5, 2022, pursuant to 15 U.S.C. § 1071(b) providing that a party dissatisfied with a final decision of the Trademark Trial and Appeal Board ("TTAB") may institute a new civil action in Federal District Court challenging such decision.  Snap had sought federal registration of its SPECTACLES trademarks, in both word- and stylized-formats.  Concluding that SPECTACLES is a generic name for "smart glasses," or alternatively that SPECTACLES is merely descriptive of smart glasses and had not acquired secondary meaning, the United States Patent and Trademark Office ("USPTO") refused registration of the marks.  The TTAB subsequently affirmed that refusal.  Through this action, Snap appeals the determination of the TTAB and seeks to register SPECTACLES as a trademark.

2.     The parties have supplemented the TTAB record, and the Court held a bench trial in this matter from March 12, 2024 through March 14, 2024.  For the reasons described herein, the Court finds that SPECTACLES is not a generic term for smart glasses, that SPECTACLES is inherently distinctive, and, in the alternative, that SPECTACLES is descriptive but has acquired the requisite secondary meaning to be eligible for registration on the Principal Register.  The Court's Findings of Fact and Conclusions of Law are set forth below.

1

**FINDINGS OF FACT**

2

**I.    THE PARTIES**

3          3.      Snap is a corporation organized under the laws of the State of Delaware,

4    with its principal place of business at 2772 Donald Douglas Loop N, Santa Monica,

5    California 90405.

6          4.      Defendant Katherine K. Vidal is the Under Secretary of Commerce for

7    Intellectual Property and Director of the United States Patent and Trademark Office

8    ("USPTO") with an address at P.O. Box 1450, Alexandria, Virginia 22313-1450.  The

9    parties have agreed by stipulation (Dkt. No. 142) that Snap may obtain all of the relief

10   that it seeks in this action against Under Secretary Vidal, which obviates the need for the

11   USPTO to be identified as a separate party.

12

**II.    SNAP'S "SPECTACLES" SMART GLASSES**

13

**A.    Snap Inc.**

14         5.      Snap Inc. is a global technology company recognized for its innovative

15   products and services that enable users to capture images and videos, and share those

16   images and videos with their friends and the general public.  Trial Tr. I, 18:17–24.

17         6.      Snap offers a vast suite of products and services, typically in the form of

18   mobile applications and hardware products.  *Id.*; *see also id.* at 19:14–24, 21:17–20.

19         7.       Most notably, "Snapchat," Snap's flagship mobile application, has been

20   identified as one of the top 10 downloaded iOS applications in the world.  As of Snap's

21   most recent public filings, Snap reported 400 million daily active Snapchat users and 800

22   million monthly active Snapchat users.  Trial Tr. I, 18:17–19:13.

23         8.      In addition to Snap's Snapchat application, Snap's suite of products and

24   services, which Snap refers to as its "Snapchat ecosystem," includes LENSES, LENS

25   STUDIO, and, as of 2016, SPECTACLES.  Trial Tr. I, 19:14–24, 22:5–24.  Snap owns

26

27

28

registered trademarks for these marks: 5,964,422 ("SPECTACLES");[1] 6,882,876 ("LENS");[2] 5,594,306 ("LENSES");[3] 6,808,829 ("LENSCAPE").[4] EX425–EX428.

9.      LENSES is a functionality within the Snapchat application that allows users to apply augmented reality effects on top of photos, encouraging use of expressive modalities (such as filters to add hair to a bald head or make one's face look like a cat) to advance communication. Trial Tr. I, 19:14–24. LENS STUDIO is software integrated with the Snapchat application that allows users to build applications within augmented reality ("AR") in a fast and easy way. Trial Tr. I, 22:13–17. Snap launched its SPECTACLES brand of "smart glasses" in 2016. SPECTACLES functions as a wearable digital camera in the form of glasses and was one of Snap's earliest hardware products. Trial Tr. I, 22:5–12, 23:3–7; EX300-2.

10.      "Smart glasses" are a relatively new type of technology that, *inter alia*, allows users to capture photos, record videos, and interact with AR applications, all while being worn on the user's face. "Smart glasses" are commonly equipped with

---

[1] Registered for: "Electronic publishing services, namely, publishing online works of others featuring user-created photographs, images, videos, text and graphics; Providing information and online databases via the Internet in the fields of entertainment and music."

[2] Registered for: "Downloadable computer software, namely, augmented reality software for integrating electronic data with real world environments for the purpose of experiencing, viewing, capturing, recording and editing augmented images, videos, audio and sensory content."

[3] Registered for: "Downloadable computer software for use in mobile devices, namely, augmented reality software for integrating electronic data with real world environments for the purpose of viewing, capturing, recording and editing augmented images and augmented videos."

[4] Registered for: "On-line journals, namely, blogs in the field of augmented reality; providing a website featuring blogs and non-downloadable publications in the nature of magazines, journals, emails, newsletters and articles in the field of augmented reality."

advanced sensor technology, including accelerometers and gyroscopes, and are capable of connecting with other devices through Wi-Fi or Bluetooth connectivity.  EX424-9, 14.

11.    Snap is not the only company that sells smart glasses.  Among the other companies that sell or have sold smart glasses are Google, Bose, Vuzix, Amazon, and Ray-Ban (in collaboration with Meta).  Significantly, none of Snap's competitors and none of the retailers who sell smart glasses refer to or identify their smart glasses products as "spectacles."  Trial Tr. I, 55:6–57:1.  Instead, they use terms like "smart glasses," "AR glasses," "audio glasses," or their own brand names, such as GLASS, FRAMES, BLADE, ECHO, and STORIES.  *See* A1464–68, A1635; Trial Tr. I, 55:10–11.

**B.    Snap's Development and Launch of SPECTACLES**

12.    Snap launched the first version of SPECTACLES in 2016 as a "wearable digital video camera housed in a pair of fashionable sunglasses," that was "designed to integrate with Snap's popular SNAPCHAT mobile application by allowing users to record and directly upload video" to Snapchat.  EX110-0367.  Images and videos captured via SPECTACLES smart glasses can be wirelessly synced to the user's smartphone, where the user can edit them by adding augmented reality filters using Snap's other products, such as LENSES.  *Id.*; Trial Tr. I, 24:2–6.

13.    Snap's SPECTACLES capitalized on the phenomenon Snapchat users were experiencing, where the users would notice a moment worth capturing, but by the time they were able to pull out their phones and record a video or take a picture on the Snapchat application, the moment had passed.  With the technology embedded in the SPECTACLES product, users were able to tap a button positioned at their temple and instantly start capturing fleeting moments.  Trial Tr. I, 23:3–22.

14.    While SPECTACLES resemble everyday glasses in their physical form, or "form factor," the similarities to ordinary glasses end there.  From both a design priority perspective and a technological perspective, SPECTACLES smart glasses "don't resemble what you would optimize a pair of glasses for."  Trial Tr. I, 32:10–19.  Rather,

4

SPECTACLES are "much heavier," "include a bunch of technology," and "get hot." *Id.*
While SPECTACLES "look superficially like a pair of glasses," the two are "not really
comparable." *Id.*

15.    The user experience with SPECTACLES differs significantly from that of
regular glasses. Essentially, wearing SPECTACLES is more akin to using a computer
on one's face than simply putting on a pair of glasses. For that reason, users of
SPECTACLES tend not to wear them the same way as ordinary glasses or sunglasses.
Rather, users wear SPECTACLES for a specific purpose, such as capturing a concert,
but do not wear SPECTACLES throughout the course of a normal day. Trial Tr. I, 58:6–
16.

16.    Snap decided to place the advanced technology embedded in the
SPECTACLES product in the form of glasses because it was the most efficient way to
optimize the user experience. Snap chose the form factor of glasses for two reasons:
(1) it was the simplest way to display content before the user's eyes and to capture
moments from their perspective; and (2) users would feel socially comfortable wearing a
device that resembled glasses. Trial Tr. I, 32:10–33:17.

C.    **The SPECTACLES Product Line**

17.    Snap has continuously used the SPECTACLES name for the last eight
years. As of 2024, Snap has developed four generations of its SPECTACLES product.
SPECTACLES 1 (2016) was Snap's first generation of the SPECTACLES product.
Each subsequent generation introduced technological advancements from the preceding
generation: SPECTACLES 2 (2018) enhanced the product with water resistance and
included a number of different styles to accommodate for different demographics and
preferences (Trial Tr. I, 25:21–26:13); SPECTACLES 3 (2019) added a second camera
to the product, allowing for "stereoscopic capture," which added the capability of depth
to the camera (Trial Tr. I, 26:14–27:7); and SPECTACLES 4 (2021) added displays to
the product, making it the "first version where a user could actually interact with the AR
[augmented reality] on the device itself" (Trial Tr. I, 27:8–16). Prior to SPECTACLES

5

4, users could add augmented reality effects to the Snaps captured through their smart glasses in the Snapchat application.  Trial Tr. I, 63:23–64:8.

18.    With the introduction of augmented reality effects on the device itself, Snap considered whether to continue to call its smart glasses "SPECTACLES" or whether to adopt a new name for the product given its enhanced capabilities.  Snap conducted a "brand lift" survey in 2019 to assess the extent users associated the SPECTACLES brand name with Snap.  The study showed that target users' association between SPECTACLES and the Snap brand had risen significantly, and aided awareness had reached 55 percent.  Accordingly, Snap determined that the SPECTACLES brand name had become a valuable property for Snap, and Snap made the business decision to retain the SPECTACLES brand for the SPECTACLES 4 product.  Trial Tr. I, 42:5–43:21; EX075-23.

### D.    Snap's Promotion of Its SPECTACLES Product Line

19.    When Snap launched SPECTACLES, it utilized advertising campaigns, billboards, building signage, and digital marketing.  Trial Tr. I, 24:14–21; A2582–2587.  Because SPECTACLES was a "major departure from what consumers had expected from Snap[] in the past," was "a new product that not a lot of consumers understood," and "embed[ded] a lot of technology that people aren't familiar with," Snap undertook a "massive effort to try and show consumers what the product was, launch the brand, drive an association with it, and generally educate people on the benefits of using a product like SPECTACLES."  Trial Tr. I, 24:7–17, 33:14–17.

20.    Snap has invested tens of millions of dollars in advertising the SPECTACLES brand, including nearly $10 million between 2020 and 2022 alone.  Trial Tr. I, 41:22–42:4; EX113-0007.

21.    Snap's product launch included an innovative stunt that attracted extraordinary attention for Snap's new smart glasses and for the SPECTACLES name.  Snap launched the product through specially designed "Snapbot" vending machines that were prominently placed in iconic locations such as Big Sur, Times Square, Venice

Beach, and the bottom of the Grand Canyon.  Trial Tr. I, 24:22–25:7; A0346–0348.  The campaign drove a rush to the new product to the point that prospective purchasers "camped out in hats, scarves, and sweaters" for a chance to buy a pair of SPECTACLES. EX363-2.

22.    The media extensively covered the SPECTACLES launch in 2016, with over 10,000 articles written about the launch itself, amounting to over 1.6 billion impressions for the launch campaign.  Trial Tr. 25:11–20.  These impressions amounted to a publicity value of over $35 million (based on the estimated price that media buyers would pay for that amount of exposure).  EX300-3–4.

23.    Since its launch, Snap has sold nearly 300,000 units of SPECTACLES 1 through SPECTACLES 3, totaling over $37,000,000 in revenue.  EX113-0006–7.  These figures do not account for the success of SPECTACLES 4, which are not for sale to the public, but rather are available on an "invite only" basis to Snap's most effective creators.  Trial Tr. I, 27:22–28:11.

24.    The launch of SPECTACLES 3 in 2019 resulted in a second wave of significant media attention, with more than 1,600 articles about the product launch, amounting to another 1.3 billion impressions.  The SPECTACLES 3 launch was featured in popular publications, such as *Vogue*, *Fast Company*, and *Wired*.  Trial Tr. 38:24–39:2; EX075-6.

25.    The SPECTACLES 3 campaign resulted in notable increases in aided product awareness and product favorability.  Elements of the campaign, such as billboards, "boosted Spectacles Awareness" and drove purchase consideration. EX075-23; Trial Tr. I, 43:9–21.  The brand lift study further saw increases in aided brand awareness (39% to 55%) and aided ad awareness (15% to 35%).  EX075-23.

26.    The SPECTACLES 3 campaign included a co-marketing effort with popular brands such as Gucci and Harmonie Korine.  This co-marketing effort resulted in an additional 62 million impressions from various social media channels, which

further connected the SPECTACLES product to the Snap brand along with its co-marketing partners.  EX075-7; Trial Tr. I, 39:3–14.

27.    The SPECTACLES 3 campaign also resulted in a nearly 500% increase in the use of the hashtag #SnapSpectacles across social media.  EX075-11.  Mr. Chan explained two main benefits of an increase in the usage of the #SnapSpectacles hashtag: (i) the general public is greatly impacted by seeing content from their friends and by sharing content under the hashtag, so an increase in usage of the hashtag educates the general public about the product that Snap has, and (ii) increased usage of the hashtag indicates that "Spectacles power users," or "people who love Spectacles [and] who create a bunch of content using Spectacles," are "making more content, getting recognition for that content, and [are] more engaged with the [Snapchat] ecosystem." Trial Tr. I, 40:4–41:4.

28.    The development and promotion of Snap's SPECTACLES product line has culminated in a number of awards and achievements, including three gold "Lions" awards (two in Product Design and one in Design) from the 2017 Cannes Lions International Festival of Creativity, "Hardware of the Year" and "Best Startup Video" at the 2017 Tech Crunch Crunchie Awards, and a publicly voted 2021 Auggie Award, which recognizes innovative and novel digital or electronic products.  Trial Tr. I, 43:22–44:23; EX300-3.

29.    Various publications, including *Architectural Digest*, *Tech Crunch*, *International Business Times*, and *Business Wire* reported on these awards, providing extensive further promotion of Snap's smart glasses and the SPECTACLES name. EX110-0368–90.

## III.    PROCEDURAL HISTORY

30.    On September 20, 2016, Snap applied to register SPECTACLES with the United States Patent and Trademark Office ("USPTO") as a trademark (Serial No. 87/177,292) (the "Word Mark Application").  Specifically, Snap applied to register SPECTACLES for use in connection with:

Computer hardware; computer peripherals; wearable computer hardware; wearable computer peripherals; computer hardware and peripherals for remotely accessing, capturing, transmitting and displaying pictures, video, audio and data; downloadable computer software, namely, software for setting up, configuring, and controlling wearable computer hardware and peripherals; downloadable computer software and software applications for use in uploading, downloading, capturing, editing, storing, distributing and sharing photographic and video content and other digital data via global and local computer networks and via mobile devices; downloadable multimedia files containing digital audio and video files featuring user generated images, videos, multimedia files, and other digital data, all in the fields of entertainment, photography and online social networking; computer software for accessing and transmitting data and content among consumer electronics devices and displays.  A0001–7.

31.    The identification of goods and services in the Word Mark Application describes the technological features of the SPECTACLES product, including the centrality of computer hardware and software features that enable capturing, transmitting, and sharing digital content.

32.    Although the description of goods and services identifies the computer peripherals as "wearable," it does not contain the terms "eyeglasses," "eyewear," "corrective eyewear," or "resembling eyewear."

33.    On October 21, 2016, Snap filed a second application with the USPTO to register a stylized version of the word SPECTACLES (Serial No. 87/211,997) (the "Stylized Mark Application," and together with the Word Mark Application, the "Applications").  A2198–2206.

34.    Similar to the Word Mark Application, the Stylized Mark Application was for use in connection with:

9

Computer hardware; computer peripherals; wearable computer hardware; wearable computer peripherals; computer hardware and peripherals for remotely accessing, capturing, transmitting and displaying pictures, video, audio and data; downloadable computer software, namely, software for setting up, configuring, and controlling wearable computer hardware and peripherals; downloadable computer software and software applications for use in uploading, downloading, capturing, editing, storing, distributing and sharing photographic and video content and other digital data via global and local computer networks and via mobile devices; downloadable multimedia files containing digital audio and video files featuring user generated images, videos, multimedia files, and other digital data, all in the fields of entertainment, photography. *Id.*

35.    Like the Word Mark Application, the Stylized Mark Application did not contain the terms "eyeglasses," "eyewear," "corrective eyewear," or "resembling eyewear."[5]

36.    Neither of the Applications included any language explicitly, or implicitly, limiting the use of the SPECTACLES mark to the current glasses-like form factor of the product offering.

37.    Between 2016 and 2020, the Applications were subject to a number of office actions issued by the USPTO.  A0025–63, A0136–0138, A0139–0141, A0144–0146, A0151–0153, A0160–A0222, A0667–0683, A1207–A1212.

