# EXHIBIT 1

E. MARTIN ESTRADA
United States Attorney
DAVID M. HARRIS
Assistant United States Attorney
Chief, Civil Division
JOANNE S. OSINOFF
Assistant United States Attorney
Chief, Complex and Defensive Litigation Section
JASMIN YANG (Cal. Bar No. 255254)
Assistant United States Attorney
     Federal Building, Suite 7516
     300 North Los Angeles Street
     Los Angeles, California 90012
     Telephone: (213) 894-8827
     Facsimile: (213) 894-7819
     E-mail: jasmin.yang@usdoj.gov

Attorneys for Defendant Katherine K. Vidal

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| SNAP INC.,<br><br>    Plaintiff,<br><br>    v.<br><br>KATHERINE K. VIDAL, Under Secretary of Commerce for Intellectual Property and Director of the United States Patent and Trademark Office,<br><br>    Defendant. | No. CV 22-00085-SK<br><br>**DEFENDANT'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**<br><br>Honorable Steve Kim<br>United States Magistrate Judge |

Pursuant to the Court's minute order (ECF 150), Defendant Katherine K. Vidal submits the following Proposed Findings of Fact and Contentions of Law.

# I.   PROPOSED FINDINGS OF FACT

1.     On September 20, 2016 and October 21, 2016, respectively, Plaintiff Snap Inc. filed applications with the U.S. Patent and Trademark Office (the "USPTO") to register SPECTACLES in standard characters (Serial No. 87177292) and the stylized form *Spectacles* (Serial No. 87211997).  A0001-07; A2198-206.[1]

2.     For both applications, Snap applied to register the term "spectacles" for use with the following goods:

> Computer hardware; computer peripherals; wearable computer hardware; wearable computer peripherals; computer hardware and peripherals for remotely accessing, capturing, transmitting and displaying pictures, video, audio and data; downloadable computer software, namely, software for setting up, configuring, and controlling wearable computer hardware and peripherals; downloadable computer software and software applications for use in uploading, downloading, capturing, editing, storing, distributing and sharing photographic and video content and other digital data via global and local computer networks and via mobile devices; downloadable multimedia files containing digital audio and video files featuring user generated images, videos, multimedia files, and other digital data, all in the fields of entertainment, photography and online social networking; computer software for accessing and transmitting data and content among consumer electronics devices and displays in International Class 9.

---

[1] All cites to the Certified Administrative Record, which is part of the record in this action, *see* ECF 42, are referenced as A___.

1

A2099-2100; A4296-97.

3.    The specimen of use that Snap submitted to the USPTO, which must depict the mark as actually used in commerce on the identified goods, is a photograph of Snap's Spectacles product.  A0012; A2205.  The product looks like a pair of glasses.  Snap identified no other products that fall within the scope of goods for which it seeks registration or with which it uses the proposed "spectacles" mark.

4.    The identification of goods encompasses wearable computer hardware in the nature and form of glasses, known as smart glasses.

5.    On December 11, 2020, the examining attorney at the USPTO issued a final office action refusing registration of Snap's applications on the grounds that "spectacles" is generic for smart glasses and, alternatively, that the term is merely descriptive and has not acquired distinctiveness under Section 2(f) of the Lanham Act.  A2040-47; A4236-43.

6.    On November 3, 2021, the Trademark Trial and Appeal Board ("TTAB") affirmed the refusal to register the term "spectacles," finding that Snap's proposed marks are unregistrable as generic for smart glasses and, in the alternative, that the term is merely descriptive and has not acquired distinctiveness.  A2099-130; A4296-327.

7.    The TTAB considered Snap's evidence, including Snap's length of use, advertising efforts, media reports, and awards won, but found the evidence insufficient to establish acquired distinctiveness.  A2121-29; A4318-26.  Among other things, the TTAB found that Snap's use was not substantially exclusive, that Snap had not provided any survey evidence or sales and advertising figures, and that Snap failed to show that the media coverage it received constituted consumer recognition of the term "spectacles" as a source identifier.  A2121-29; A4318-26.  The TTAB also considered and rejected Snap arguments that "spectacles" is a double entendre.  A2120 n.13; A4317 n.13.

8.    On January 5, 2022, Snap filed this civil action under the Lanham Act § 21(b), 15 U.S.C. § 1071(b), challenging the TTAB's decision refusing registration of the term "spectacles."

9.     The parties introduced in this action new evidence, thus augmenting the agency record, on the issue of secondary meaning.

10.     Snap launched its Spectacles product in 2016.  ECF 138, Tr. vol. I (Chan), 22:23-24.  Snap sold various versions of the Spectacles product until 2021, when it released a version that was part of an "experimental program" and not for sale.  *Id.* 27:8-25.