---

[5] Notably, these descriptions are highly similar to the description included in the registration for Google's GLASS mark (Reg. No. 5.018.176), that covers its competing smart glasses product.  While not entered into evidence at trial, the Court can take judicial notice of the GLASS registration, which is on file at the USPTO.  *See WheelImage Corp. v. Axial Manufacturing*, No. 8:23-cv-02206, 2024 WL 1012847, at *3 (C.D. Cal. Mar. 5, 2024)* ("It is also appropriate to take judicial notice of public records on file with federal agencies like the United States Patent and Trademark Office.") (citing *Metro Publ'g, Ltd. v. San Jose Mercury News*, 987 F.2d 637, 641 n.3 (9th Cir.1993)) (taking judicial notice of trademarks registrations issued by the USPTO).

38.     Ultimately, on December 11, 2020, the USPTO issued a final office action refusing to register the Applications on the grounds that the term SPECTACLES is generic for the category of "smart glasses" and that, if not generic, it remains highly descriptive of Snap's product with insufficient secondary meaning capable of identifying the source of the product.  A2040–47.

39.     After the USPTO issued its final refusal of the Applications, Snap appealed the Trademark Examiner's decision to the Trademark Trial and Appeal Board ("TTAB").  The TTAB affirmed the USPTO's refusal to register the SPECTACLES mark, holding that SPECTACLES is a generic term that the consuming public primarily understands to designate an entire class of goods (*i.e.*, wearable cameras), rather than the source of those goods (*i.e.*, Snap's branded smart glasses).  A2099–2130, A4296–4327.

40.     On January 5, 2022, Snap filed the instant civil action, pursuant to 15 U.S.C. § 1071(b), appealing the TTAB's determination to this Court.  Section 1071(b) permits an applicant in Snap's position to submit new evidence and testimony to supplement the TTAB's administrative record.  *Viña Undurraga S.A. v. Serine-Cannonau Vineyard, Inc.*, No. CV 15-9658, 2017 WL 11636421, at *6 (C.D. Cal. May 17, 2017) ("On appeal [from a final decision of the TTAB], the parties may ask the district court to make its decision based on the record before the TTAB, or the parties may submit new evidence and ask for additional review.").

41.     Both Snap and Defendant conducted additional discovery and submitted substantial new evidence that was not originally presented to the USPTO during the initial examination and TTAB appeal proceedings.

42.     Defendant submitted a survey purporting to show that SPECTACLES is generic.  Snap submitted (1) fact evidence about Snap's SPECTACLES smart glasses and the smart glasses market generally, (2) a survey demonstrating that SPECTACLES is not generic, (3) a linguistics analysis demonstrating that SPECTACLES is not generic, and (4) media, consumer, and retailer usage evidence demonstrating that the media, consumers, and retailers all overwhelmingly use SPECTACLES, when used in

11

connection with smart glasses, as a brand reference to Snap's smart glasses and not as a category name for smart glasses generally.

43.    On September 22, 2023, Defendant moved for summary judgment (Dkt. No. 68), arguing that there was no genuine dispute of material fact as to whether relevant consumers perceive SPECTACLES as a generic name for smart glasses.  On March 4, 2024, this Court denied Defendant's motion for summary judgment, finding that genuine issues of material fact existed over whether "spectacles" is a generic name for "smart glasses." *Snap Inc. v. Vidal*, Case No. 2:22-cv-00085, 2024 WL 1136407, at *7 (C.D. Cal. Mar. 4, 2024).  The Court found that Defendant's arguments were based on unsupported assumptions. *Id.* at *4.  In particular, Defendant presumed that "glasses" was a necessary subset of "smart glasses," and merely assumed that the key aspect of the "smart glasses" genus was its "glasses" component and not the embedded computer technology. *Id.*  Finding no inescapable reason why smart glasses could not be placed in a distinct category from ordinary eyewear, the Court held that Defendant failed to carry its burden on summary judgment. *Id.*

44.    A bench trial was held from March 12, 2024 through March 14, 2024.  The issues at trial centered around whether SPECTACLES was a generic name for smart glasses, and if not, whether SPECTACLES was inherently distinctive and/or had acquired secondary meaning.

## IV.    TESTIMONIAL RECORD

### A.    Snap's Witnesses

45.    At trial, Snap called four witnesses: Ryan Chan, a former Senior Manager of Product Management at Snap; Professor Robert A. Leonard, a linguistics expert from Hofstra University; Professor Peter N. Golder, a marketing professor from Dartmouth University; and Brian M. Sowers, a consumer survey expert.

#### 1.    Ryan Chan

46.    Mr. Chan testified about his involvement in the development and marketing of Snap's SPECTACLES product line.  His testimony covered the technological features

of SPECTACLES that distinguish them from ordinary eyewear, such as integration with Snap's Snapchat application, hands-free video and photo capture capabilities, augmented reality functionality, and content sharing features.  Trial Tr. I, 22:7–24:6.

47.    Mr. Chan also described Snap's branding and marketing efforts for SPECTACLES, including media coverage, advertising campaigns, and promotional tactics like the "Snapbot" vending machines.  Trial Tr. I, 24:7–25:20.  Mr. Chan also testified that Snap consistently presented SPECTACLES as a *branded* product, not generically for the smart glasses category.  Trial Tr. I, 22:23–23:2, 25:21–25, 26:14–15, 27:8–9.

48.    Mr. Chan further testified about the competitive landscape, Snap's competitors in the "smart glasses" market, the terms competitors used with respect to their products, and the total absence of the term "spectacles" from the competitive marketplace other than use by Snap.  Trial Tr. I, 53:25–54:11, 55:6–57:1.

49.    The record establishes that Snap is the only company using SPECTACLES as a brand name for its "smart glasses" product and that it has consistently used SPECTACLES as a brand name to identify its line of camera-enabled smart glasses.

## 2.    Professor Robert A. Leonard

50.    Professor Leonard conducted a linguistics analysis of the term "spectacles," utilizing corpus linguistics, relying on the Corpus of Contemporary American English ("COCA"), the Corpus of Historical American English ("COHA"), Google Ngram, Google Trends, and well-respected dictionaries to examine real-world usage patterns. Trial Tr. I, 92:13–93:22, 94:17–22.

51.    Professor Leonard tested two competing hypotheses: (1) users of American English use the lexical item "spectacles" to commonly refer to smart glasses or wearable technology that can take photographs and videos, and (2) users of American English do not use the lexical item "spectacles" to commonly refer to smart glasses or wearable technology that can take photographs and videos.  Trial Tr. I, 94:9–16.

13

52.   Professor Leonard's review of numerous well-respected dictionaries supported the finding that SPECTACLES does not commonly refer to smart glasses or wearable technology.  Professor Leonard testified regarding the Cambridge Dictionary of American English, American Heritage Dictionary, and Merriam-Webster, in which Professor Leonard found that the term "spectacles" generally is defined as "corrective eyewear" or "an event or behavior."  Trial Tr. I, 103:22–104:3.

53.   Specifically, Merriam-Webster defines SPECTACLES as "glasses" and "any of various things felt to resemble a pair of glasses."  EX124-0001.  American Heritage defines SPECTACLES as "a pair of eyeglasses" and "something resembling eyeglasses in shape or suggesting them in function."  EX122-0003; EX123-0003. Oxford English Dictionary defines SPECTACLES as "a device for assisting defective eyesight."  A2049–51.

54.   Further, Cambridge Dictionary defines "smart glasses" as "a pair of glasses that contain computer technology" and includes the example sentence: "A pair of smart glasses will mean that you can take photos with your spectacles."  EX126-0001.  This example shows use of "spectacles" as a synonym for glasses, not smart glasses, which is consistent with the dictionary definitions for "spectacles."

55.   Neither party presented evidence of a dictionary definition which defines "spectacles" as a synonym for "smart glasses."  Neither party is even aware of a dictionary definition that defines "spectacles" as a synonym for "smart glasses."  Trial Tr. III, 102:19–23; EX423-11.

56.   Professor Leonard found, based on his analysis of COHA and COCA, that the only uses of "spectacles" in relation to smart glasses products specifically referred to Snap's own SPECTACLES brand.  Trial Tr. I, 111:21–112:9.

57.   Professor Leonard concluded that his linguistics analysis better supported the hypothesis that "the American public does not use the lexical item 'spectacles' to commonly refer to smart glasses or wearable technology that can take photographs and

videos," and Professor Leonard found no evidence to support the alternative hypothesis that "spectacles" is used in such a way.  Trial Tr. I, 94:23–95:12.

### 3.    Professor Peter N. Golder

58.    Professor Golder presented an analysis using the historical research method, an empirical analysis of extensive real-world data, to assess consumer perception and usage of "spectacles."

59.    The historical research method is the subject of numerous well-received and award-winning publications by Professor Golder, Trial Tr. II, 9:3–20, and also was endorsed by 11 well-respected marketing experts (in addition to Professor Golder) in an amicus brief submitted to the United States Supreme Court in *United States Pat. & Trademark Off. v. Booking.com B.V.*, 591 U.S. 549 (2020).  Trial Tr. II, 11:13–12:2; EX044, EX431.

60.    As Professor Golder explained, the historical research method is a multi-step process, that begins with identifying a research question.  By first identifying the relevant research question, Professor Golder is able to pinpoint what type of data will be best-suited to answer the question.  Professor Golder explained that, after identifying the relevant research question, the historical research method requires the researcher to compile relevant data, ensure its reliability, and then take random samples to make inferences and draw conclusions about the overall data population.  Trial Tr. II, 7:21– 8:6, 20:9–23:4.  Although the historical research method has a number of steps, it is "absolutely…not at all a checklist" but rather "a rigorous method that considers a wide variety of factors."   Specifically, Professor Golder explained that applying the historical research method and drawing conclusions is "a function of the research question" and "a function of the data that are available."  Trial Tr. II, 10:17–11:12.

61.    As part of the historical research method, Professor Golder examined data sources including media articles, social media postings, online reviews, retailer categorizations, and consumer search data.  Trial Tr. II, 15:15–20:3.

62.      Professor Golder explained that media articles are relevant to the genericness inquiry because they "reflect[] and influence[] consumer perception and understanding."  Social media posts were "highly relevant" because social media accounts directly represent "the voice of the consumer" which "bear[s] directly on consumer perception and usage."  Online consumer reviews were relevant because, "just like the media sources…here we have consumers who are writing reviews directly in the context of shopping for smart glasses" and that those reviews are then seen by others considering purchasing smart glasses, which informs the researcher "about consumer perception and understanding" of the term at issue.  Retailer categorizations were relevant because the "categorization structure [] helps consumers find the products that they want," and "if [a term] was operating as a category name" it would be expected to be "used in that category structure by retailers."  Lastly, online search data was relevant because "online search queries are another example of direct voice of the consumer," and captures "how [consumers] search for terms online in relation to [the smart glasses] category."  *Id.*

63.      Based on his analysis, Professor Golder found that each set of sources overwhelmingly showed that "spectacles" is used and perceived as a brand name for Snap's products rather than as a common category term for smart glasses.

64.      Specifically, Professor Golder found, based on his research, that 86 to 100 percent of traditional media articles across a variety of samples use "spectacles" in this way.  Trial Tr. II, 24:15–20.  Further, when Professor Golder looked at social media samples, he found that 92 to 100 percent of social media postings used "spectacles in this way."  Trial Tr. II, 28:17–24.  The product review analyses yielded comparable results, further reinforcing the overall conclusion that "spectacles" is predominantly used and understood as referring to Snap's specific product rather than as a generic name for the smart glasses category.  Trial Tr. II, 40:19–42:22.  Additionally, the retailer categorization data derived from a review of the top 10 online U.S. retailers (*e.g.*, Amazon, Best Buy, Walmart, etc.) showed that the common category names for the

16

relevant product class are "smart glasses" or "wearable technology," but that there was <u>no use</u> of "spectacles" as a category name.  Trial Tr. II, 45:19–47:15.

### 4. Brian M. Sowers

65.    Mr. Sowers presented the results of a *Thermos*-format survey that examined consumer usage of the term "SPECTACLES."  The survey asked relevant consumers (*i.e.*, those who had purchased smart glasses within the past two years or were likely to purchase smart glasses in the next two years) a series of open-ended questions to determine (i) the generic terms consumers use to describe the category of smart glasses, and (ii) whether and to what extent consumers use "spectacles" as a generic term for smart glasses.  Trial Tr. I, 163:25–164:8, 164:17–165:3.

66.    Mr. Sowers' survey showed that, across all of the questions in his survey, only 1.5% of respondents used "spectacles" as a generic term; in contrast, more than 75% used terms such as "smart glasses" or "camera glasses."  Trial Tr. I, 174:22–175:6; EX013-0024–25.

67.    Mr. Sowers also testified regarding criticisms of Defendant's *Teflon*-format survey, described below.

### B.    Defendant's Witnesses

68.    Defendant called the following witnesses: Professor Edward Finegan, professor emeritus of linguistics at University of Southern California; Professor Ashish Sood, a marketing professor from University of California Riverside; Dr. Justin R. Anderson, a consumer surveys expert; and, through her deposition, Orchideh Rushenas, a paralegal specialist at the USPTO.

### 1. Professor Edward Finegan

69.    Professor Finegan testified regarding his critiques of Professor Leonard's linguistics analysis.  However, those critiques were the extent of Professor Finegan's testimony, as he conceded he had no other independent opinions to offer.  Trial Tr. III, 100:23–101:19.  In other words, unlike Professor Leonard, Professor Finegan did not

conduct a linguistics analysis of the term "spectacles," or an analysis of any kind for that matter.  Trial Tr. III, 108:23–109:23.

70.     Professor Finegan conceded that, had he conducted his own linguistics analysis, it is possible that he may have reached the same conclusion as Professor Leonard; however, without having performed such an analysis, he had no way of knowing.  Trial Tr. III, 142:22–143:17.

71.     Despite his critiques of Professor Leonard's linguistics analysis and the corpora Professor Leonard consulted, Professor Finegan did not identify what he believed to be a more appropriate corpus.  Trial Tr. III, 104:19–22.  Rather, Professor Finegan conceded that he has used in his other work the same exact corpora that Professor Leonard used here.  Trial Tr. III, 112:12–17, 142:19–21.

### 2.    Professor Ashish Sood

72.     Much like Professor Finegan, Professor Sood's testimony was limited to critiques of Professor Golder's analyses, rather than any independent empirical analysis conducted by Professor Sood himself.  Further, Professor Sood failed to substantiate his critiques of Professor Golder's analyses, conceding that the critiques were "purely theoretical" and that he had no data or empirical research to show that the critiques impacted the ultimate results of Professor Golder's analyses.  Trial Tr. III, 24:8–28:18.

### 3.    Dr. Justin R. Anderson

73.     Dr. Anderson presented the results of two *Teflon*-format surveys, each of which examined the extent consumers understood the term "spectacles" to be generic for "smart glasses."  Trial Tr. II, 133:5–18, 135:15–136:4.

74.     Dr. Anderson's first survey found that 82.4% of respondents understood "spectacles" to be generic for "smart glasses."  Trial Tr. II, 149:15–150:4.  Dr. Anderson's second survey, which was conducted in response to critiques by Mr. Sowers, found that 72.9% of respondents understood "spectacles" to be generic for "smart glasses."  Trial Tr. II, 150:5–8, 161:14–23.

4.     Orchideh Rushenas

75.     Ms. Rushenas offered testimony, by deposition, regarding media articles and various product listings with respect to the smart glasses market.  Aside from confirming that she printed certain exhibits from the internet (articles and website screenshots), Ms. Rushenas had no knowledge about the documents she printed. EX275-0028 at 110:17–111:21.

C.     **Administrative Record Before the TTAB**

76.     In addition to the witness testimony and other documentary evidence offered at trial, the entirety of the Administrative Record that was before the TTAB was offered and accepted into evidence as part of these proceedings, as permitted by 15 U.S.C. § 1071(b)(3).

## CONCLUSIONS OF LAW

## V.     JURISDICTION AND VENUE

77.     This action presents questions of trademark registrability subsequent to a TTAB opinion affirming a final refusal from the USPTO.  This Court has jurisdiction over the subject matter of this action pursuant to 15 U.S.C. § 1071(b) and 28 U.S.C. §§ 1331, 1338(a).

## VI.     ISSUES BEFORE THE COURT

78.     There are a number of distinct but closely related issues before the Court, each of which requires determining where on the spectrum of distinctiveness the SPECTACLES mark falls.