11.     Various dictionaries provide definitions for the term "spectacles" as glasses or something resembling glasses:

   a.   The Online Merriam-Webster Dictionary defines "spectacle" as "glasses," which means "plural:  a device used to correct defects of vision or to protect the eyes that consists typically of a pair of glass or plastic lenses and the frame by which they are held in place—called also eyeglasses, spectacles."  A0029-30; A0037; A2222-23; A2230.

   b.   The Online Oxford English Dictionary defines "spectacle" as "[a] device for assisting defective eyesight, or for protecting the eyes from dust, light, etc., consisting of two glass lenses set in a frame which is supported on the nose, and kept in place by side-pieces passing over the ears.  Usually in *plural*."  A2049; A4245.

   c.   The American Heritage Dictionary defines "spectacles" as "[a] pair of eyeglasses" and "[s]omething resembling eyeglasses in shape or suggesting them in function."  A2048; A4244; *see also* EX122-0003; EX123-0003.

   d.   The Unabridged Merriam-Webster Dictionary defines "spectacles" as "any of various things felt to resemble a pair of glasses."  EX124-0001.

12.     The Online Cambridge Dictionary defines "smart glasses" as a "pair of glasses that contain computer technology so that, for example, they can be used in a similar way to a smartphone, or you can get information added to what you are seeing as

3

you look through them," and provides the example, "A pair of smart glasses will mean that you can take photos with your spectacles." EX126-0001.

13.    Snap designed its product to resemble glasses.  ECF 138, Tr. vol. I (Chan), 32:10-12 ("[W]hat we found is that the most comfortable form factor for a product like this was something that looked like glasses."); *id.* 33:1-2 ("[F]or Spectacles, the product resembles a glasses form factor."); *id.* 33:22-25 ("So with this product, you know, we thought a lot about how to -- how to deliver that to our users.  And it ends up that a device that looks like a pair of glasses is the one that people are most comfortable with.").

14.    Consistent with that product design, Snap's websites refer to and promote the Spectacles product as sunglasses or glasses.  *Id.* 59:17-23, 61:2-62:23; EX068 (describing the Spectacles 1 product as "Sunglasses that Snap!"); EX106-0001 (describing the Spectacles 4 product as "our first pair of glasses that bring augmented reality to life").

15.    Snap's products are meant to be worn in circumstances that someone might be wearing sunglasses; they can also be ordered with prescription inserts from Snap's official partner to function as corrective eyewear.  ECF 138, Tr. vol. I (Chan), 62:25-63:15; *see also* EX119-0070 (reporting to Snap's shareholders that the Spectacles product is regulated by FDA and other agencies that regulate the medical device industry).

16.    Companies in the marketplace use the term "spectacles" to refer to smart glasses, including products marketed by companies other than Snap.  An Amazon product listing for an eFashion smart glasses product with a "DVR camcorder camera" referred to the product as "spectacles."  A2248-53; A4300.  Similarly, "spectacles" was used on a Walmart product listing for a Relax smart glasses product with Bluetooth, a speaker, and a waterproof mic.  EX104-0014 to -16.

17.    The media uses the term "spectacles" for smart glasses from sources besides Snap.  The record includes numerous examples of media uses of "spectacles" to refer to

4

or describe smart glasses offered by other entities, including Apple, Huawei, Amazon, North, Intel, Microsoft, Google, Bose, Samsung, and Ray-Ban and Meta. *See*, *e.g.*, A2381-418; A2866-76; EX086-0002; EX087; EX088; EX090-0007; EX091-0001; EX092; EX093-0001; EX094-0001; EX097-0001; EX108; EX040-0016; EX052-0350; EX052-0383; EX052-0387; EX052-0388; EX052-0403.

18. Dr. Anderson's expert testimony and report concerning the Teflon surveys he conducted was credible and convincing. His two surveys showed that respondents understood what a brand name is and how it differs from a generic term. For the first survey, 82.4% of respondents identified "spectacles" as generic and not a brand name, and 15.2% identified "spectacles" as a brand name. ECF 139, Tr. vol. II (Anderson), 149:15-22; EX271-0016. For the second survey, 72.9% of respondents identified "spectacles" as generic and not a brand name, and 23.8% identified "spectacles" as a brand name. ECF 139, Tr. vol. II (Anderson), 161:14-23; EX272-0046.

19. Snap did not provide any evidence establishing that its advertising expenditures or marketing campaigns reflect or resulted in consumer association of the term "spectacles" with a single source.

20. Snap did not provide any evidence establishing that its sales reflect or resulted in consumer association of the term "spectacles" with a single source.

21. Snap did not provide any evidence establishing that media coverage of its Spectacles product was unsolicited.

22. Snap did not provide any evidence establishing that media coverage of its Spectacles product reflects or resulted in consumer association of the term "spectacles" with a single source.