79.     Marks are generally classified in one of five categories of increasing distinctiveness: (1) generic, (2) descriptive, (3) suggestive, (4) arbitrary, or (5) fanciful. *Two Pesos, Inc. v. Taco Cabana, Inc.,* 505 U.S. 763, 768 (1992).  Which category a mark belongs in is a question of fact.  *See Lahoti v. VeriCheck, Inc.,* 586 F.3d 1190, 1195–96 (9th Cir. 2009).  Suggestive, arbitrary, and fanciful marks are considered "inherently distinctive" and are automatically entitled to federal trademark protection because "their intrinsic nature serves to identify a particular source of a product." *Two*

1    *Pesos,* 505 U.S. at 768.  Generic marks are not eligible for trademark

2    protection.  *Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135, 1141 (9th Cir.

3    2002).  Merely descriptive marks are not inherently distinctive, making them not entitled

4    to automatic trademark protection, but a merely descriptive mark can become eligible for

5    protection if it acquires distinctiveness "as used on or in connection with the applicant's

6    goods in commerce."  15 U.S.C. § 1052(f).  This acquired distinctiveness is referred to

7    as "secondary meaning."  *Two Pesos,* 505 U.S. at 769.

8         80.    As a threshold issue, this Court must first determine whether the applied-for

9    mark, SPECTACLES, is a generic mark for the class of goods upon which it is used:

10    "smart glasses."

11        81.    If SPECTACLES is generic, it is not eligible for registration.  If

12    SPECTACLES is not generic, the Court must then consider whether it is either

13    inherently distinctive (*i.e.*, a suggestive mark), in which case, it is eligible for registration

14    on the Principal Register.  If SPECTACLES is descriptive rather than suggestive, the

15    Court must then consider whether it has secondary meaning (*i.e.*, acquired

16    distinctiveness), in which case it would be eligible for registration on the Principal

17    Register.  If the Court determines that SPECTACLES is merely descriptive without

18    secondary meaning, it would be eligible for registration on the Supplemental Register.

19    *See* Dkt. No. 142.

20    **VII.  DEFENDANT HAS NOT DEMONSTRATED THAT SPECTACLES IS A**

21    **GENERIC MARK**

22        **A.    Test for Genericness**

23        82.    The Lanham Act provides nationwide protection of trademarks.  A

24    trademark is "any word, name, symbol, or device, or any combination thereof" used "to

25    identify and distinguish…goods, including a unique product, from those manufactured or

26    sold by others and to indicate the source of the goods, even if that source is unknown."

27    15 U.S.C. § 1127.

28

83.    A generic term cannot be protected or registered as a trademark because it is "the common descriptive name of an article or substance" and thus does not distinguish the product and source from others on the market. *Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 193–94 (1985) (citation omitted).

84.    Whether a mark is generic depends on the "primary significance" of the mark to members of the relevant public. *See* 15 U.S.C. § 1064(3); *see also Booking.com*, 591 U.S. at 556 ("[T]he relevant meaning of a term is its meaning to consumers."). This determination turns on how consumers actually use or refer to the mark. *See Filipino Yellow Pages Inc. v. Asian J. Publ'ns, Inc.*, 198 F.3d 1143, 1148–52 (9th Cir. 1999) (explaining courts must consider evidence of whether consumers use the mark as a genus name); *see also Kudos Inc. v. Kudoboard LLC*, No. 20-CV-01876, 2021 WL 5415258, at *6 (N.D. Cal. Nov. 20, 2021) ("[T]he proper inquiry [is] namely, consumer's use of the word…as a generic referent to…the class of goods[.]").

85.    As the Supreme Court has recognized, "difficult questions may be presented when a term has concurrent meanings to consumers or a meaning that has changed over time." *Booking.com*, 591 U.S. at 561 n.6. Accordingly, "[m]erely establishing that [a term] is generic for ***something***…does not establish that [it] is generic for the relevant class of goods." *Kudos Inc.*, 2021 WL 5415258, at *8 (emphasis in original) (finding KUDOS to be non-generic for the class of "employee recognition and engagement software" even where the mark was generic for the "term's own dictionary meaning").

86.    In this Circuit, courts follow the "who-are-you/what-are-you" test to determine whether a mark is generic. *Yellow Cab Co. of Sacramento v. Yellow Cab of Elk Grove, Inc.*, 419 F.3d 925, 929–930 (9th Cir. 2005) (reversing summary judgment on grounds that "yellow cab" was not generic as a matter of law). Put another way, when a consumer asks for a product using the term at issue, the question the court seeks to answer is whether the consumer is seeking the product of a particular producer (species) or referring to the type of product itself (genus). *See id.*

87.    Notably, the test is not whether **some** portion of the relevant public views a term as generic, but whether the term's primary significance to a **majority** is as a generic term.  *See Horizon Mills Corp. v. QVC, Inc.*, 161 F. Supp. 2d 208, 213 (S.D.N.Y. 2001) ("A term is generic when the **majority** of the buying public associates the term with a product, rather than the source of the product, whether the source is known or unknown.") (emphasis added).  Under the primary significance test, "**majority usage controls**."  2 McCarthy on Trademarks and Unfair Competition (5th ed.) [hereinafter "McCarthy"] § 12:6 (emphasis added); *see also id.* § 12:12 ("[A] court should not find genericness without persuasive and clear evidence that the contested term has become generic among a **majority of the buyer group**.") (emphasis added).

88.    For this reason, an evidentiary record reflecting mixed usage of a term (*i.e.*, both generic and non-generic usage) falls short of proving that the **primary** significance of a term is generic. *In re Merrill Lynch, Pierce, Fenner, and Smith, Inc.*, 828 F.2d 1567, 1571 (Fed. Cir. 1987) ("The mixture of usages…does not show, by clear evidence, that the [relevant consumer] views and uses the term [] as a generic, common descriptive term for the [product category].");  *Baroness Small Estates, Inc.*, 104 U.S.P.Q.2d 1224, 2012 WL 4763149, at *5 (T.T.A.B. Sept. 17, 2012) (same).

89.    Further, evidence of both *use* and *understanding* is relevant to determining the primary significance of the mark at issue. *H. Marvin Ginn Corp. v. Int'l Ass'n of Fire Chiefs, Inc.*, 782 F.2d 987, 989–90 (Fed. Cir. 1986) ("The critical issue in genericness cases is whether members of the relevant public primarily **use or understand** the term sought to be protected to refer to the genus of goods or services in question") (collecting cases) (emphasis added); *see also In re Am. Fertility Soc.*, 188 F.3d 1341, 1348 (Fed. Cir. 1999) (reversing TTAB finding that SOCIETY OF REPRODUCTIVE MEDICINE for association services related to reproductive medicine was generic where there was "no evidence produced that the term is **used** by the relevant public to refer to a similar class") (emphasis added).  How consumers use—or don't use—a term can reveal their understanding of the term as applied to a product.

90.     In order to affirm a refusal to register a mark on genericness grounds, this Court must find that a majority of the relevant public primarily uses or understands the applied-for mark (here, SPECTACLES) for an entire class of products (here, smart glasses).  McCarthy § 12:12.  If there are any doubts regarding this showing, they must be resolved in Snap's favor.  *In re Merrill Lynch*, 828 F.2d at 1571.

**B.   Burden of Proof**

91.     It is well established that Defendant bears the burden of proof on the issue of genericness.  *See, e.g., Booking.com B.V. v. United States Pat. & Trademark Off.*, 915 F.3d 171, 179–80 (4th Cir. 2019) ("We therefore hold here that the USPTO bears the burden of proving that BOOKING.COM is generic in the instant case."), *rev'd on different issues*, 141 S. Ct. 187 (2020); *see also In re Merrill Lynch*, 828 F.2d at 1571 ("The burden of showing a proposed mark is generic remains with the Patent and Trademark Office.").  Defendant does not dispute this.  *See* Dkt. No. 144 at 8:17–19 ("The parties also agree that, for genericness refusals, [Defendant] ultimately bears the burden of proving that a term is generic.").

**C.   Standard of Proof**

92.     Although the parties have disputed the standard of proof that should apply on the question of genericness, they have now agreed that, for purposes of this case, it is ***clear and convincing evidence***.

93.     This heightened standard of proof has consistently been affirmed for decades by the Federal Circuit and the TTAB.  *In re Cordua Rests., Inc.*, 823 F.3d 594, 601 (Fed. Cir. 2016) ("When a proposed mark is refused registration as generic, the Office has the burden of proving genericness by 'clear evidence' thereof." (citations omitted)); *In re Hotels.com, L.P.*, 573 F.3d 1300, 1302 (Fed. Cir. 2009) ("The Patent and Trademark Office (PTO) bears the burden of establishing that a proposed mark is generic [] and must demonstrate generic status by clear evidence.") (citation omitted); *see also In re Merrill Lynch*, 828 F.2d at 1571 (holding that the PTO's burden "must be based on clear evidence of generic use").

23

94.     Most recently, the Fourth Circuit applied the clear evidence standard in *Booking.com*, which the Supreme Court affirmed.  *Booking.com*, 915 F.3d at 179, *as amended* (Feb. 27, 2019), *aff'd*, 591 U.S. 549 (2020).

95.     Courts have applied this heightened standard because of the significant consequences that follow from a finding of genericness.  As the TTAB has explained: "To determine that a trademark is generic and thus pitch it into the public domain is a fateful step.  It penalizes the trademark's owner for his success in making the trademark a household name and forces him to scramble to find a new trademark.  And it may confuse consumers who continue to associate the trademark with the owner's brand when they encounter what they thought a brand name on another seller's brand."  *In re Trek 2000 Int'l Ltd.*, 97 U.S.P.Q.2d 1106, 2010 WL 5099653, at *3 (T.T.A.B. Nov. 30, 2010) (citing *Ty Inc. v. Softbelly's Inc.*, 353 F.3d 528, 531 (7th Cir. 2003)); *In re Hotels.com*, 573 F.3d at 1302 ("To determine that a trademark is generic and thus pitch it into the public domain is a fateful step.") (citation omitted).

96.     Although Defendant initially argued that a "preponderance of the evidence" standard should apply based on a 2022 change to its Trademark Manual of Examining Procedure ("TMEP"), for purposes of this case, Defendant concedes that the USPTO and TTAB applied the "clear and convincing evidence" standard when they examined Snap's Applications, and the USPTO amended the TMEP only after Snap filed the instant action in this Court.  Whether the TMEP amendment is effective is a hotly disputed issue between the parties, but ultimately Defendant agreed not to press that issue in this case and agreed that the Court should apply the "clear and convincing evidence" standard in this case.  *See* Dkt. No. 152 at 74:3–81:19.

97.     This Court does not now make a broad ruling that the "clear and convincing" standard of proof applies to all genericness determinations.  Rather, this Court makes the following limited ruling, to which each party in this matter has agreed: because the "clear and convincing" standard of proof applied in December 2020 when the Examining Attorney issued its final refusal of Snap's Applications, in November

24

1    2021 when the TTAB issued its decision affirming the refusal, and in January 2022 when

2    Snap filed the Complaint in this action, it is the standard of proof that will continue to

3    apply here.  In any event, Defendant's limited evidence, as explained below, would have

4    failed to meet even a "preponderance of the evidence" standard of proof.

5           **D.**    **Defendant Has Failed to Prove SPECTACLES Is a Generic Name for**

6                **Smart Glasses**

7         98.    Courts assess genericness using a two-part inquiry: (1) identifying the genus

8    of goods or services at issue; and (2) determining whether the relevant public uses or

9    understands the term primarily to refer to that genus as a whole.  *Marvin Ginn Corp.*,

10    *782 F.2d at 989–90*.  Defendant has failed to establish that SPECTACLES is a generic

11    name for smart glasses, let alone for all of the computer hardware and software identified

12    in Snap's trademark applications.  At best, Defendant has shown some de minimis

13    generic use of SPECTACLES that falls far short of proving—under either the clear

14    evidence standard or the lower preponderance of the evidence standard—that the

15    primary significance of the term SPECTACLES is a generic name for the category of

16    smart glasses generally.

17               1.   <u>The Relevant Genus is "Smart Glasses"</u>

18         99.    From the outset, the parties have generally agreed that the relevant genus is

19    "smart glasses," although there has been disagreement on what "smart glasses" actually

20    means.

21         100.    Properly defining the genus is a crucial step in the genericness inquiry,

22    because if the evidence shows that a mark names the "key aspect of the genus," it must

23    be found generic.  *Royal Crown Co. v. Coca-Cola Co.*, 892 F.3d 1358, 1367 (Fed. Cir.

24    *2018*) (citation omitted).

25         101.    A "key aspect" of a claimed genus is "an integral, if not the paramount,

26    aspect" of that genus.  *In re Cordua Rests.*, 823 F.3d at 603–04 (quoting *In re Reed*

27    *Elsevier Props. Inc.*, 482 F.3d 1376, 1379 (Fed. Cir. 2007)).  To be clear, it is not enough

28    that a term refers to any "portion" or "part" of the genus.  Rather, the term must refer to a

"central characteristic" of the genus. *Royal Crown*, 892 F.3d at 1367. The proper definition of the genus is essential to how the evidence is analyzed in the primary significance inquiry. *See In re Cordua Rests.*, 823 F.3d at 605 ("By expanding or contracting the definition of a 'genus' of products, a court can substantially affect the final determination of whether a term is 'generic.'").

102. Throughout this litigation, Defendant has not offered a workable definition of smart glasses. Rather, Defendant has consistently argued that (i) "spectacles" is generic for "eyeglasses," (ii) "eyeglasses" is a "portion" or "part' of "smart glasses," and therefore (iii) "spectacles" is generic for "smart glasses."

103. However, the second premise of Defendant's syllogism is argument by *ipse dixit*. For Defendant's syllogism to compute, one must *presuppose* that "glasses" is a necessary subset of—and thus completely subsumed by—the genus of "smart glasses." The mere presence of the shared word "glasses" does nothing to prove the point.

104. To claim that the relevant genus here—smart glasses, or computer peripherals wearable as glasses—categorically encompasses *all* eyeglasses, while instrumental to Defendant's defense of its genericness finding, is beset by logical fallacies. In other words, Defendant's logic only follows if Snap's claimed genus was a broad class of eyewear, since in that instance, even glasses with embedded computer technology would be encompassed by a broad "all eyewear" genus. However, the facts of the present matter do not support such a conclusion. There is no inescapable reason why smart glasses cannot be placed in its own category—overlapping with, but distinct from, eyeglasses.

105. Defendant cannot categorically declare that one component of a genus is logically a subcategory of that genus based on semantic similarities alone. Rather, Defendant has the burden of showing that the purported "key aspect" is actually understood by consumers to refer to the genus at issue. *See Booking.com*, 915 F.3d at 182–83 (rejecting USPTO's argument that addition of ".com" to generic term "booking"

26

1    is necessarily generic for the class of online hotel reservation services and requiring

2    evidence that consumers would understand the term to refer to that class).

3        106.   Defendant has failed to come forward with any such evidence.  Rather,

4    Defendant persists in arguing that "glasses" is *a* characteristic of smart glasses, without

5    supporting it is *the* key aspect.  In contrast, Snap has presented evidence that users of

6    SPECTACLES do *not* wear SPECTACLES in the same way they would wear ordinary

7    eyeglasses or sunglasses.  Rather, SPECTACLES users wear the product for a *specific*

8    *purpose*, such as capturing a concert, but not throughout the normal course of a day.

9    Trial Tr. I, 58:6–16.  Furthermore, Snap has adduced substantial evidence that the key

10   aspect of its SPECTACLES product is all of the computer hardware and software

11   embodied in the product, rather than the form factor of how that computer hardware is

12   presented and worn.  Consumers primarily use Snap's SPECTACLES for their

13   technological capabilities and not because they are effective eyeglasses that correct one's

14   vision or protect one's eyes from the sun.  Trial Tr. I, 58:6–59:4.

15       107.   No party denies that "spectacles" is a synonym for "glasses."  But for this

16   Court to focus on that aspect of Snap's product, it must necessarily ignore all of the

17   advanced technology embedded in the product.  Although Defendant would like this

18   Court to reason that Snap's SPECTACLES are simply eyeglasses that happen to have

19   embedded technology, that is not what the evidence shows.

20       108.   Accordingly, this Court finds that the genus is computer hardware and

21   peripherals designed to be worn as glasses (though the Applications are not limited to

22   wearable technology in the form factor of glasses and could cover other peripherals that

23   embody other forms).  The integral and paramount aspect of that genus is the

24   technological functionality—the ability to take and share photos and videos, and connect

25   with software applications (like Snapchat).  Traditional eyeglasses lacking those

26   capabilities are not part of the relevant genus, even if certain smart glasses may

27   incorporate some features of traditional eyewear.