23. Snap did not provide any evidence establishing copying by others that was intended to deceive consumers about the product's source.

24. Snap did not provide any consumer surveys or consumer testimony establishing that the term "spectacles" is understood to signify a single source. Although not relied on as a secondary meaning survey, the survey Snap provided to support its

5

position that "spectacles" is not generic showed just one respondent who identified "spectacles" as a brand name.

25.     Mr. Chan's testimony as to the effectiveness of Snap's efforts in driving consumer awareness and association was not credible and convincing.

26.     Any findings of fact deemed to be a conclusion of law is hereby incorporated into the Conclusions of Law.

## II.     PROPOSED CONCLUSIONS OF LAW

1.     This Court has jurisdiction over the parties and the subject matter of this litigation pursuant to 15 U.S.C. § 1071(b), which provides that a party "dissatisfied with the decision" of the TTAB may have a "remedy by a civil action" against the Director of the USPTO in district court.

2.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(e)(1)(C).

3.     In a § 1071(b) action, when new evidence on a disputed fact question is introduced, "a *de novo* finding will be necessary to take such evidence into account together with the evidence before the board." *See Kappos v. Hyatt*, 566 U.S. 431, 444 (2012) (quoting *Fregeau v. Mossinghoff*, 776 F.2d 1034, 1038 (Fed. Cir. 1985)); *Fregeau*, 776 F.2d at 1037 (explaining that "the record before the [USPTO] is the evidentiary nucleus"). In such a case, "[t]he district court must assess the credibility of new witnesses and other evidence, determine how the new evidence comports with the existing administrative record, and decide what weight the new evidence deserves." *Kappos*, 566 U.S. at 444. A § 1071(b) action is conducted as a trial, subject to the Federal Rules of Evidence and the Federal Rules of Civil Procedure. *See id.* at 443-44 & n.4; *Fregeau*, 776 F.2d at 1037.

4.     The USPTO may register a mark only if it meets the requirements of the Lanham Act. The Lanham Act requires that a proposed mark "identify and distinguish" the applicant's goods and services from those of others and "indicate the source of the goods" or services. 15 U.S.C. §§ 1052, 1127.

5. A proposed mark may not be registered on the Principal Register if, "when used on or in connection with the [goods] of the applicant is merely descriptive . . . of them," unless the mark has acquired distinctiveness and registration is sought under Section 2(f). 15 U.S.C. §§ 1052(e)(1), (f). A proposed mark is merely descriptive if it "describes the qualities or characteristics of a good or service, and this type of mark may be registered only if the registrant shows that it has acquired secondary meaning, *i.e.*, it has become distinctive of the applicant's goods in commerce." *Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 194 (1985) (internal quotation marks omitted).

6. The statutory prohibition exists to ensure that terms that do not perform the function of distinguishing a particular producer's goods from those of others remain in the public domain for competitors to use to describe the qualities or characteristics of their own goods. *See*, *e.g.*, *Estate of P.D. Beckwith, Inc. v. Comm'r of Patents*, 252 U.S. 538, 543-44 (1920) ("[T]he function of a trade-mark is to point distinctively, either by its own meaning or by association, to the origin or ownership of the wares to which it is applied, and words merely descriptive of qualities, ingredients or characteristics, when used alone, do not do this. Other like goods, equal to them in all respects, may be manufactured or dealt in by others, who, with equal truth, may use, and must be left free to use, the same language of description in placing their goods before the public.").

7. The applicant seeking registration bears the burden of establishing that a term has acquired distinctiveness or otherwise is inherently distinctive. *In re Louisiana Fish Fry Products, Ltd.*, 797 F.3d 1332, 1335 (Fed. Cir. 2015).

**A. "Spectacles" Is Merely Descriptive.**

8. "Marks which are merely descriptive of a product are not inherently distinctive. When used to describe a product, they do not inherently identify a particular source, and hence cannot be protected." *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 US. 763, 769 (1992). "A term is merely descriptive if it immediately conveys knowledge of a quality, feature, function, or characteristic of the goods or services with which it is used." *In re Bayer Aktiengesellschaft*, 488 F.3d 960, 963 (Fed. Cir. 2007); *see also*

1 | *Surgicenters of Am., Inc. v. Med. Dental Surgeries, Co.*, 601 F.2d 1011, 1014-15, 1019
2 | (9th Cir. 1979).

3 |        9.     By contrast, a term is suggestive and inherently distinctive "if imagination
4 | or a mental leap is required in order to reach a conclusion as to the nature of the product
5 | being referenced." *Rudolph Int'l, Inc. v. Realys, Inc.*, 482 F.3d 1195, 1198 (9th Cir.
6 | 2007) (internal quotation marks omitted); *see also Self-Realization Fellowship Church v.*
7 | *Ananda Church of Self-Realization*, 59 F.3d 902, 911 (9th Cir. 1995).