28

109.   With the genus properly defined, Defendant had the burden to prove by clear and convincing evidence that consumers primarily understand "spectacles" to refer to the computer hardware and peripheral aspects that define the actual genus at issue.

2.   <u>Defendant Failed to Meet Its Burden to Show That the Primary Significance of SPECTACLES to the Relevant Consuming Public Is a Generic Term for "Smart Glasses"</u>

110.   In assessing genericness, courts consider: (1) generic use by competitors that has not been contested by the trademark owner; (2) generic use by the trademark proponent itself; (3) dictionary definitions; (4) generic usage in media sources like trade journals and newspapers; (5) testimony of persons in the trade; and (6) consumer surveys.  *Ossur hf v. Manamed Inc.*, 331 F. Supp. 3d 1005, 1012 (C.D. Cal. 2017) (citation omitted).  For the reasons stated herein, Defendant has failed to demonstrate by clear and convincing evidence that the primary significance of SPECTACLES to consumers is a generic term.

a.   *Defendant Failed to Show Any Generic Use of SPECTACLES by Competitors.*

111.   In determining whether a mark is generic, courts look to whether competitors in the industry are using the same mark to describe their goods.  *Threshold Enterprises Ltd. v. Pressed Juicery, Inc.*, 445 F. Supp. 3d 139, 152 (N.D. Cal. 2020) (citations omitted) (describing usage of a term by competitors in the industry as "strong evidence" of public perception of the term); *see also Closed Loop Marketing, Inc. v. Closed Loop Marketing, LLC*, 589 F.Supp.2d 1211, 1219 n.6 (E.D. Cal. 2008) ("Significant use of a term by competitors in the industry has traditionally been recognized…as indicating genericness.") (citation omitted).

112.   Despite bearing the burden on genericness, Defendant put forth no credible evidence on this factor.

113.   Defendant has pointed to two online product listings that include "Spectacles" in the name of the product listing.  *See* EX104-1; EX111-0051–56.

28

However, other than submitting these documents through the deposition testimony of Ms. Rushenas, Defendant failed to provide any evidence of what these listings were, if they were actually available for purchase, or if the listings were from bona fide sellers.

114.    One of the products, listed on Walmart's website, is titled "Relax love Bluetooth Smart Glasses Spectacles Open-ear Glasses Speaker with MIC Waterproof." The Walmart listing is sold by a seller identified as "Joybuy," that sells the product for $33.79, less than one-tenth of the $380 sale price of SPECTACLES 3.  The product's listed features appear to differ greatly from those of Snap's SPECTACLES, lacking cameras, AR capabilities, and integration with the Snapchat application.  Neither the product details, product categorization, nor suggested similar products use "spectacles" in reference to the products.  *See* Ex. 104-1; Trial Tr. I, 48:15–50:2.  No evidence was presented that this product is a competitor of Snap's SPECTACLES, and the differences in functionality, pricing, and features suggest the exact opposite conclusion.

115.    Similarly, the second product, listed on Amazon.com, is titled "Spectacles Eyewear Glasses DVR Camcorder Camera 720P."  The Amazon listing is sold by a seller by the name of "eFashion."  It is described as "sports sunglasses DVR camcorder camera," and categorized as "surveillance cameras" and "hidden cameras."  The camera is designed to be concealed, whereas Snap's product is designed to indicate when the camera is being used, via LED highlighting around the lens.  The Amazon product is listed for a sale price of $32.13, less than one-tenth of Snap's $380 sale price for its SPECTACLES 3 product.  The product description, titles of similar items, and reviews of this product do not use the term "spectacles" at any time.  *See* EX111-0051–56; Trial Tr. I, 50:18–51:4, 51:19–22, 53:3–10.  No evidence was presented that this product is a competitor of Snap's SPECTACLES, and the differences in functionality, pricing, and features suggest the exact opposite conclusion.

116.    As Mr. Chan explained at trial, Snap had an active and successful enforcement program for challenging infringement by other sellers in the market.  Specifically, Mr. Chan testified that members of the Snap team would search for Snap's

own products and other online retailers, and any time Snap saw a product that was referencing the SPECTACLES brand name, Snap would highlight it for its legal team, and the legal team would take it from there.  Trial Tr. I, 54:20–55:5.  In support of this enforcement program, Snap presented voluminous records of successful takedown notices.  *See* EX306–EX327.  Notably, as part of this enforcement program, Snap never became aware of either the Joybuy or eFashion products, which further supports the conclusion that these products in particular were not competitor products of Snap.

117.   Mr. Chan confirmed that Snap did not consider either eFashion or Joybuy to be competitors of Snap.  Trial Tr. I, 53:22–54:2.  The products in these listings are better characterized as "knock-offs" or cheap spy camera glasses rather than genuine smart glasses comparable to SPECTACLES.  The use of SPECTACLES in connection with these fringe products does not demonstrate genericness for the smart glasses category as a whole.

118.   The few isolated examples of "spectacles" used in connection with smart glasses products by minor, relatively unknown third parties, such as those identified in the eFashion and Joybuy listings, are questionable at best, and do not demonstrate majority usage.  In contrast, major industry participants such as Amazon, Meta, and Bose do not use "spectacles" to refer to their products, but instead use generic terms like "smart glasses," and branded terms like Echo, Stories, and Frames.  *See* A1464–68, A1634–39; Trial Tr. I, 55:6–13. *See E.T. Browne Drug Co. v. Cococare Prods., Inc.*, 538 F.3d 185, 198–99 (3d Cir. 2008) ("Evidence that competitors use terms other than 'Cocoa Butter Formula' […] tends to prove that the term is not generic.").

119.   Further, Professor Golder's empirical analysis of how major online retailers categorize and describe smart glasses products revealed that none of the top retailers, including Amazon, Best Buy, and Walmart, use "spectacles" as a product category or generic descriptor.  Instead, these retailers consistently use terms like "smart glasses," "AR glasses," or "wearable technology" to refer to this product class.

120.    The absence of generic industry usage coupled with the availability and *actual* usage of other terms for the relevant goods (for example, "smart glasses" and "camera glasses") deals a double strike against finding genericness. *See In re Trek*, 2010 WL 5099653, at *9 (availability of other terms for flash drives, and "complete absence of competitor uses after ten years," indicated that mark THUMBDRIVE was not generic). As the court in *Elliot v. Google Inc.* explained in finding that GOOGLE was not generic for search engine services, "[i]f competitors can accurately describe their products or services without using the mark in question, it suggests the mark is not generic." 45 F. Supp. 3d 1156, 1172 (D. Ariz. 2014), *aff'd sub nom.*, 860 F.3d 1151 (9th Cir. 2017); *see also Ossur hf*, 331 F. Supp. 3d at 1013 (absence of evidence of competitors using the mark "Unloader One" in a generic sense for knee braces weighed against finding the mark generic); *Moroccanoil, Inc. v. Marc Anthony Cosms., Inc.*, 57 F. Supp. 3d 1203, 1212–14 (C.D. Cal. 2014) (competitors' non-use of terms "Moroccan Oil" or "Moroccanoil" for similar argan oil hair products was a factor weighing against a finding that disputed mark was generic).

121.    If "spectacles" were truly understood by the relevant public as a common name for the entire category of smart glasses, one would expect to see such generic usage reflected among Snap's chief rivals in this space. Defendant's evidence does not support such a conclusion. Based on the lack of use of SPECTACLES generically by Snap's competitors, as well as the apparent availability of other terms, this factor weighs heavily in favor of finding SPECTACLES to be non-generic.

> b.    *Defendant Failed to Show Any Generic Use of SPECTACLES by Snap.*

122.    Evidence that Snap itself has used the term "spectacles" generically would have been strong evidence of genericness. *See* McCarthy § 12:13 ("If the proponent of a trademark itself uses the term as a generic name, this is strong evidence of genericness."). However, there is no record evidence to support such a finding.

123.    Defendant points to Snap's own advertisements that say: "Sunglasses that Snap!" (EX068) and Snap's "first pair of glasses that bring augmented reality to life" (EX106-0001).  However, neither of these advertisements are evidence of generic use of "spectacles"; indeed, "glasses" and "sunglasses" are not the terms at issue here.

124.    Further, Mr. Chan explained "in reference to the form factor, we do refer to the product as sunglasses."  Trial Tr. I, 59:7–10.  When asked about Snap referring to SPECTACLES as its "first pair of glasses," Mr. Chan explained, "we're referring to the form factor of the device, just to give people a sense as to what the product looks and feels like."  Trial Tr. I, 61:19–25.  These uses of "glasses" and "sunglasses" are not evidence of generic usage of "spectacles" by Snap.

125.    Again, despite bearing no burden on the genericness issue, Snap put forth significant evidence that Snap has employed SPECTACLES as a brand name, not a generic term, in its marketing, advertising, and promotional materials for its specific line of smart glasses products, distinguishing them from competing products in the same category.  Snap's websites, product listings, and other marketing material all refer to and promote the products using the brand name SPECTACLES, never generically as "spectacles."

126.    Therefore, this factor weighs in favor of finding SPECTACLES to be non-generic.

c.    *Defendant Failed to Present Any Dictionary Definitions That Define SPECTACLES as Smart Glasses.*

127.    In the Ninth Circuit, dictionary definitions are relevant evidence regarding genericness because they capture the public understanding and meaning of words.  *See Filipino Yellow Pages, Inc.*, 198 F.3d at 1148 ("[W]e place[] significant but not controlling weight on the dictionary definitions[.]"); *see also Creative Gifts, Inc. v. UFO*, 235 F.3d 540, 546 n.5 (10th Cir. 2000) (finding the term LEVITRON not generic for science-oriented products and toys in part, due to lack of dictionary listings, including in the comprehensive unabridged Webster's *Third New International Dictionary* (1986));

McCarthy § 12:13 (dictionary definitions "usually reflect the public's perception of a word's meaning and its contemporary usage") (citation omitted).

128.    Here, a review of leading dictionaries reveals that the definitions of "spectacles" predominantly refer to traditional eyewear or glasses used for correcting vision.  Notably absent from these definitions is any reference to smart glasses, digital technology, or integrated camera functionality, which, as discussed above, are the key aspect of smart glasses.

129.    Defendant's dictionary evidence is *only* probative if this Court accepts the premise that the "glasses" component is the key aspect of the relevant genus.  Because Defendant has failed to support that premise, Defendant's dictionary evidence does little to move the needle.  Rather, the dictionary evidence from both parties all points to the same conclusion: "spectacles" does not name smart glasses as a class of products.

130.    For example, the Merriam-Webster Dictionary defines "spectacles" as "glasses that are supported by the ears…usually used in plural and often with *pair*."  The same entry also includes a more general definition of "any of various things felt to resemble a pair of glasses," but this broad, and arguably vague, language does not specifically encompass smart glasses or digital eyewear.  EX124-0001.  Merriam-Webster Dictionary further defines "spectacles" as "a device used to correct defects of vision."  EX125-0001.

131.    Similarly, the American Heritage Dictionary provides two relevant definitions for "spectacles": "a pair of eyeglasses" and "something resembling eyeglasses in shape or suggesting them in function."  EX122-0003; EX123-0003.  Although the latter definition is more expansive, it still does not explicitly include smart glasses or any reference to digital or camera capabilities.

132.    The Oxford English Dictionary also focuses on the vision-correcting function of spectacles, defining the term as "a device for assisting defective eyesight, or for protecting the eyes from dust, light, etc., consisting of two glass lenses set in a frame which is supported on the nose, and kept in place by side-pieces passing over the ears."

A2049–51.  Indeed, this definition expressly references such elements as the lenses and the frame but notably lacks any mention of cameras, batteries, lights, gyroscopes, accelerometers, or Bluetooth/Wi-Fi capabilities.

133.    Defendants have failed to identify a single dictionary entry that defines "spectacles" as a synonym for smart glasses.  *See* EX423.  Defendant admits, for example, that it is "not aware of any English language dictionary that defines 'spectacle' or 'spectacles' as 'eyeglasses with photo and audio/video capture features that can connect to a smartphone via Bluetooth or Wi-Fi" and that it is "not aware of any English language dictionary that defines 'spectacle' or 'spectacles' as 'smart glasses.'"  *Id.*  Indeed, neither party is aware, or has presented evidence, of such a dictionary definition.

134.    The lack of any dictionary entries defining SPECTACLES as smart glasses is particularly noteworthy given that dictionaries are regularly updated to reflect shifts in language and the emergence of new technology.  Dictionaries are continuously updated to reflect current usage and understanding.  Indeed, Professor Finegan conceded that, if dictionaries were finding examples of "spectacles" being used in reference to smart glasses, dictionaries would add to the definition of smart glasses and include "spectacles."  *See* Trial Tr. III, 93:17–22.  Further, Professor Leonard explained that dictionaries are *descriptive*, not *prescriptive*.  In other words, dictionaries look at examples of how words are being used in the real world and update definitions accordingly, making dictionaries "reflective of actual usage."  Trial Tr. I, 98:9–99:10.

135.    If the consuming public understood SPECTACLES to mean smart glasses, we would expect to see that definition.  For example, terms like "generative AI," "large language model," "chatbot," and "greenwashing" have all been added to dictionaries in recent years.  These terms all have entries in Merriam-Webster.  Even the definition of a

hallucination as being a "false or misleading response generated by an artificial intelligence algorithm" is now reflected in Merriam-Webster.[6]

136.   If "spectacles" were truly a commonly used and understood generic term for smart glasses, one would expect to see this usage reflected in at least some dictionaries.

137.   In an attempt to make a showing on this factor, Defendant points to a singular dictionary definition from the Online Cambridge Dictionary, that defines "smart glasses" as "a pair of glasses that contain computer technology so that, for example, they can be used in a similar way to a smartphone, or you can get information added to what you are seeing as you look through them." Defendant then points to the example use of the dictionary entry, that states, "A pair of smart glasses will mean that you can take photos with your spectacles." EX126-0001.

138.   This dictionary entry is not a generic use of "spectacles" as it refers to smart glasses. Rather, the use of "spectacles" in the example is just as a synonym for "glasses." If "spectacles" meant smart glasses, the example sentence would be circular. In other words, if "spectacles" were being used in that sentence to reference smart glasses, the example sentence would read "a pair of smart glasses will mean that you can take photos with your *smart glasses*." As such, this entry is not evidence that weighs in Defendant's favor.

---

[6] This Court can take judicial notice of the dictionary definitions for "generative AI," "large language model," "chatbot," "greenwashing," and "hallucination." Fed. R. Evid. 201(b) allows a court to take judicial notice of facts that are either "(1) generally known within the territorial jurisdiction of the trial court; or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Further, "[i]t is well-established that courts can consider dictionary definitions in determining the "plain, unambiguous, and common meanings of terms." *See Quinn v. Dowbak*, No. 2:17-cv-992, 2018 WL 3428560, at *3 (E.D. Cal. July 16, 2018), *report and recommendation adopted*, 2018 WL 4385593 (E.D. Cal. Sept. 14, 2018) (citing *United States v. Wealth and Tax Advisory Servs., Inc.*, 526 F.3d 528, 530 (9th Cir. 2008)).

139.   Although not dispositive, the absence of a single dictionary definition defining "spectacles" as smart glasses is telling.  As Professor Leonard explained, dictionary definitions are "reflective of actual usage"; if "spectacles" was commonly used as a synonym for smart glasses in American English, he would have expected that to be reflected in dictionaries.  Trial Tr. I, 98:9–99:10.

140.   Indeed, Defendant's expert, Professor Finegan, has argued in other cases that the absence of a term from dictionaries is evidence that the consuming public does not understand the term to be generic.  Professor Finegan has further stated that the most common and foundational reason for the absence of a term from a dictionary is that the lexicographer did not find sufficient evidence of its generic use to warrant entering it as a common noun.  *See* EX28; Trial Tr. III, 116:18–118:2.

141.   The dictionary evidence, taken as a whole, supports Snap's position that SPECTACLES is not a generic term for smart glasses.  The absence of any definitions explicitly including smart glasses or digital functionality, coupled with the consistent focus on traditional eyewear, indicates that the primary meaning of SPECTACLES to the relevant public is not as a name for the smart glasses product category.

> d.   *Defendant Failed to Show Widespread Generic Usage of SPECTACLES in Media.*

142.   How media outlets use a term is helpful in genericness analysis because the media "often has its finger on the pulse of the general public."  *Threshold Enterprises Ltd.*, 445 F. Supp. 3d at 151 (citation omitted).  If SPECTACLES was truly understood by the relevant public as a generic term for smart glasses, one would expect to see that usage reflected consistently across media outlets.