8 |        10.    "Descriptiveness of a mark is not considered in the abstract.  Rather, it is
9 | considered in relation to the particular goods for which registration is sought, the context
10 | in which it is being used, and the possible significance that the term would have to the
11 | average purchaser of the goods because of the manner of its use or intended use." *Bayer*,
12 | 488 F.3d at 964.  "[A] mark need not be merely descriptive of all recited goods or
13 | services in an application.  A descriptiveness refusal is proper if the mark is descriptive
14 | of any of the [goods] for which registration is sought." *In re Chamber of Com. of the*
15 | *United States*, 675 F.3d 1297, 1300 (Fed. Cir. 2012) (internal quotation marks omitted)).

16 |        11.    The descriptiveness analysis assumes that the consumer knows what the
17 | goods are, and asks if the consumer will understand the alleged mark to convey
18 | information about the goods. *DuoProSS Meditech Corp. v. Inviro Med. Devices, Ltd.*,
19 | 695 F.3d 1247, 1254 (Fed. Cir. 2012) ("The question is not whether someone presented
20 | with only the mark could guess what the goods or services are.  Rather, the question is
21 | whether someone who knows what the goods and services are will understand the mark
22 | to convey information about them." (quotation marks omitted)).

23 |        12.    For a consumer of Snap's product, the term "spectacles" immediately
24 | conveys a characteristic of the goods, namely, that they are in the form and nature of
25 | glasses.  The thought process is direct.  No imagination or mental leap is needed to
26 | conclude that Snap's Spectacles product looks like and are worn like glasses.

27 |        13.    The term "spectacles" is defined and understood to mean a "pair of
28 | eyeglasses" and "[s]omething resembling eyeglasses." *See*, *e.g.*, EX122-0003.  Snap's

product could have been designed in other forms of wearable computer hardware, such as goggles or a helmet attachment.  But Snap specifically designed its product to look like glasses because it decided that was the form with which its consumers would be most comfortable.  ECF 138, Tr. vol. I (Chan), 32:10-12, 33:1-2, 33:22-25.  Consistent with that design and relying on the well-understood meaning of "spectacles," Snap describes and promotes the Spectacles product as sunglasses or glasses.  EX068 (describing the Spectacles 1 product as "Sunglasses that Snap!"); EX106-0001 (describing the Spectacles 4 product as "our first pair of glasses that bring augmented reality to life"); ECF 138, Tr. vol. I (Chan), 59:17-23, 61:2-62:23.

14.    That the Snap Spectacles product may have other technological characteristics does not alter the analysis.  The Federal Circuit's registration precedent is clear that "[a] mark need not recite each feature of the relevant goods or services in detail to be descriptive, it need only describe a single feature or attribute." *Chamber of Com. of the U.S.*, 675 F.3d at 1300 (internal quotation marks omitted).  The Ninth Circuit's precedent also "makes it clear that merely descriptive marks need not describe the 'essential nature' of a product; it is enough that the mark describe some aspect of the product." *Zombondo Ent., LLC v. Falls Media, LLC*, 602 F.3d 1108, 1116 (9th Cir. 2010).

15.    While Snap contends that "spectacles" has multiple associations that could be used refer to Snap's product, ECF 143 at 55, Snap presented no evidence supporting those associations.  For example, Snap relies on solely attorney argument that consumers associate or understand "spectacles" to mean encouraging users to make a spectacle of themselves.  Even if there were evidence that consumers perceive that meaning of "spectacles," it would not aid Snap because that meaning describes the purpose of the goods and thus also is merely descriptive.

16.    Snap also contends that "spectacles" is a double entendre but does not actually rely on multiple meanings of the term.  ECF 143 at 54.  Instead, it relies on a single meaning for the term—corrective eyewear—that has persisted over time.  *Id.*  This

9

meaning also immediately and directly conveys information about Snap's product, given that it can be fitted and worn with prescription lenses.  ECF 138, Tr. vol. I (Chan), 62:25-63:15; *see also* EX119-0070.

17.    The term "spectacles" thus is merely descriptive and cannot be registered on the Principal Register without a showing of acquired distinctiveness.

**B.    "Spectacles" Has Not Acquired Distinctiveness.**

18.    Acquired distinctiveness or secondary meaning is "the mental association by a substantial segment of consumer and potential consumers between the alleged mark and a single source of the product." *Levi Strauss & Co. v. Blue Bell, Inc.*, 778 F.2d 1352, 1354 (9th Cir. 1985) (en banc) (internal quotation marks omitted).  "In general, to establish that a term has acquired distinctiveness, an applicant must show that in the minds of the public, the primary significance of a product feature or term is to identify the source of the product rather than the product itself." *Louisiana Fish Fry*, 797 F.3d at 1336 (internal quotation marks omitted).