143.   As such, Defendant's reliance on a handful of media articles using SPECTACLES in connection with smart glasses is similarly unavailing.  Defendant has pointed to a select number of articles, including, for example: (i) a TechRadar article referring to Apple's augmented reality smart glasses as "the Apple AR spectacles," (A2381–95); (ii) a CNET article referring to Huawei's new glasses that "let you listen to

music in stereo and take calls" as "smart spectacles," (A2396–99); (iii) a BusinessInsider article reporting that "Amazon is the latest firm to try to build its own smart spectacles," (A2400–07); and (iv) an MIT Technology Review article entitled "Coming Soon: Smart Glasses That Look Like Regular Spectacles," (A2866–67). These articles do not prove the point for which Defendant offers them. Rather, each time "spectacles" is used in these headlines, it is being used as a synonym for the glasses part of the product, not as a generic term for "smart glasses" as a class. That is why each of the illustrative examples above, and the remaining articles presented by Defendant, add modifiers before "spectacles" such as "AR" or "smart."

144.    Notably, Defendant offers no evidence about the process by which it identified these articles. And, in any event, the small number of articles presented by Defendant is eclipsed by the overwhelming evidence from Professor Golder's empirical analysis showing that the vast majority of media usage of SPECTACLES in the context of smart glasses is as a brand reference to Snap's smart glasses, not a generic product term. *In re Am. Online, Inc.*, 77 U.S.P.Q.2d 1618, 2006 WL 236389, at *7–8 (T.T.A.B. Jan. 18, 2006) (concluding INSTANT MESSENGER was not generic where a majority of media articles used the term as a trademark).

145.    Professor Golder's methodology, that involved representative samples of media sources and a scientifically randomized coding process to classify usage as either brand-specific or generic, is undoubtedly more reliable and probative than Defendant's anecdotal examples. Professor Golder's testimony and supporting data is credible and persuasive evidence that SPECTACLES is not commonly used as a generic term for smart glasses in the media.

146.    Defendant's critiques of Professor Golder's methodology, raised through the rebuttal testimony of its expert, Professor Sood, are unpersuasive. Professor Sood acknowledged that he did not conduct any affirmative empirical analysis of media usage himself. His criticisms of Professor Golder's sampling and coding processes are

speculative and are not supported by any concrete evidence demonstrating that the results of the analysis are unreliable or unrepresentative of media usage patterns.

147. Therefore, this factor weighs in favor of finding SPECTACLES to be non-generic.

> e. *Defendant Put Forth No Testimony of Persons in the Trade.*

148. Courts recognize that testimony of persons in the trade is relevant to the question of genericness because these users possess knowledge, experience, and industry-specific terminology. *See Ossur hf*, 331 F. Supp. 3d at 1012; *see also* McCarthy § 12:13 ("The understanding of those who are familiar with the marketplace usage of the designation in question can be helpful evidence on the genericness issue.").

149. Defendant has not produced a single witness from the smart glasses industry to substantiate its position that SPECTACLES is a generic name. In contrast, Snap has introduced testimony from Mr. Chan, its former Senior Manager of Product Management, who possesses expertise in the smart glasses product space. Drawing on his industry experience, Mr. Chan testified that Snap's competitors do not use the word generically or as part of their own product names.

> f. *Defendant's* Teflon-*Format Survey Does Not Carry Defendant's Burden.*

150. Following the close of witness testimony at the bench trial, this Court noted that Defendant's only affirmative evidence on the genericness issue was the *Teflon*-format survey conducted by Dr. Anderson. Trial Tr. III, 224:25–225:21. This is confirmed by Defendant, who, when presenting closing arguments, did not mention its two other witnesses, Professor Finegan and Professor Sood, even once, before concluding opening remarks on the issue of genericness. *See* Dkt. No. 145 at 6:11–9:6.

151. It is undisputed that consumer surveys, like Dr. Anderson's *Teflon*-format and Mr. Sowers' *Thermos*-format survey, are generally accepted as probative evidence in assessing consumer perception and understanding of a term. *See Princeton Vanguard, LLC v. Frito-Lay N. Am., Inc.*, 786 F.3d 960, 969 (Fed. Cir. 2015) ("Consumer surveys

have become almost de rigueur in litigation over genericness.") (citation omitted); *see also* McCarthy § 12:14 ("Two preferred models of surveys to test for genericness have been approved by the courts: the Thermos Model and the Teflon Model."). Although surveys can be probative and the surveys in this case provide some relevant evidence, the Court is wary of placing dispositive weight on any given consumer survey. As the Supreme Court warned in *Booking.com*, surveys "require care in their design and interpretation." 591 U.S. at 561 n.6. Indeed, flaws in survey design or inherent weaknesses in consumer surveys could limit their probative value in assessing the genericness of a term. *Id.* at 564 (Sotomayor, J., concurring). That is why the question of genericness should not simply come down to the results of a survey; rather, all forms of competent evidence should be considered, such as "dictionaries, usage by consumers and competitors, and ***any other source of evidence*** bearing on how consumers perceive a term's meaning." *Id.* at 561 n.6 (emphasis added).

152.   In fact, that courts have adjudicated the issue of genericness without any survey evidence at all supports Justice Sotomayor's conclusion in *Booking.com* that surveys are not the "be-all and end-all." *Id.* at 564 (Sotomayor, J., concurring); *see also* McCarthy § 12:14 ([T]here is no need for a survey if other evidence overwhelmingly proves [the genericness issue].") (collecting cases making a genericness determination without requiring survey evidence).

153.   In recognizing that surveys should not be given dispositive weight, this Court looks critically at how Dr. Anderson's *Teflon*-format survey, upon which Defendant rests nearly its entire case, was designed and conducted.

154.   A *Teflon* survey, such as the one Dr. Anderson conducted, "is essentially a mini-course in the generic versus trademark distinction, followed by a test." McCarthy § 12:16. Respondents are instructed on the difference between a brand name and a common name, and then given a "mini-test" to determine whether respondents understand the difference. Those respondents who pass the mini-test are then placed in the full survey, where they are shown the mark at issue, along with several other

"control" or "benchmark" names, and then asked for each one whether they believe it is a brand name or a common name.

155. That is precisely what Dr. Anderson attempted to do here. However, given that the mark at issue, SPECTACLES, can take on distinct meanings (*i.e.*, a generic name for eyeglasses, but a brand name for Snap's product), the court is skeptical that a *Teflon*-format survey was appropriate under the circumstances of this case. As Mr. Sowers testified, "there are a lot of potential problems with designing a reliable *Teflon* survey for this matter" and, had he been asked to conduct a *Teflon* survey for the research question provided, he "probably would have turned down the assignment, because [he did not] think it would have been reliable." Trial Tr. I, 179:12–22.

156. In discussing the issues with Dr. Anderson's *Teflon*-format survey, the Court recognizes that Dr. Anderson conducted *two* separate surveys, but focuses only on the results of the second survey, which corrected for a number of Mr. Sowers' criticisms, including the fact that in the first survey, other than on the initial "Instructions" page, respondents were not told that the questions being asked were in "the context of smart glasses." EX271-0260–0272. Recognizing that surveys must be carefully constructed, this flaw is significant, and it is not lost upon the Court that, when Dr. Anderson corrected for some of Mr. Sowers' critiques, the number of respondents finding SPECTACLES to be generic decreased by more than 10%. Trial Tr. II, 198:23–199:10.

157. Dr. Anderson's second *Teflon*-format survey, following a primer on the difference between a brand name and common name, proceeded to the prototypical mini-test. The mini-test asked respondents to classify STORIES and EYEWEAR as brand names or common names for smart glasses. Only those who identified STORIES as a brand name and EYEWEAR as a common name were allowed to continue in Dr. Anderson's survey. Trial Tr. II, 159:11–160:8.

158. The survey then presented respondents with seven terms: SPECTACLES, VISION PRO, ECHO FRAMES, BLADE, CAMERA GLASSES, WIFI GLASSES, and

1  LENSES.  Again, respondents were asked to categorize each term as a brand name or

2  common name.  Trial Tr. II, 161:5–162:6.

3      159.   Dr. Anderson's second survey purports to show that 72.9% of respondents

4  classified SPECTACLES as a common, or generic, name (Trial Tr. II, 161:14–23),

5  which Defendant contends is sufficient for this Court to find SPECTACLES is generic.

6  However, such a finding would require this Court to ignore problems with the *Teflon*

7  survey, as conducted in this matter.

8      160.   Dr. Anderson's *Teflon*-format survey, unlike Mr. Sowers' *Thermos*-format

9  survey, asked respondents only *closed-ended* questions and presented respondents with a

10 dichotomous choice, asking respondents to identify whether a given mark is a generic

11 term or a brand name.

12     161.   Although that approach is the appropriate way to conduct a *Teflon* survey,

13 because the mark at issue here, SPECTACLES, has multiple meanings, this dichotomous

14 choice presents a challenge.  In a case like this, where the mark at issue has one

15 definition that is generic for the form factor of glasses and where the defendant argues

16 that the term, even if not generic, is highly descriptive, respondents who thought that

17 SPECTACLES was neither a common name nor a brand name for smart glasses did not

18 have an appropriate answer to select.  Respondents who did not recognize

19 SPECTACLES as a brand name had no other choice but to indicate it was a generic

20 term, even if they did not believe it to be.

21     162.   Further, Mr. Sowers identified three specific issues with Dr. Anderson's

22 survey methodology, each of which this Court finds to be persuasive: (i) the use of

23 EYEWEAR as a generic term for "smart glasses" in the survey's "mini-test," (ii) the use

24 of LENSES as a generic benchmark term, and (iii) an unexplained statistically

25 significant difference between responses identifying SPECTACLES as a brand name

26 (23.8%) and responses identifying the generic benchmarks as a brand name (10.6%).

27     163.   Taking each issue in turn, the use of EYEWEAR as a generic term in the

28 mini-test is concerning because any respondent who did not believe EYEWEAR was a

common name for smart glasses was excluded from the survey.  However, there is no evidence that EYEWEAR is a common name for smart glasses.  EYEWEAR could mean any number of things: prescription eyewear, goggles, safety glasses, etc.  Those who understood EYEWEAR was not generic for smart glasses were *excluded* from Dr. Anderson's survey, which thereby eliminated individuals who also may not have identified SPECTACLES as a generic term.  Dr. Anderson's survey also is problematic because, in addition to screening out potentially qualified respondents, the survey also only allowed into the survey those respondents who thought that EYEWEAR was generic for smart glasses (even though it is not a common name for smart glasses), and therefore were also more likely to think that SPECTACLES (another synonym for eyeglasses) was generic.  Trial Tr. III, 158:6–23.

164.    Further, the use of LENSES as a generic benchmark term raises issues with Dr. Anderson's *Teflon*-format survey.  LENSES is a registered trademark of Snap's, which is registered for "augmented reality software for integrating electronic data with real world environments for the purpose of viewing, capturing, recording and editing augmented images and augmented videos."  EX427-1.  As Mr. Chan testified, Snap's LENSES is closely integrated with its SPECTACLES products, making LENSES a brand name *in the context of* smart glasses, even if it is not a brand name for the smart glasses product itself.  As such, that 80.5% of respondents in Dr. Anderson's survey classified LENSES as a common name, and not a brand name, indicates that an overwhelming majority of respondents in Dr. Anderson's survey did not understand the critical brand name/common name dichotomy that the *Teflon*-format survey relies upon.  Trial Tr. III, 158:24–160:3.  Alternatively, it could indicate that respondents did not recognize LENSES as a brand in the context of smart glasses, and simply categorized it as a common name because LENSES is a common name for a component of ordinary eyeglasses.  Respondents who did that similarly may have categorized SPECTACLES as a common name in the context of smart glasses given that it is a common name for

ordinary eyeglasses. In either case, the use of LENSES as a generic benchmark term raises further doubts regarding the reliability of Dr. Anderson's survey results.

165. Lastly, as Mr. Sowers pointed out, there is an unexplained, statistically significant difference between the rate respondents identified "spectacles" as a brand (23.8%) compared to the rate respondents identified the generic benchmarks as a brand (10.6%) in Dr. Anderson's survey. Trial Tr. III, 160:14–161:10.

166. If "spectacles" were truly generic, one would expect the rate respondents identified it as a brand name to be consistent with the rate they identified the generic benchmark terms as brand names. Although it is not a requirement for a *Teflon*-format survey to determine whether differences between response rates are statistically significant, the reason for the statistically significant difference here remains unexplained, raising further doubts about whether Dr. Anderson's *Teflon*-format survey is suitable to address the facts of this case.

167. These issues, coupled with the fact that Dr. Anderson's survey is inconsistent with the remaining evidence of record, significantly diminish its probative value, and cannot bear the near-dispositive (if not fully dispositive) weight that Defendant asks this Court to give it.

168. In contrast, the *Thermos* survey format employed by Mr. Sowers, which relies on open-ended questioning to elicit respondents' own terminology and understanding provides a more reliable and insightful assessment of consumer perception for a term with multiple potential meanings like "spectacles."

169. This is confirmed by the fact that Mr. Sowers' survey results, that found that 98.5% of respondents do not use "spectacles" as a generic term for smart glasses, comports with the other documentary evidence and testimony in the record.

170. Notably, Mr. Sowers' survey is well-suited to elicit replies to the Ninth Circuit's "what-are-you" test. In other words, based on the form of Mr. Sowers' questions, respondents were prompted to provide responses that identified a class of goods, rather than a brand name. As such, if "spectacles" were truly generic, or an

answer to the "what-are-you" question, one would expect "spectacles" to have been provided as a response in Mr. Sowers' survey with much higher frequency. That "spectacles" was provided as a response by only 1.5% of respondents is strong evidence that "spectacles" does not answer the "what-are-you" question, and is therefore not generic.

        3.    <u>SPECTACLES Has Not Been Proven to Be Generic for Smart Glasses by Clear and Convincing Evidence</u>

171.    Having considered all of the evidence on each of the genericness factors, this Court finds that Defendant has failed to demonstrate by clear and convincing evidence that SPECTACLES is a generic name for the class of goods commonly referred to as "smart glasses."

172.    Defendant's concerns that trademark protection for SPECTACLES will hinder competition, are the same concerns that the Supreme Court rejected in *Booking.com*. This Court rejects those concerns for the same reasons here. In particular, trademark law "hems in" the scope of marks that may have some descriptive qualities— "[n]otably, a competitor's use does not infringe a mark unless it is ***likely to confuse consumers***." 591 U.S. at 562 (2020) (emphasis added). Further, "even where some consumer confusion exists, the doctrine known as classic fair use…protects from liability anyone who uses a descriptive term, 'fairly and in good faith' and 'otherwise than as a mark,' merely to describe her own goods." *Id.* (citation omitted).

173.    Just as the Supreme Court found in *Booking.com* that "these doctrines guard against the anticompetitive effects the PTO identifies," the very same conclusion follows here. *Id.*

## VIII.  SNAP HAS DEMONSTRATED THAT SPECTACLES IS A SUGGESTIVE TRADEMARK FOR THE RELEVANT CLASS OF GOODS

### A.    The Spectrum of Distinctiveness

174.    Having found that SPECTACLES is not generic for the class of goods commonly referred to as "smart glasses," this Court must determine where on the

spectrum of distinctiveness the mark falls.  In other words, this Court must find that SPECTACLES is either inherently distinctive (*e.g.*, suggestive, fanciful, or arbitrary), not inherently distinctive but has acquired distinctiveness (*e.g.*, descriptive with secondary meaning), or merely descriptive (*e.g.*, descriptive without secondary meaning).  *Two Pesos,* 505 U.S. at 768.

175.    The determination of where SPECTACLES falls on the spectrum of distinctiveness is a crucial one: if SPECTACLES is found to be inherently distinctive, it is "automatically entitled to federal trademark protection because [its] intrinsic nature serves to identify a particular source of a product." *Zobmondo Entertainment, LLC v. Falls Media, LLC*, 602 F.3d 1108, 1113 (9th Cir. 2010) (citation omitted) (internal quotations omitted).  In contrast, should SPECTACLES be found not inherently distinctive, Snap must make an additional showing of acquired distinctiveness "as used on or in connection with the applicant's goods in commerce" to be protectable as a federal trademark.  *Id.* (citation omitted).

176.    Whereas Defendant bore the burden of proof on genericness, the parties agree that Snap bears the burden of proving by a preponderance of evidence that SPECTACLES is inherently distinctive, or alternatively, has acquired distinctiveness. Dkt. No. 93 at 90:24–91:14.