19.    It is not enough for a company to simply take steps to promote a product with an alleged mark.  "The test of secondary meaning is the effectiveness of the effort to create it, and the chief inquiry is directed towards the consumer's attitude about the mark in question:  does it denote to him a single thing coming from a single source?" *Carter-Wallace, Inc. v. Procter & Gamble Co.*, 434 F.2d 794, 802 (9th Cir. 1970) (internal quotation marks omitted); *see also* Trademark Manual of Examining Procedure ("TMEP") § 1212.06(b) (2024) (citing cases).

20.    "Where a mark sits on a sliding scale of descriptiveness impacts the burden a proposed registrant must bear with respect to its claim of acquired distinctiveness." *Royal Crown Co. v. Coca-Cola Co.*, 892 F.3d 1358, 1365 (Fed. Cir. 2018).  "[A] more descriptive term requires more evidence of secondary meaning." *Id.* (quoting *In re Steelbuilding.com*, 415 F.3d 1293, 1300 (Fed. Cir. 2005)).  For example, a descriptive mark that is closer to the generic line than the suggestive line within the category of descriptive marks "could be a valid trademark only with a strong showing of strong

secondary meaning." *Filipino Yellow Pages, Inc. v. Asian J. Publ'ns, Inc.*, 198 F.3d 1143, 1151 (9th Cir. 1999).

21.     Regarding the weight of the evidence, Section 2(f) of the Lanham Act, 15 U.S.C. § 1052(f), "is silent except for the suggestion that substantially exclusive use for a period of five years immediately preceding filing of an application may be considered prima facie evidence.  Congress has chosen to leave the exact degree of proof necessary to qualify a mark for registration to the judgment of the Patent Office and the courts." *In re Hehr Mfg. Co.*, 279 F.2d 526, 528 (C.C.P.A. 1960).  For example, Section 2(f) does not require the USPTO to accept a certain length of use as sufficient for any mark, no matter where it falls on the descriptiveness scale.  *See Louisiana Fish Fry*, 797 F.3d at 1336-37 ("Although Section 2(f) . . . provides that that the PTO may accept five years of 'substantially exclusive and continuous' use as *prima facie* evidence of acquired distinctiveness, the statute does not require the PTO to do so.").

22.     As the evidence discussed above shows, the term "spectacles" is highly descriptive of smart glasses.  It describes a significant feature of the goods—the glasses form and nature of the product.  Snap thus has a heavy burden to show it has acquired distinctiveness as a source indicator.

23.     Direct evidence, such as consumer surveys, "can provide the most persuasive evidence on secondary meaning." *Blue Bell*, 778 F.2d at 1358.  A party may also establish secondary meaning through other evidence, including:  consumer testimony; exclusivity, manner, and length of use; amount and manner of advertising; amount of sales and number of customers; established place in the market; and proof of intentional copying by others. *Filipino Yellow Pages*, 198 F.3d at 1151.  "While evidence of a manufacturer's sales, advertising and promotional activities may be relevant in determining secondary meaning, the true test of secondary meaning is the effectiveness of this effort to create it." *Int'l Jensen, Inc. v. Metrosound U.S.A., Inc.*, 4 F.3d 819, 824 (9th Cir. 1993).

1    **1.    Exclusivity and length of use**

2    24.    "When the record shows that purchasers are confronted with more than one

3    (let alone numerous) independent users of a term or device, an application for

4    registration under Section 2(f) cannot be successful, for distinctiveness on which

5    purchasers may rely is lacking under such circumstances." *Levi Strauss & Co. v.*

6    *Genesco, Inc.*, 742 F.2d 1401, 1403 (Fed. Cir. 1984).  "Evidence of third party usage . . .

7    is relevant to disprove the existence of secondary meaning." *Blue Bell*, 778 F.2d at

8    1358.  Relevant third-party uses need not be limited to uses as a trademark or a brand.

9    *See*, *e.g.*, *Carter-Wallace*, 434 F.2d 79 at 802 (listing third-party, non-exclusive uses of

10    "sure," such as "The Safe-and-Sure Deodorant" and "Dial's a sure thing").

11    25.    Numerous third parties, including companies in the marketplace and the

12    media, have used the term "spectacles" to refer to smart glasses products from sources

13    other than Snap.  *See*, *e.g.*, A2381-418; A2866-76; EX040-0016; EX052-0350; EX052-

14    0383; EX052-0387; EX052-0388; EX052-0403; EX086-0002; EX087; EX088; EX090-

15    0007; EX091-0001; EX092; EX093-0001; EX094-0001; EX097-0001; EX108.