## B.    Snap's Evidence Satisfies the Tests for Suggestiveness

177.    Whether a mark is suggestive or descriptive is far from simple, and courts have long recognized this challenge.  *See Lahoti*, 586 F.3d at 1197 ("Deciding whether a mark is distinctive or merely descriptive is far from an exact science and is a tricky business at best.") (citation omitted) (internal quotations omitted); *see id.* at 1204 ("Whether a mark is suggestive or descriptive is a fact-intensive question that poses a difficult decision in many close cases."); *see also* McCarthy § 11:71 ("[J]udges should not deceive themselves into conceiving the descriptive-suggestive dichotomy as some kind of concrete and objective classification system.").

178.    Indeed, as the TTAB has recognized, "there is often a thin line separating

merely descriptive from suggestive terms and…judgments in these cases are frequently
subjective." *In re Bed-Check Corp.*, 226 U.S.P.Q. 946, 1985 WL 72091, at *3 (T.T.A.B.
Aug. 23, 1985).

179.   That is the case here.  It is true that SPECTACLES describes *some aspect of*
Snap's smart glasses product—namely, its "form factor."  However, as explained above,
*supra* at 26–27, there is little evidence in the record to support the contention that the
glasses form of the SPECTACLES product is the *key* or *integral* aspect of Snap's smart
glasses product.

180.   By way of example, there are some instances where it is clear that a mark is
descriptive rather than suggestive: ALO for "cream of aloe plant," BED & BATH for
"store items for the bedroom and bathroom," CAR-FRESHENER for "auto air
deodorizer," and HOME SAVINGS for "saving and loan services."  *See* McCarthy
§ 11:24.  For each of these examples, the mark is highly descriptive of the service or
good it ultimately names.  There is no doubt that each of these marks names the integral
aspect of the service or good to which it refers.

181.   However, the analysis is not always as simple, and there are times when the
question between suggestiveness and descriptiveness is a much closer one.  *See, e.g.*,
*AMF, Inc. v. Sleekcraft Boats*, 599 F.2d 341, 349 (9th Cir. 1979) ("Whether Slickcraft is
suggestive or descriptive [for recreational speedboats] is a close question.  The line
separating the two is uncertain.").  This case, where the mark at issue names one aspect
of the product, but ignores a crucial other element, is one of those "close call" cases.

182.   However, "where there is doub[t] in the matter [of suggestiveness or
descriptiveness], the doubt should be resolved in applicant's behalf and the mark should
be published for opposition."  *In re Bed-Check Corp.*, 1985 WL 72091, at *3; *see also In
re YZ Enters., Inc.*, No. 75/262,976, 2000 WL 1125563, at *2 (T.T.A.B. July 28, 2000)
("To the extent that there is any doubt in drawing the line of demarcation between a
suggestive mark and a merely descriptive mark, such doubt is resolved in applicant's
favor."); *In Re SC Licensing, LLC*, No. 88737743, 2022 WL 633387, at *11 (T.T.A.B.

1    Feb. 14, 2022) (same).

2    183.   To determine on which side of the suggestive-descriptive line any given

3    mark falls, the Ninth Circuit has historically applied one of two tests: the "Imagination

4    Test" or the "Competitors' Needs Test." *Zobmondo Entertainment*, 602 F.3d at 1115.

5    184.   This Court finds that Snap's evidence satisfies both tests, and takes each in

6    turn.

7                    1.    Snap's Evidence Satisfies the Imagination Test.

8    185.   The Imagination Test is "clearly the most-used test." *Id.*  It asks whether

9    "imagination or a mental leap is required in order to reach a conclusion as to the nature

10   of the production being referenced." *Id.*  This test considers "how immediate and direct

11   is the thought process from the mark to the particular product" and, from the mark at

12   issue, how readily one might conjure up the idea of the applicant's product. *AMF Inc.*,

13   599 F.2d at 349.

14   186.   If Snap had applied for SPECTACLES to cover goods like corrective

15   eyewear, there would be no question that SPECTACLES in that context requires no

16   imaginative or mental leap to reach a conclusion as to the nature of the goods being

17   referenced.  However, Snap's application seeks registration for a far more specific, niche

18   class of goods: "wearable computer peripherals."  A0001–7, A2198–2206.

19   187.   The question here is whether a mental leap is required to conjure up

20   "wearable computer peripherals" containing technology such as gyroscopes and

21   accelerometers, with capabilities to display augmented reality lenses in front of the

22   user's eyes, from the mark SPECTACLES.  *See* EX424-9, 14.

23   188.   This Court finds that such a mental leap is required.  Merely naming *some*

24   aspect of the product is not sufficient to render the mark descriptive rather than

25   suggestive.  In other words, the mere fact that there is "some association" between

26   "spectacles" and the form of Snap's product does not automatically preclude

27   SPECTACLES from being a suggestive mark.  *See Cross Commerce Media, Inc. v.*

28   *Collective, Inc.*, 841 F.3d 155, 164 (2d Cir. 2016) (finding the district court erred by

equating the mere existence of some association between the mark and the plaintiff's
services with the immediacy of that association in the minds of consumers); *see also
Maduka v. Tropical Naturals, Ltd.*, 409 F. Supp. 3d 337, 354 (E.D. Pa. 2019)
(classifying DUDU OSUN for African black soap as suggestive, explaining that,
"[a]lthough the DUDU OSUN mark is somewhat descriptive in that it identifies one of
the many ingredients in the parties' black soap and the fact that the product is black, the
Court concludes that the DUDU OSUN mark ***does not fully describe the goods or
services it represents***") (emphasis added).

189.    Importantly, the mental leap required to support a finding of
suggestiveness need not be large at all, so long as "a modicum of imagination is
necessary." Marks that required far less imagination than what is required here have
been found to be suggestive rather than descriptive. In *In re YZ Enters.*, the applicant
sought registration for the mark BRANTREATS for "biscuits." 2000 WL 1125563 at *1.
The USPTO refused the application as merely descriptive, finding that the mark named
"food treats containing bran." On appeal to the TTAB, the applicant urged reversal of
the refusal, contending that the mark "only hints at the nature of the [] goods" since
"bran products are not commonly considered to be treats." *Id.* In reversing the
USPTO's refusal and finding BRANTREATS to be suggestive, the TTAB explained that
"the combined term, BRANTREATS, does not describe the nature of biscuits made of
bran. On the contrary, a modicum of imagination is necessary upon viewing the mark
BRANTREATS as used in connection with applicant's biscuits in order to determine the
nature of such goods." The TTAB further explained that, "because BRANTREATS
does not ***immediately describe*** the nature of applicant's goods, it is not merely
descriptive thereof." *Id.* at *2 (emphasis added).

190.    Similarly, just as bran products are not commonly considered to be treats,
"spectacles," or ordinary eyewear, are not commonly considered to contain advanced,
AR-capable computer technology. SPECTACLES does not "immediately describe" the
technological nature of Snap's products, and is therefore not merely descriptive.

48

191.    The TTAB's analysis in *In re YZ Enters.* does not stand alone.  *See Pom Wonderful Ltd. Lab. Co. v. Hubbard*, 775 F.3d 1118, 1126 (9th Cir. 2014) (finding POM suggestive for pomegranate juice beverages); *see also Lahoti v. Vericheck, Inc.*, 636 F.3d 501, 507 (9th Cir. 2011) (finding "VERICHECK" suggestive for check verification services); *Brookfield Communs., Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036, 1058 (9th Cir. 1999) (finding MOVIEBUFF suggestive for software providing information about the movie and TV industries); *Mend Health, Inc. v. Carbon Health Techs., Inc.*, No. 2:21-CV-06142, 2023 WL 3431902, at *4 (C.D. Cal. Mar. 16, 2023) (finding WALK IN. FEEL BETTER. suggestive for walk in healthcare clinics); *Reserve Media, Inc. v. Efficient Frontiers, Inc.*, No. CV 15-05072, 2017 WL 1377591, at *4 (C.D. Cal. Apr. 14, 2017) (finding RESERVE Q suggestive for reservation management service); *iCall, Inc. v. Tribair, Inc.*, No. C-12-2406, 2012 WL 5878389, at *10 (N.D. Cal. Nov. 21, 2012) (N.D. Cal. Nov. 21, 2012) (finding "iCall" suggestive for internet calling platform).

192.    There is little doubt that, for a consumer to identify the technologically-advanced smart glasses produced by Snap from the mark SPECTACLES, more imagination is required than in any of the illustrative examples above, all of which found the mark at issue to be suggestive.  Where, as here, an extra step is required to get from the mark to the actual product it names, courts have found such marks to be suggestive rather than descriptive.  *See Self-Realization Fellowship Church v. Ananda Church of Self-Realization*, 59 F.3d 902, 911 (9th Cir. 1995) (noting that the mark RECOVERY was "mostly likely to be descriptive in the context of self-help services and products," but suggestive in the context of "teach[ing] informal counselors to teach ex-patients to help themselves," finding the latter to be "one step removed," and that the "extra step constitute[d] the difference between descriptiveness and suggestiveness").

193.    *Conversive, Inc. v. Conversagent, Inc.*, 433 F. Supp. 2d 1079 (C.D. Cal. 2006) is further instructive.  There, the plaintiff used the mark CONVERSIVE AGENT for, "downloadable computer programs, namely an interactive natural language

processing knowledge base used to build and customize interactive conversational

mechanisms which assist, answer questions and provide information to customers via

web sites, for use in real-time Internet relay communications platforms." *Id.* at 1084.  In

finding the mark suggestive, the Court noted as persuasive that, "the software at issue

merely simulates a conversation; *i.e.,* it gives the appearance of a conversation to the

web site user.  No actual conversation takes place because the computer software merely

generates a response to a question posed by a web site user." *Id.* at 1088–1089.  The

Court further explained that, "[a]dmittedly, the response may be sophisticated and

'chatty'; nevertheless, the interaction is not a conversation **in the conventional sense**."

*Id.* at 1089 (emphasis added).

194.   Here, too, although Snap's smart glasses may "give the appearance of"

eyeglasses in some form, they are from far eyeglasses "in the conventional sense."

195.   Also instructive is *Mend Health*.  There, in finding that the mark WALK

IN. FEEL BETTER. was suggestive for "urgent care facilities," the Court reasoned that,

although the mark "describes the actions a patient would take (walking into an urgent

care clinic) and the desired end goal (feeling better), the Mark does not describe the

services Plaintiff provides. 2023 WL 3431902, at \*1.  Indeed, there is nothing about the

phrase 'Walk In. Feel Better.' that would cause someone encountering the Mark by itself

to assume it must be referring to healthcare services; the Mark could be referring to any

number of personal services, such as spa treatments, workout classes, or meditation

workshops." *Id.* at \*4.  The Court explained that, although "it does not require a large

stretch of the imagination to connect the Mark to Plaintiff's services, it nevertheless

requires some imagination, making the mark suggestive." *Id.*

196.   Here, too, there is nothing about SPECTACLES that would "cause someone

encountering the mark by itself to assume it must be referring" to AR-capable wearable

computer peripherals.  Similarly, just like WALK IN. FEEL BETTER. could refer to any

number of personal services, so too could SPECTACLES refer to any number of forms

of eyewear: antique wire-rimmed eyeglasses, prescription lenses, sunglasses, protective

1  goggles, or smart glasses. As such, *some* imagination is required here, thereby

2  supporting a finding of suggestiveness.

3      197.   Additionally, a mark that constitutes a double entendre or incongruity is

4  generally considered to be suggestive rather than merely descriptive. *See, e.g.,*

5  *Transparent Energy, LLC v. Premiere Mktg., LLC,* No. 3:19-CV-3022, 2021 WL

6  6135475, at *4 (N.D. Tex. Dec. 29, 2021) (a mark that is a double entendre is "more

7  likely suggestive than descriptive").

8      198.   The Court agrees with Snap that SPECTACLES is a "double entendre that

9  plays on both the familiar form and fanciful function of Snap's device" and "evokes the

10 incongruity between an antiquated term for corrective eyewear and Snap's 21st century

11 smart glasses," which further supports a conclusion that the mark is suggestive. *See* Dkt.

12 No. 143 at 44.

13     199.   Because an imaginative leap is required to get from the SPECTACLES

14 mark to the technology-embedded smart glasses product it names, SPECTACLES

15 satisfies the Imagination Test.

16          2.    Snap's Evidence Also Satisfies the Competitors' Needs Test.

17     200.   The second test that this Circuit uses in suggestiveness inquiries, the

18 Competitors' Needs test, "focuses on the extent to which a mark is actually needed by

19 competitors to identify their goods or services." *Rodeo Collection, Ltd. v. West Seventh,*

20 812 F.2d 1215, 1218 (9th Cir. 1987). "If competitors have a great need to use a mark,

21 the mark is probably descriptive; on the other hand, if the suggestion made by the mark

22 is so remote and subtle that it is really not likely to be needed by competitive sellers to

23 describe their goods or services[,] this tends to indicate that the mark is merely

24 suggestive." *Zobmondo Entertainment,* 602 F.3d at 1117 (citation omitted) (internal

25 quotations omitted) (alteration in original).

26     201.   The Competitors' Needs test further looks at "whether granting the

27 trademark owner a limited monopoly will in fact inhibit legitimate use of the mark by

28 other sellers." *AMF Inc.,* 599 F.2d at 349 (finding SLICKCRAFT to be suggestive when

51

applied to boats, in part because "[t]here [was] no evidence [] that others have used or desire to use [the mark] in describing their goods").

202.   The evidence presented at trial strongly supports a finding that Snap's competitors do not need the term "spectacles" to identify their smart glasses products. At trial, Snap presented testimony from Mr. Chan demonstrating that not one single competitor has been identified that has ever used SPECTACLES as a brand name, referent, descriptor, or identifier for its competing smart glasses products, despite Snap having a number of direct competitors in the smart glasses space, such as Bose, RayBan, Amazon, and Vuzix.  *See* Trial Tr. I, 55:6–57:21.

203.   Although Defendant has presented evidence of two product listings that contain the term "spectacles" in the name, including "Spectacles Eyewear Glasses DVR Camcorder Camera 720P" and "Relax love Bluetooth Smart Glasses Spectacles Open-ear Glasses Speaker with MIC Waterproof," Mr. Chan's testimony demonstrates that those products do not compete with Snap's SPECTACLES branded smart glasses, the products differ considerably from SPECTACLES in both form and function, the products were not categorized as "smart glasses," the products were being offered for less than 10% of the price of SPECTACLES, and none of the other items recommended as "similar items" on the product listings used "spectacles" in the product name or description.  Trial Tr. I, 48:15–50:2, 50:18–51:4, 51:19–22, 53:3–10.

204.   Because all of the evidence presented at trial indicates that Snap's competitors do not need to use "spectacles" to describe or market their goods, and further shows that those same competitors seemingly have no desire to do so and have instead used their own unique terms (*e.g.*, Amazon Echo, RayBan Stories, Bose Frames, Vuzix Blade), SPECTACLES satisfies the Competitors' Needs Test.

3.   <u>SPECTACLES is a Suggestive Mark for Smart Glasses</u>

205.   Although SPECTACLES may fall on the line between a descriptive and suggestive mark, the Court finds that Snap has satisfied both the Imagination Test and Competitors' Needs Test, and Snap is entitled to have any doubts resolved in its favor.

52

Accordingly, this Court finds SPECTACLES to be a suggestive mark for the class of goods commonly referred to as "smart glasses."  SPECTACLES is therefore inherently distinctive, and is entitled to registration without the need for any further showing.  *See Filipino Yellow Pages, Inc.*, 198 F.3d at 1147 n.3 (holding that suggestive marks do not require a showing of secondary meaning).

## IX. IN THE ALTERNATIVE, SNAP'S EVIDENCE DEMONSTRATES THAT SPECTACLES IS A DESCRIPTIVE MARK THAT HAS ACQUIRED SECONDARY MEANING.

206.   For completeness, even if the Court had concluded that SPECTACLES is descriptive, the mark would still be entitled to registration on the Principal Register because Snap has demonstrated that it has acquired the requisite secondary meaning, pursuant to 15 U.S.C. § 1052(f).

207.   As described above, *supra* at 45, unlike suggestive marks, descriptive marks are not inherently distinctive and are not entitled to trademark protection unless they have acquired secondary meaning.  *See Ironhawk Techs., Inc. v. Dropbox, Inc.*, 2 F.4th 1150, 1162 (9th Cir. 2021).  Secondary meaning refers to the acquired distinctiveness required for descriptive marks to be registrable.  *See Two Pesos,* 505 U.S. at 769 ("[D]escriptive marks may acquire the distinctiveness which will allow them to be protected under the [Lanham] Act…[t]his acquired distinctiveness is generally called 'secondary meaning.'") (citations omitted).