16    26.    While Snap does not consider the eFashion and Relax products sold on

17    Amazon and Walmart, respectively, to be competitors due to differences in price and

18    features, ECF 138, Tr. vol. I (Chan), 47:18-49:5, 50:10-51:22, 53:11-24, "the question of

19    registrability of an applicant's mark must be decided on the basis of the identification of

20    goods set forth in the application regardless of what the record may reveal as to the

21    particular nature of an applicant's goods, the particular channels of trade or the class of

22    purchasers to which sales of the goods are directed," *In re Cordua Rests., Inc.*, 823 F.3d

23    594, 602 (Fed. Cir. 2016).

24    27.    In any event, "spectacles" has been used to refer to smart glasses products

25    offered by competitors such as Google, Facebook and Ray-Ban, and Bose.  *See*, *e.g.*,

26    A2873-76; EX040-0016; EX052-0350; EX052-0383; EX052-0387; EX052-0388;

27    EX052-0403; EX090-0007; EX093-0001.

28

28.    Snap's use of "spectacles" has not been substantially exclusive since it began using the term for its product in 2016.

29.    Even if Snap's use had been substantially exclusive since 2016, such evidence is not prima facie evidence of acquired distinctiveness.  In view of the highly descriptive nature of "spectacles," more evidence is needed to establish acquired distinctiveness.  *See Louisiana Fish Fry*, 797 F.3d at 1336-37 ("Particularly for a mark that is as highly descriptive like FISH FRY PRODUCTS, the Board was within its discretion not to accept Louisiana Fish Fry's alleged five years of substantially exclusive and continuous use as *prima facie* evidence of acquired distinctiveness.").

30.    The third-party uses of "spectacles" for smart glasses do not support a finding of acquired distinctiveness.

### 2.    Snap's advertising expenditures

31.    A "large expenditure of money does not in itself create legally protectable rights." *Carter-Wallace*, 434 F.2d at 800 (internal quotation marks omitted); *see also CG Roxane LLC v. Fiji Water Co.*, 569 F. Supp. 2d 1019, 1031 (N.D. Cal. 2008).  In other words, "[e]xpenditures themselves do not, from a legal standpoint, establish secondary meaning without a showing that they translated into what counts—consumers associating the claimed [mark] with a single source." *TBL Licensing, LLC v. Vidal*, No. 23-1150, 2024 WL 1609096, at *8 (4th Cir. Apr. 15, 2024) (internal quotation marks omitted).  Evidence of advertising activities also must be "extensive enough to effectively create an association with the advertiser's product." *Mercado Latino, Inc. v. Indio Prod., Inc.*, No. CV 13-01027 DDP (RNBx), 2018 WL 3490752, at *4 (C.D. Cal. July 17, 2018).

27.    Snap claims to have spent tens of millions of dollars on advertising the Snap product, including creating Snap Bot vending machines and placing them in scenic locations such as the Grand Canyon.  ECF 138, Tr. vol. I (Chan), 24:7-25:10, 41:22-42:4.  However, Snap's evidence fails to provide sufficient context in which to evaluate its advertising expenditures for purposes of secondary meaning.  For example, Snap

1    provided no evidence showing whether and to what extent its advertising featured the

2    term "spectacles," how much of its expenditures was spent on advertising featuring the

3    term "spectacles," or how Snap's advertising expenditures compare to the rest of the

4    market.  Snap provided no evidence to establish that its advertising efforts have

5    translated to consumer association with a single source or have been extensive enough to

6    create that association.

7         32.    To the contrary, as discussed below, the consumer survey evidence

8    indicates that its advertising efforts have not been effective in establishing Snap

9    Spectacles as a brand.

10        33.    Given the highly descriptive nature of "spectacles," Snap's advertising

11   expenditures are insufficient to support a finding of acquired distinctiveness.  *See In re*

12   *Boston Beer Co. L.P.*, 198 F.3d 1370, 1371, 1373 (Fed. Cir. 1999) (finding annual sales

13   of approximately $85 million and annual advertising expenditures over $10 million

14   insufficient to establish distinctiveness in view of the highly descriptive nature of the

15   proposed mark).

16                    **3.    Snap's sales**

17        34.    Sales figures by themselves are insufficiently probative of acquired

18   distinctiveness because they may indicate popularity of the product or other marks used

19   along with the mark at issue, rather than recognition of the mark as indicative of source.

20   *See In re Bongrain Int'l Corp.*, 894 F.2d 1316, 1318 (Fed. Cir. 1990).  "Raw sales

21   figures need to be put into context to have any meaning."  2 McCarthy § 15:49.  A

22   party's sales figures are insufficient to show secondary meaning where it "has not

23   adduced contextual evidence from which the court can determine whether its sales

24   figures show that the product has been successful in the marketplace."  *Aurora World,*

25   *Inc. v. Ty Inc.*, No. CV 09-08463 MMM (Ex), 2011 WL 13176413, at *30 (C.D. Cal.