### 1. Snap's Evidence Supports a Finding That SPECTACLES Has Acquired Distinctiveness.

208.   Whether a mark has acquired secondary meaning may be proven through a variety of factors, including "(1) advertising expenditures; (2) consumer studies linking the name to a source; (3) sales success; (4) unsolicited media coverage; (5) attempts to plagiarize the mark; and (6) the length and exclusivity of the mark's use."  *Phat Fashions, L.L.C. v. Phat Game Athletic Apparel, Inc.*, Case No. 01C1771, 2002 WL

1  570681, at *7 (E.D. Cal., Mar. 20, 2002); *see also Filipino Yellow Pages, Inc.*, 198 F.3d

2  at 1151 (listing out secondary meaning factors); McCarthy § 15:30 (same).

3      209.  Importantly, no one factor is dispositive.  Rather, courts look at each of the

4  factors holistically, rather than in isolation.  *See Opulent Treasures, Inc. v. Ya Ya*

5  *Creations, Inc.*, 682 F. Supp. 3d 815, 823 (C.D. Cal. July 13, 2023) ("No single factor or

6  type of evidence is required for, or dispositive of, this [acquired distinctiveness]

7  analysis."); *see also Converse, Inc. v. Int'l Trade Comm'n*, 909 F.3d 1110, 1119 (Fed.

8  Cir. 2018) ("All six [secondary meaning] factors are to be weighed together in

9  determining the existence of secondary meaning."); *In re Steelbuilding.com*, 415 F.3d

10  1293, 1300 (Fed. Cir. 2005) ("[N]o single [secondary meaning] factor is

11  determinative…[r]ather, the determination examines all of the circumstances involving

12  the use of the mark."); *In Re Guaranteed Rate, Inc.*, Ser. No. 87054820, 2020 WL

13  4383820, at *3 (T.T.A.B. July 30, 2020) ("Our ultimate Section 2(f) analysis of acquired

14  distinctiveness and determination in this case is based on all of the evidence considered

15  as a whole.").

16      210.  Further, when considering figures such as sales success or advertising

17  expenditures, courts in this circuit have not relied on a comparison to industry standards

18  or benchmarks, but rather consider the numbers in the abstract.  *See, e.g., Gucci*

19  *Timepieces America Inc. v. Yidah Watch Co.*, No. CV-97-6985, 1998 WL 650078, at *4

20  (C.D. Cal. Aug. 4, 1998) (relying on units sold and dollars spent on advertising to find

21  secondary meaning, without comparison to similar products in the market); *Blue Bottle*

22  *Coffee, LLC v. Liao*, No. 21-cv-06083, 2024 WL 2061259, at *22 (N.D. Cal. May 7,

23  2024) (finding secondary meaning where there was "significant advertising,"

24  "substantially exclusive" use, and "media coverage," and rejecting a comparison to the

25  advertising spend of others in the industry); *id.* at *21 (considering advertising spend as

26  evidence of secondary meaning, even without sufficient evidence of the **effectiveness** of

27  the advertising) (emphasis added); *Gianni Versace, S.p.A. v. Versace 19.69*

28  *Abbigliamento Sportivo SRL*, 328 F.Supp.3d 1007, 1016 (N.D. Cal. 2018) (considering,

*inter alia*, advertisement and promotional efforts, along with annual revenues, as evidence of secondary meaning, without comparison to similar products in the market). Courts in this circuit have thus found plaintiffs' advertising and sales figures sufficient to show acquired distinctiveness even when such numbers are not accompanied by broader market statistics or benchmarks.

211.  Notably, there is no bright line rule for how much evidence of secondary meaning is required before such a finding can be made.  *See* McCarthy § 15:28 ("It is impossible to lay down any generalized rule as to the minimum amount of distinctiveness necessary to achieve secondary meaning in a mark.").  Rather, each case must be considered in light of the particular evidence presented therein.  *See id.* ("No hard and fast line can be drawn and no general rule can be enunciated by which one can determine precisely where a word…acquires such distinctiveness[.]  Each case must stand on its own record.") (citation omitted).

212.  When balancing the factors, it is important to approach the analysis from first principles, focusing on what "secondary meaning" is truly meant to capture.  At the outset, marks that are merely descriptive are not eligible for trademark protection.  *See Ironhawk Techs.*, 2 F.4th at 1162.  This makes sense—sellers of goods should be free to accurately describe their own goods, and a company who is first to use a descriptive mark should not have an absolute claim to that term.

213.  However, should a descriptive mark begin generating valuable brand association, such association should be protectible.  This is why, prior to granting trademark rights in a descriptive mark, the onus is on the user of the descriptive mark to affirmatively show that the mark is capable of functioning as a brand.

214.  Take, for example, American Airlines, which is *highly* descriptive of the services offered:  an airline that services America.  In addition to American Airlines, there are a number of other American airlines:  Delta, JetBlue, Frontier, and Spirit. However, when someone says, "I am flying American Airlines," no rational consumer responds with, "which one?"  This is because American Airlines, despite being

descriptive, has generated secondary meaning, or in other words, brand association. This brand association is the very reason that American Airlines is entitled to a federal trademark registration for its highly descriptive name.

215.    Accordingly, in assessing secondary meaning, the underlying question always remains the same: Is there evidence that a descriptive mark has been imbued with brand significance? If so, it is entitled to trademark protection, despite its descriptive aspects. If not, then the mark remains free for all to use.

216.    Here, most, if not all, of the secondary meaning factors weigh in Snap's favor. There is strong evidence that Snap's advertising efforts have been successful, that a vast number of consumers have seen the SPECTACLES mark in association with the Snap name, that hundreds of thousands of consumers have purchased the SPECTACLES product from Snap, and that, when taken together, consumers associate the SPECTACLES mark with the Snap brand.

217.    Therefore, based on the discussion of each factor that follows, this Court finds that SPECTACLES, if descriptive, has acquired the requisite secondary meaning and is entitled to trademark protection pursuant to 15 U.S.C. § 1052(f).

> a.    *Snap's Continuous and Exclusive Use of the SPECTACLES Mark Favors a Finding of Secondary Meaning.*

218.    Pursuant to 15 U.S.C. § 1052(f), "proof of substantially exclusive and continuous use thereof as a mark by the applicant in commerce for the five years before the date on which the claim of distinctiveness is made" is acceptable *prima facie* evidence that the mark at issue has become distinctive. Snap applied for the SPECTACLES mark in 2016, and the evidence supports the finding that Snap has continuously used the SPECTACLES mark since the date of application, and that no competitor has used SPECTACLES to identify its goods or services. Trial Tr. I, 22:23–23:2; 25:21–25; 26:14–15; 27:8–9; 54:7–11; 55:6–57:1.

219.    Therefore, Snap's exclusive and continuous use of SPECTACLES since 2016 constitutes *prima facie* evidence of secondary meaning. *See California Scents v.*

1    *Surco Prods., Inc.*, 28 F. App'x 659, 663 (9th Cir. 2002) ("[Plaintiff] has used its [mark]

2    [for 9 years]. This is a fairly long time. Five years of exclusive use is prima facie

3    evidence of secondary meaning."); *see also Blue Bottle Coffee*, 2024 WL 2061259, at

4    *22 ("[F]rom its inception…Plaintiff has continuously used its company name…this

5    continuous use supports secondary meaning.").

6    220.    Further, there has been no evidence presented that a single other competitor

7    of Snap's smart glasses product uses the term "spectacles" in connection with their

8    goods.

9    221.    To rebut this finding, Defendant has pointed to two product listings that

10    appear to use "spectacles" in the title of the product listings. EX111-0051–56, EX104-

11    0001–3. As discussed above, *supra* at 29–30, the evidence presented at trial confirms

12    that these product listings are not competitors of Snap's SPECTACLES product.

13    222.    In any event, a mere two listings is of no consequence, since the "exclusive

14    use" described in 15 U.S.C. § 1052(f) need not be "absolute[]," only "substantial[]."

15    4 Callmann on Unfair Competition, Trademarks & Monopolies § 20:16 (4th ed.)

16    (citation omitted); *see also Alphaville Design, Inc. v. Knoll, Inc.*, 627 F. Supp. 2d 1121

17    (N.D. Cal. 2009) ("'[S]ubstantially exclusive' use does not require absolutely exclusive

18    use on the part of the applicant…. As a result, the mere use of a mark by a third party

19    may not be sufficient to defeat a claim of substantially exclusive use.").

20    223.    This factor weighs in favor of finding the SPECTACLES mark has acquired

21    secondary meaning.

22        b.    *Snap's Advertising Expenditures in Connection with the*

23            *SPECTACLES Mark Favors a Finding of Secondary Meaning.*

24    224.    Whether a mark has acquired secondary meaning turns, in part, on the

25    extent of the mark's advertising expenditures. *See Transgo, Inc. v. Ajac Transmission*

26    *Parts Corp.*, 768 F.2d 1001, 1016 (9th Cir. 1985) (considering promotional efforts, in

27    addition to sales and duration of exclusive use, in finding secondary meaning); *see also*

28    *Intenze Products, Inc. v. TCM Supply Corporation*, No. 23-55710, 2024 WL 511878, at

*1 (9th Cir. Feb 9, 2024) (finding secondary meaning due, in part, to plaintiff's "extensive" advertising of the mark); *adidas America, Inc. v. Skechers USA, Inc.*, 890 F.3d 747, 754 (9th Cir. 2018) (finding "ample evidence" of secondary meaning where adidas had, *inter alia*, expended considerable capital to promote the product); *Vans, Inc. v. Walmart, Inc.*, Case No. 8:21-cv-01876, 2022 WL 1601530, at *5 (C.D. Cal., Mar. 31, 2022) (finding Vans' considerable promotional expenditures evidence of secondary meaning of the product at issue).

225.   Importantly, although there are a number of secondary meaning factors to consider, courts in this Circuit have held that evidence of use and advertising over a substantial period of time alone can be sufficient to establish secondary meaning.  *See Clamp Mfg. Co. v. Enco Mfg. Co.*, 870 F.2d 512, 517 (9th Cir. 1989); *Dogloo, Inc. v. Doskocil Mfg. Co., Inc.*, 893 F.Supp. 911, 918 (C.D. Cal. 1995) ("In fact, the Ninth Circuit has held that evidence of use and advertising over a substantial period of time are enough to establish secondary meaning") (finding expenditures of $3 million over 5 years sufficient to support finding secondary meaning).

226.   Further, there is no specific amount of advertising expenditure required for it to favor a finding of secondary meaning, and even a modest investment could be sufficient.  *See Grupo Salinas Inc. v. JR Salinas Wheels & Tires Inc.*, No. SA-CV-161923, 2016 WL 9277320, at *3 (C.D. Cal. Dec. 22, 2016) (finding expenditures of $180,000 to $200,000 on advertising per year to be "significant" and evidence of secondary meaning); *see also GTFM, Inc. v. Solid Clothing, Inc.*, 215 F. Supp. 2d 273, 294 (S.D.N.Y. 2002) (secondary meaning established where plaintiff showed that it "spent in excess of $8 million to advertise [its mark,]" received "**widespread**, **unsolicited media** coverage of [its] mark," and "consistent[ly] used [the mark] as a designation of source") (emphasis added); *Tranik Enterprises, Inc. v. Fulda*, No. 2:16-cv-02931, 2017 WL 11150925, at *4 (C.D. Cal. Mar. 7, 2017) (finding "millions of dollars" in advertising "in order to increase awareness surrounding [the mark] to be evidence of secondary meaning"); *Gucci Timepieces*, 1998 WL 650078, at *4 (finding sales of

27,000 units and expense of over $1.4 million on advertising "sufficient to find secondary meaning").

227.    As described above, supra at 54–55, the amount spent on advertising any given mark need not be compared to industry standards or "benchmarks" to be sufficient evidence of secondary meaning, so long as it is substantial in its own right.  *See Blue Bottle Coffee*, 2024 WL 2061259, at *21 ("Defendants respond that…[plaintiff's] expenditures…is virtually nothing compared to the expenditures of well-known marks such as T-Mobile or Coca Cola. But [plaintiff] need not have spent Coca Cola money for its advertising sales to support a finding of secondary meaning."); *see also Grupo Salinas Inc.*, 2016 WL 9277320, at *3 ("Although [plaintiff] has not shown how significant [its advertising expenditures are] relative to its competitors' advertising, the advertising budget still has moderate persuasive value.").

228.    Here, Snap pursued a rather unique advertising campaign that utilized billboards, building signage, and digital marketing but also included custom-built vending machines that served as point-of-sale locations for the original SPECTACLES product.  These vending machines were placed in iconic locations, including Big Sur, Times Square, Venice Beach, and the bottom of the Grand Canyon.

229.    Snap invested tens of million dollars in this initial campaign, and continued investing in advertising, including nearly $10 million in advertising alone between 2020 and 2022.  Part of Snap's investment to promote its SPECTACLES product included a co-marketing campaign, in which Snap collaborated with popular brands such as Gucci and Harmony Korine, that generated 63 million impressions across various social media channels.  *See Blue Bottle Coffee*, 2024 WL 2061259, at *21 (describing plaintiff's collaborations and co-branding arrangements, that prominently featured plaintiff's marks, as support for secondary meaning).

230.    Snap's multimillion dollar investment into advertising the SPECTACLES mark, taken together with the length of use described above (*supra* at 56–57) and sales success described below (*infra* at 63), as well as the apparent reach of the promotional

efforts, supports a finding of secondary meaning.

    *c. Snap's Brand Lift Study for SPECTACLES 3 Favors a Finding of Secondary Meaning.*

231. In determining whether a mark has developed secondary meaning, courts may consider the results of consumer surveys that test whether a link exists between the mark at issue and the source. *Phat Fashions, L.L.C.*, 2002 WL 570681, at *7.

232. However, surveys are not required to prove secondary meaning. *See Eko Brands, LLC v. Adrian Rivera Maynez Enters.*, No. 20-35369, 2021 WL 3630225, at *1 (9th Cir. Aug. 17, 2021) ("Consumer survey evidence is not required, and here the district court properly considered other evidence indicative of secondary meaning, such as [plaintiff's] advertising practices, financial success, industry recognition, and the exclusivity of the use of the mark for [the relevant genus]."); *see also Adidas Am., Inc. v. Skechers USA, Inc.*, No. 3:15-cv-01741, 2017 WL 3319190, at *9 (D. Or. Aug. 3, 2017) ("Direct survey evidence of purchaser perception is not required to successfully demonstrate secondary meaning.") (internal quotations omitted) (citation omitted); McCarthy § 15:30 ("However, survey data is not a requirement and secondary meaning can be, and most often is, proven by circumstantial evidence.").

233. Further, where the mark holder provides "ample and convincing circumstantial evidence of secondary meaning," as Snap has done here, "the need for a consumer survey" is "obviate[ed]." *Adidas Am., Inc.*, 2017 WL 3319190, at *10.

234. Although neither party put forth a survey expert to testify about a secondary meaning survey, Snap has presented the results of a "brand lift study" conducted as part of the campaign for its SPECTACLES 3 product.[7] *See* EX075-15–46.

---

[7] Defendant has argued that Mr. Sowers' *Thermos* survey demonstrates a lack of secondary meaning because it included a question that asked respondents who stated they were aware of brand names for smart glasses to list those brand names, and only 1 out of 114 respondents named SPECTACLES.  The Court is not persuaded by Defendant's argument.  As discussed, the manner in which surveys are designed has a

*(footnote cont'd on next page)*

235.    Defendant properly points out that Snap did not put forth evidence to support the reliability of this "brand lift study" (*i.e.*, the criteria for selecting participants, the questions in their entirety, the answers provided by participants).  However, this critique is taken skeptically, as Defendant had the opportunity to take discovery on the brand lift study and cross-examined Mr. Chan, through whom Snap offered this exhibit, and did not ask Mr. Chan about these issues.

236.    Further, despite Defendant's critiques of the "brand lift study," Defendant has relied on the results of the study to argue that Snap's campaign was ineffective and thereby demonstrates a lack of secondary meaning.  But Defendant cannot have it both ways; either the survey is unreliable *or* it is reliable and provides some evidence concerning secondary meaning.

237.    Because each party relies on the "brand lift study" in part, and there is no affirmative evidence suggesting it is unreliable, this Court has no reason to exclude the results of the study from consideration but gives it little weight in comparison to the other record evidence.