26   Mar. 14, 2011); *see also Cont'l Lab'y Prods., Inc. v. Medax Int'l, Inc.*, 114 F. Supp. 2d

27   992, 1003 (S.D. Cal. 2000) ("Continental has failed to provide any supporting data to

28   place these raw sales figures into a coherent evidentiary context.  For example,

Continental offers no evidence as to the size of the relevant market or the market share Continental achieved by December 1996. The Court cannot determine whether these sales numbers reflect success in the pipette tip industry or simply the rapid gains achieved by any new product that emerges within a large and growing market.").

35.    Snap's sales evidence lacks context to determine whether its product has been successful or whether the term "spectacles" has garnered consumer recognition as a source identifier.

36.    Snap's sales evidence is insufficient to support a finding of acquired distinctiveness.

### 4.    Unsolicited media coverage

37.    Mr. Chan and Snap's marketing expert, Professor Peter N. Golder, testified about various media articles about Snap's product, but none of those articles are in evidence. Very little is known about the nature of these articles in order to assess secondary meaning. There is no indication of whether and how many articles praised the Spectacles product or the extent to which the term "spectacles" is used in those articles.

38.    Snap provided no evidence showing whether and the extent to which media coverage on the Spectacles product was unsolicited. Mr. Chan testified that the Snap 3 product generated hundreds of articles in press coverage, but was not able to provide a breakdown of the articles that were "organically" created versus those that were "unearned" or paid for by Snap. ECF 138, Tr. vol. I, 70:25-71:17. Professor Golder similarly did not identify any articles that were unsolicited by Snap. ECF 139, Tr. vol. II (Golder), 104:11-105:7.

39.    Snap's media coverage evidence is insufficient to support a finding of acquired distinctiveness.

### 5.    Intentional copying

40.    "[E]vidence of deliberate copying is relevant to a determination of secondary meaning." *Fuddruckers, Inc. v. Doc's B.R. Others, Inc.*, 826 F.2d 837, 844 (9th Cir. 1987). However, "[c]ompetitors may intentionally copy product features for a

15

variety of reasons" unrelated to secondary meaning. *Id.* at 844-45. "Imitation suggests secondary meaning only if it is intended to deceive consumers about the product's source." *TBL Licensing*, 2024 WL 1609096, at *11.

41.    Snap relies on takedown requests sent by a law firm to third parties and third-party product listings using references to Snap and "spectacles." ECF 143 at 62-64. Many of these documents contain merely accusations of copying by Snap and provide little information to determine whether copying occurred, much less intentional copying, and no witness testified about these documents. The documents that appear to reflect copying of Snap's Spectacles product are few and isolated. This type of evidence pales in comparison to evidence of intentional copying found in other cases to support secondary meaning. *See, e.g.*, *H.I.S.C., Inc. v. Rajanayagam*, 810 F. App'x 560, 561 (9th Cir. 2020) (attempts to sell product with party's identical name and trade dress, attempts to procure product from party's supplier, and advertisements using same trade dress features and photo of party's product); *Clicks Billiards, Inc. v. Sixshooters Inc.*, 251 F.3d 1252, 1263-64 (9th Cir. 2001) (employees' testimony indicating desire and efforts to make pool hall "look like" competitor's); *Audio Fid., Inc. v. High Fid. Recordings, Inc.*, 283 F.2d 551, 558 (9th Cir. 1960) (visual comparison of designs at issue); *Venetian Casino Resort, LLC v. VenetianGold.Com*, 380 F. Supp. 2d 737, 743 & n.1 (E.D. Va. 2005) (two court proceedings finding or enjoining infringement).

42.    Snap's evidence of purported intentional copying does not support a finding of acquired distinctiveness.

### 6.    Survey evidence

43.    Courts may consider Teflon-format surveys in determining secondary meaning (or lack thereof). 2 McCarthy § 32.191.

44.    Dr. Anderson's Teflon surveys show that only 15.2%-23.8% of respondents identified "spectacles" as a brand name. ECF 139, Tr. vol. II (Anderson), 161:14-23; EX272-0046. Dr. Anderson's Teflon surveys also show that 72.9%-82.4% of respondents identified "spectacles" as a generic name, ECF 139, Tr. vol. II (Anderson),