238.    Snap's "brand lift study" suggests that, following the SPECTACLES 3 campaign, Snap saw an increase in both "product favorability" and "purchase consideration."  EX075-25.  The study further suggests that out-of-home advertising, or OOH, "drove awareness and consideration in the United States" and "boosted Spectacles Awareness and generated interest purchase."  EX075-33.  In fact, Snap's testimonial evidence, which went unrebutted, demonstrated that it was upon these findings that Snap decided to retain the SPECTACLES mark for its SPECTACLES 4 product, rather than develop a new name.  Trial Tr. I, 42:5–22.

239.    Whether or not these results support a finding of secondary meaning is not clear cut.  Assuming the study is credited, there are opposing results between the

---

significant impact on the results.  The *Thermos*-format survey was designed to test genericness, not secondary meaning, and the Court therefore declines to interpret these results with respect to the secondary meaning issue.

"unaided brand awareness" and "aided product awareness" results.

240.   For the purposes of this study, the "unaided brand awareness" results were based on respondents' responses to the question, "When thinking of wearable cameras, which come to mind?" and measuring any mention of SPECTACLES.  In contrast, the "aided product awareness" results were based on respondents' responses to the question, "Which of the following wearable cameras have you heard of?" and measuring how many selected "Snapchat Spectacles 3" from a provided list.  EX075-18.

241.   Overall, the "unaided brand awareness" results were low.  EX075-23.  In contrast, the "aided product awareness" results demonstrated the SPECTACLES 3 campaign was a success, exhibiting an increase from 39% to 55%.  *Id.*  Similarly, the "aided ad awareness," that showed respondents a number of ads and asked "have you seen the following wearable cameras advertised in any of the following places in the past 30 days?" demonstrated an increase from 15% to 35%.  *Id*. at 18, 23.

242.   Despite the low unaided brand awareness, the notable increase in aided product awareness and aided ad awareness is probative of secondary meaning.  *See McNeil-PPC, Inc. v. Walgreen Co.*, No, 91184978, 2013 WL 223400, at *6 n.20 (T.T.A.B. Jan. 22, 2013)* ("While unaided awareness numbers are more significant, that does not mean that aided awareness numbers have no significance…moreover, the very high aided awareness numbers have significance and have not been shown to be compromised.") (citations omitted); *National Pork Board and National Pork Producers Council v. Supreme Lobster and Seafood Company*, 96 U.S.P.Q.2d 1479, 2010 WL 2513872, at *11 (T.T.A.B. June 11, 2010)* (precedential) ("Applicant attacks the aided awareness questioning used during the [] survey…. In assessing the proper evidentiary weight to be accorded to this evidence…we find the results to be probative of the public perceptions…."); *Schieffelin & Co. v. Jack Co. of Boca, Inc.*, 850 F.Supp. 232, 241–42 (S.D.N.Y. 1994)* (finding secondary meaning based on a high aided recognition rate, despite a 1% unaided recognition rate).

243.   In light of the high aided brand awareness exhibited in the SPECTACLES 3

campaign "brand lift study," particularly in conjunction with the other record evidence, this factor weighs slightly in favor of finding secondary meaning.

                      *d.*      *Snap's Sales Success Favors a Finding of Secondary Meaning.*

     244.   The success of the sales of a particular product sold under a particular mark is relevant evidence for determining whether a mark has developed secondary meaning. *Creative Tech., Ltd. v. SRT, Inc.*, No. 93-3511, 1993 WL 603292, at *2 (N.D. Cal., Nov. 8, 1993) (relying, in part, on evidence of sales success in determining the mark at issue had acquired secondary meaning); *see also Transgo, Inc.*, 768 F.2d at 1016 (finding sales exceeding $5 million to be "significant" and evidence supporting secondary meaning); *Gucci Timepieces*, 1998 WL 650078, at *4 (finding sales of 27,000 units and expense of over $1.4 million on advertising "sufficient to find secondary meaning").

     245.   Here, as of March 2023, Snap had sold nearly 300,000 units of SPECTACLES 1 through SPECTACLES 3 totaling over $37,000,000 in revenue. Additionally, these sales do not account for the success of SPECTACLES 4 that, rather than being offered for sale to the general public, were distributed to Snap's most dedicated users on an invite-only basis.

     246.   Both the total units of SPECTACLES sold, as well as the total revenue generated through those sales, favor a finding of secondary meaning.

     247.   This factor weighs in favor of finding the SPECTACLES mark has acquired secondary meaning.

                      *e.*      *The Extensive Media Coverage of Snap's SPECTACLES Products Favors a Finding of Secondary Meaning.*

     248.   Evidence that a mark has been the subject of a significant amount of unsolicited media coverage is evidence in support of secondary meaning. *See adidas America, Inc.*, 890 F.3d at 754–55 (finding a considerable amount of unsolicited media coverage indicative of secondary meaning); *Vans, Inc.*, 2022 WL 1601530, at *6 (same).

     249.   Snap's advertising campaign for SPECTACLES 1, including the

SPECTACLES vending machines described above, *supra* at 6–7, drew a significant amount of media attention. This media attention resulted in over 10,000 articles written about the launch itself, which generated over 1.6 billion impressions for that campaign alone. As explained above, Snap continued investing in advertising its SPECTACLES product. As a result of the campaign for SPECTACLES 3, Snap saw more than 1,600 additional media articles written about its product, which generated an additional 1.3 billion impressions.

250. Inclusion in well-known publications is further evidence of secondary meaning. *See Jean Royere SAS, et al. v. Edition Modern, et al.*, Case No. 2:22-cv-01507 (C.D. Cal. Dec. 7, 2023) (features in well-known media, such as *Christie's* and *Town and Country*, as associated with the rights-holder, favored a finding of secondary meaning). Here, Snap's SPECTACLES product line launches were covered in well-known publications such as *Fast Company*, *Vogue*, and *Wired*.

251. Further, Snap has also received numerous awards for its SPECTACLES product line and promotional campaigns, including three gold "Lions" awards from the 2017 Cannes Lions International Festival of Creativity, a prestigious gathering honoring design and product innovation, for Snap's SPECTACLES product and the Snap Bot vending machines from which they were sold. Additionally, Snap received awards at the 2017 Crunchie Awards, hosted by leading technology publication Tech Crunch, Snap's SPECTACLES won "Hardware of the Year" and Snap's video promoting SPECTACLES to the relevant consumers won "Best Startup Video." Snap's SPECTACLES product also won an award at the 2021 Auggie Awards, which is an awards ceremony for largely digital products or electronic products that are innovative or novel. The Auggie Awards are publicly voted upon, and Snap's win suggests the voters associated SPECTACLES with Snap, the company that they voted for. These awards are further evidence of secondary meaning. *See Jason Scott Collection, Inc. v. Trendily Furniture, LLC*, 68 F.4th 1203, 1216 (9th Cir. 2023) (finding that plaintiff had won several awards for his claimed trade dress to be support for a finding of secondary

meaning).

252.   Many of Snap's awards have been recognized and featured in various well-known publications, including *Architectural Digest*, *Tech Crunch*, *International Business Times*, *Business Wire*, and more, which favors a finding of secondary meaning. *See Jean Royere SAS, et al., v. Edition Modern, et al.*, Case No. 2:22-cv-01507 (C.D. Cal. Dec. 7, 2023) (features in well-known media such as *Christie's* and *Town and Country*, as associated with the rights-holder, favored a finding of secondary meaning).

253.   Further, although not traditional media, Snap's social media efforts support a finding of secondary meaning.  Following the SPECTACLES 3 campaign, Snap saw a nearly 500% increase in the use of #SnapSpectacles on social media.  As Mr. Chan explained, an increase in hashtag usage is relevant for two reasons:  (i) people are greatly impacted by seeing content from their friends and creators that they like, and by sharing content under the hashtag, the general public was educated about Snap's SPECTACLES product; and (ii) many of the users of the hashtag were "SPECTACLES power users," who create a bunch of content using SPECTACLES, and by seeing the increase in the hashtag, Snap was able to deduce that creators were making more content and more engaged with the ecosystem.

254.   For all of the foregoing reasons, this factor weighs in favor of finding the SPECTACLES mark has acquired secondary meaning.

      *f.*   *Snap's Evidence of Third-Party Attempts to Plagiarize the SPECTACLES Mark Favors a Finding of Secondary Meaning.*

255.   When a mark holder can demonstrate that third parties have begun copying its mark, such copying weighs in favor of finding secondary meaning.  This is because, as the Ninth Circuit has explained, "[t]here is no logical reason for the precise copying save an attempt to realize upon a secondary meaning that is in existence." *Audio Fid., Inc. v. High Fid. Recordings, Inc.*, 283 F.2d 551, 558 (9th Cir. 1960); *see also Clicks Billiards, Inc. v. Sixshooters Inc.*, 251 F.3d 1252, 1263–64 (9th Cir. 2001) (collecting cases and noting that the Ninth Circuit has repeatedly "recognize[d] that evidence of

deliberate copying is relevant to a determination of secondary meaning") (citation omitted); *Vision Sports, Inc. v. Melville Corp.*, 888 F.2d 609, 615 (9th Cir. 1989) (noting that, in combination with other evidence, "proof of copying strongly supports an inference of secondary meaning"); *H.I.S.C., Inc. v. Rajanayagam*, 810 F. App'x 560, 561 (9th Cir. 2020) ("Proof of exact copying ... can be sufficient to establish a secondary meaning.") (citation omitted).

256.    Importantly, courts have found that such copying need not be widespread. Limited evidence of third parties intentionally copying a trademark can serve to support finding secondary meaning. *See Venetian Casino Resort, LLC v. Venetiangold.Com*, 380 F. Supp. 2d 737, 743 (E.D. Va. 2005) (finding marks distinctive based, in part, on "two examples where VCR has prevailed in fending off persons who were plagiarizing or infringing on its marks.").

257.    Here, Snap has presented evidence of some third-party listings using the phrase "Snapchat Spectacles" in their product listings, including "Spy Camera Glasses with Video Recording, 1080P HD Hidden Camera, Super Small Surveillance **Snapchat Spectacles** Glasses, USB Charger" (emphasis added) and "Glasses Neon **Snapchat Spectacles** Vintage Sunglasses Kaleidoscope Festival Party Colorful EDM Diffracted Lens." EX302-2, EX302-3.

258.    If SPECTACLES had not acquired secondary meaning, these sellers would have no reason to include "Snapchat Spectacles" in their product titles. In other words, but for SPECTACLES' acquired distinctiveness, inclusion of "Snapchat Spectacles" would serve no benefit to the third-party sellers.

259.    However, it is worth noting that not all of Snap's evidence on this factor weighs in favor of finding secondary meaning. For instance, some of the submitted third-party listings were titled, "Wifi Connection Smart Glasses **Similar As Snapchat Spectacles** Save Video And Photo To Mobile Directly," and "Jakcom N2 Smart New Product Of Other Consumer Electronics **Like Snapchat Spectacles** Glasses Fixie Data Entry Work Home Job." EX302-4, EX302-5. As Defendant has correctly pointed out,

these product listings are simply using Snapchat Spectacles as a basis for comparison, not as a branded usage.  Therefore, these listings are not the type of "copying" that the secondary meaning analysis is concerned with.

260.   As such, with regard to intentional copying, this factor weighs at least slightly in Snap's favor, since even a small amount of intentional copying is credited towards secondary meaning.  However, recognizing that there are listings favoring both parties, this factor is *at worst* neutral.

261.   Another consideration on this "copying" factor is whether Snap has taken enforcement efforts against unauthorized third-party users of the SPECTACLES mark and whether those efforts were successful.  *See Cartier v. TechnaOro, Inc.*, No. 05-cv-6614, 2008 WL 11518433, at *6 (S.D.N.Y. Mar. 28, 2008) (finding enforcement efforts relevant to maintaining exclusivity of the mark and relying on such efforts, in part, to find the test for secondary meaning had been met).  The evidence presented at trial demonstrated Snap's repeated and successful efforts to take down unauthorized uses of the SPECTACLES mark, including the removal of a claw-machine arcade game offering inauthentic SPECTACLES products and prominently displaying the SPECTACLES mark, color, and logo, as well as the removal of a product listing that consisted of phone cases with a replica of Snap's SPECTACLES.

262.   With regard to enforcement efforts, this factor weighs in favor of finding the SPECTACLES mark has acquired secondary meaning.

2.    The SPECTACLES Mark Has Acquired Secondary Meaning.

263.   When taken together and viewed holistically, Snap has demonstrated by a preponderance of evidence that the SPECTACLES mark has acquired secondary meaning.

264.   Although Defendant has pointed to a number of cases where the court declined to find secondary meaning, each is distinguishable in significant ways from the present one.

265.   In *Levi Strauss & Co. v. Blue Bell, Inc.*, 778 F.2d 1352, 1358 (9th Cir.

67

1985), the court declined to find secondary meaning because the mark in question was a
design feature actively used by third parties, and plaintiff had presented evidence of
advertising for only a portion of the relevant time at issue.  In contrast, here there is no
evidence of active use of the SPECTACLES mark by third parties, and Snap has
presented evidence that it has continuously advertised SPECTACLES for eight years.

266.   In *Carter-Wallace, Inc. v. Procter & Gamble Co.*, 434 F.2d 794, 802 (9th
Cir. 1970), the court declined to find secondary meaning, citing at least seven instances
of third-party uses and a "lack of exclusivity."  That is not the case here.

267.   In *In re Boston Beer Co. L.P.*, 198 F.3d 1370, 1371–72 (Fed. Cir. 1999), the
mark at issue "The Best Beer in America" was highly descriptive of the product, beer,
and the only evidence presented in support of secondary meaning was the Plaintiff's
advertising, an affidavit from its president, and a single competitor's advertisement.
Here, Snap has presented far more evidence of secondary meaning, and the mark is
without doubt far less descriptive.  Indeed, as discussed above, the Court actually finds
that SPECTACLES is suggestive for smart glasses.

268.   In *Aurora World, Inc. v. Ty Inc.*, No. CV 09-08463, 2011 WL 13176413 at
*30 (C.D. Cal. Mar. 14, 2011), Plaintiff rested its secondary meaning argument on sales
figures, as well as advertising expenditures of merely $35,000—without any evidence
addressing the content of its promotions. Snap's evidence far exceeds that showing.

269.   Finally, in *Mercado Latino, Inc. v. Indio Prod., Inc.*, No. CV 13-01027,
2018 WL 3490752 at *4 (C.D. Cal. July 17, 2018), plaintiff failed to put forth any
evidence of exclusive use of the mark at issue.  Snap has made a significant showing in
that regard.

270.   Because Snap's evidence exceeds the evidence presented in the cases relied
on by Defendant, and because most, if not all, of the factors that courts consider in
determining whether a mark has acquired secondary meaning weigh in Snap's favor, in
conjunction with the *prima facie* evidence of secondary meaning Snap achieved through
its continuous and exclusive use of the SPECTACLES mark, this Court finds that, even

68

if the SPECTACLES mark is considered to be descriptive, it has acquired the requisite secondary meaning and is entitled to registration on the Principal Register.

## CONCLUSION

271.   Snap's applied-for trademark, SPECTACLES, is not generic for the relevant genus:  smart glasses.

272.   SPECTACLES is a suggestive mark, making it inherently distinctive, and entitled to federal trademark protection without any further showing from Snap.

273.   In the alternative, even if SPECTACLES is descriptive, rather than suggestive, Snap has demonstrated secondary meaning through its exclusive and extensive use, advertising and promotion, unsolicited media coverage, and evidence of consumer brand recognition.  *See* 15 U.S.C. § 1052(f).

274.   The decision of the TTAB (*In Re Snap Inc.*, Nos. 87177292 and 87211997, 2021 WL 5232470 (T.T.A.B. Nov. 3, 2021)) is reversed, and the Court orders Defendant to publish the SPECTACLES marks (Ser. Nos. 87/177,292; 87/211,997) for opposition in the *Official Gazette of the USPTO*.  If no opposition is filed or any opposition is unsuccessful, the marks shall proceed to registration on the Principal Register.

[signature block on next page]

1  Dated: June 26, 2024

2                                /s/ David H. Bernstein
                                 DAVID H. BERNSTEIN
3                                Debevoise & Plimpton LLP
                                 650 California Street
4                                San Francisco, CA 94108
                                 Tel.: (212) 909-6696
5                                Fax: (212) 521-7696
                                 dhbernstein@debevoise.com
6

7                                JARED I. KAGAN (admitted *pro hac vice*)
                                 Debevoise & Plimpton LLP
8                                66 Hudson Boulevard
                                 New York, NY 10001
9                                Tel.: (212) 909-6000
                                 Fax: (212) 909-6836
10                               jikagan@debevoise.com

11

12                               *Attorneys for Plaintiff*

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28