149:15-22; EX271-0016, which is the ultimate in descriptiveness because it does more than describe a product feature, it names the product, *H. Marvin Ginn Corp. v. Int'l Ass'n of Fire Chiefs, Inc.*, 782 F. 2d 987, 989 (Fed. Cir. 1986) ("The generic name of a thing is in fact the ultimate in descriptiveness."). These survey results do not show that a "substantial segment of consumer and potential consumers" associate "spectacles" with a single source. *See Blue Bell*, 778 F.2d at 1354. In addition, these survey results are well below what courts have considered sufficient for establishing secondary meaning through Teflon-type survey evidence. *See*, *e.g.*, *Schwan's IP, LLC v. Kraft Pizza Co.*, 379 F. Supp. 2d 1016, 1024 (D. Minn. 2005) (61% of respondents believing that BRICK OVEN was a brand name), *aff'd on other grounds*, 460 F.3d 971 (8th Cir. 2006); *March Madness Athletic Ass'n, L.L.C. v. Netfire, Inc.*, 310 F. Supp. 2d 786, 803-04 (N.D. Tex. 2003) (61.3% of respondents stating that "March madness" was a trade name), *aff'd*, 120 F. App'x 540 (5th Cir. 2005); *In re Country Music Ass'n, Inc.*, 2011 WL 5600319, at *9 (T.T.A.B. Oct. 25, 2011) (85% of respondents identifying COUNTRY MUSIC ASSOCIATION as a brand name).

45.     Snap relies on an internal branding study for the Spectacles 3 product, from which Snap concluded that out-of-home advertisements increased product awareness and purchase interest. EX075-0033. However, Snap presented insufficient evidence by which to evaluate the design and reliability of that study for purposes of secondary meaning. No witness or document described the criteria for selecting participants in the study, the questions in their entirety (with the answers that participants may select in response to multi-choice questions), all answers provided by participants, and an explanation of the survey method and/or design employed. Importantly, no question in that study appears to test consumer association of the term "spectacles" with a single source. *See* EX075-0018 to -19. Snap's own marketing expert, Professor Golder, was not made aware of any study at Snap "that was done properly to track consumer perception of the term 'spectacles.'" ECF 139, Tr. vol. II (Golder), 99:2-13. Further, the study results show that, in the "Unaided Brand Awareness" segment of the study in

17

which participants were asked "When thinking of <u>wearable cameras</u>, which come to
mind?", participants exposed to out-of-home ("OOH") advertisements, digital, and print
media showed "[n]o significant movement" as compared to the control group.  EX075-
0018, -23, -33.  The study results that Snap focuses on are in connection with established
Snapchat users who are already familiar with Snap's products and were exposed to out-
of-home advertising only.  EX075-0033 ("Combined with running in core markets of
frequent Snapchat users, memorable OOH exposure boosted Spectacles awareness and
generated interested purchase").  For that same "Aided Product Awareness" segment of
the study, in which participants were asked "Which of the following <u>wearable cameras</u>
have you heard of?" with "Snapchat Spectacles" as an answer choice, participants
exposed to digital and print media showed "[n]o significant movement" as compared to
the control group.  EX075-0018, -33.  These study results show that Snap's marketing
campaigns largely have been unsuccessful in increasing customer awareness of Snap's
Spectacles product, let alone creating the necessary consumer associations for secondary
meaning.

46.    Both Snap's internal study results and Dr. Anderson's surveys show that
Snap's advertising and other marketing efforts have not been effective in establishing
consumer association between "spectacles" and a single source.

### 7.    Other evidence

47.    As evidence of consumer association between Snap and "spectacles," Snap
relies on impression numbers, usage of the hashtag for Snap's Spectacles product, and
awards it has received.  *See*, *e.g.*, ECF 143 at 65-67.  This evidence does not sufficiently
show consumer association for purposes of secondary meaning.

48.    For example, Snap has not shown that impression numbers indicate how
many people have viewed the content.  Snap has neither shown whether those
impression numbers are significant by any relevant measure nor whether impressions
indicate effectiveness with respect to consumer association between "spectacles" and a
single source.

49.     With respect to hashtag usage and product awards, such evidence may reflect increased recognition of a particular product, but they do not necessarily reflect consumer association of "spectacles" with a single source.

50.     Mr. Chan's testimony that Snap's efforts, including in advertising, garnering media coverage, and increasing hashtag usage, drove consumer awareness and association is conclusory and not credible.  As a former employee, his statements have "little probative value regarding the assessment of consumer perception" because they "do not reflect the views of the purchasing public"; "[t]rademark law is skeptical of the ability of an associate of a trademark holder to transcend personal biases to give an impartial account of the value of the holder's mark." *Self-Realization Fellowship, 59 F.3d at 910*; *see also Filipino Yellow Pages, 198 F.3d at 1152* ("Evidence of secondary meaning from a partial source possesses very limited probative value.").

51.     Considering the evidence in its entirety, Snap has not met its burden in establishing that the term "spectacles" has acquired distinctiveness.  The evidence is insufficient to show that, in the minds of consumers, the primary significance of "spectacles" has become to identify Snap as a unique source of smart glasses.

52.     Any conclusion of law deemed to be a finding of fact is hereby incorporated into the findings of fact.


Dated: _____                          _____
                                            STEVE KIM
                                            United States Magistrate Judge

19